# EXHIBIT A

# FILED UNDER SEAL

# Exhibit B

Transcript of the Testimony of

# Nicole Bolton

**Date:** May 22, 2019

**Case:** Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

**Bushman Court Reporting**

Janess Ferguson Smith

Phone:  (501) 372-5115

Fax: (501) 378-0077

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____

CENTRAL FREIGHT LINES, INC. a
Texas Corporation

                Plaintiff,

VS.                    CASE NO. 2:17-CV-00814-JLR

AMAZON FULFILLMENT SERVICES, a
Delaware corporation, and DOES 1 through
25, inclusive,

                Defendant.

_____

ORAL DEPOSITION OF NICOLE BOLTON

May 22, 2019

_____

BUSHMAN COURT REPORTING
620 West Third, Suite 302
Little Rock, Arkansas  72201
501.372.5115

Page 2

1                   A P P E A R A N C E S

2


3    ON BEHALF OF THE PLAINTIFF:

4    MARC H. KALLISH, ESQ.
     Roetzel & Andress
5    30 N. LaSalle Street
     Suite 2800
6    Chicago, Illinois 60602

7


8


9    ON BEHALF OF THE DEFENDANT:

10   STEVEN W. BLOCK, ESQ.
     Foster Pepper PLLC
11   111 Third Avenue
     Suite 3000
12   Seattle, Washington  98101

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                          I N D E X

2    EXAMINATION

3         By Mr. Kallish  . . . . . . . . . . . .    5

4

5

6

7

8                        E X H I B I T S

9    Exhibit No. 1 (Expert Opinion Report) . . . .    80
     Exhibit No. 2 (Addendum to Expert Report) . .   189
10   Exhibit No. 3 (Bills of Lading) . . . . . . .   185
     Exhibit No. 4 (Examples). . . . . . . . . . .   198

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 4

1            ANSWERS AND DEPOSITION OF NICOLE BOLTON, a

2     witness produced at the request of the Plaintiff, was

3     taken in the above-styled and numbered cause on the

4     22nd day of May, 2019, before Janess Ferguson Smith,

5     Certified Court Reporter and Notary Public in and for

6     Saline County, Arkansas, at the Hilton Garden Inn

7     conference room, 322 Rock Street, Little Rock,

8     Arkansas, at 10:57 a.m.

9                * * * * * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                        NICOLE BOLTON,

2      the witness hereinbefore named, having first been

3      duly cautioned and sworn or affirmed to tell the

4      truth, the whole truth and nothing but the truth,

5      testified as follows:

6                        EXAMINATION

7      BY MR. KALLISH:

8      Q.    I'm an attorney that represents Central Freight

9      Lines in the lawsuit brought by Central Freight Lines

10     against Amazon Fulfillment Center Services or Amazon.

11            Today I'm going to refer to Amazon or

12     Amazon Fulfillment Center and Amazon as the same

13     company, so I will talk about Amazon to the extent

14     that we talk about Amazon or Amazon Fulfillment

15     Center Services; is that okay?  Do you understand

16     that?

17     A.    Yes.

18     Q.    Okay.  So it's my understanding that you are

19     here today as a retained expert by Amazon to give

20     expert opinions regarding the rate dispute between

21     Central Freight Lines and Amazon; is that correct?

22     A.    Yes.

23     Q.    Okay.  Have you ever given a deposition before?

24     A.    I have not.

25     Q.    Okay.  Then let me go over some of the rules

Page 6

1    for giving a deposition.  Obviously, you were sworn

2    under oath, so all of your answers are under oath

3    pursuant to the court guidelines.

4           You can see there is a court reporter

5    taking down everything that everyone says in this

6    room.  Therefore, it is important that all of your

7    answers be out loud and verbal, "Yes," "No," further

8    explanation as is needed.

9           It's hard for the court reporter to take

10   down "Uh-huh" or "Huh-uh," or if you shrug your

11   shoulders or nod your head, it could be

12   misinterpreted.  So if you could answer verbally,

13   that would be helpful.

14          Also, only one person can talk at a time,

15   so if you could wait until I finish my entire

16   question before you answer, that would be helpful, so

17   that the court reporter can get a clear question and

18   then an answer.

19          If people talk over each other, she will

20   probably miss some stuff, or it will be difficult to

21   get a clear record.  Is that understood?

22   A.    Yes.

23   Q.    Finally, if I ask you a question that you don't

24   understand, or that is unclear, or is vague, I would

25   ask that you ask me to rephrase it or provide you

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 7

1    with additional information.  If you answer the

2    question, I'm going to assume that you understand my

3    question.

4    A.     Yes, sir.

5    Q.     Okay.  All right.  And you were retained by

6    Amazon in this matter?

7    A.     That's correct.

8    Q.     When were you retained by Amazon?

9    A.     In the beginning of April of this year.

10   Q.     April of 2019?

11   A.     Uh-huh.

12   Q.     And who retained you?

13   A.     Mr. Block.

14   Q.     And how did Mr. Block come in contact with you?

15   A.     Through a conference for Transportation

16   Logistics Counsel.

17   Q.     And what conference was that at?

18   A.     I'm sorry?

19   Q.     You were at a conference with him, and that's

20   how he met you and got in contact with you?

21   A.     That is correct.

22   Q.     What was the conference?

23   A.     It was about transportation logistics and the

24   law.  It's their annual conference.  Is that the

25   question you're asking?

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 8

1  Q.     Yeah.  Where was it at?  Was it --

2  A.     Oh, Memphis, Tennessee.

3  Q.     And who was putting that on?

4  A.     Transportation Logistics' counsel.

5  Q.     And that was the first time that Mr. Block had

6  mentioned to you that he had an opportunity for you

7  to act as an expert witness in this particular case?

8  A.     That is correct.

9  Q.     Was that the first time you met Mr. Block?

10 A.     We -- yes, that is the first time we actually

11 formally met.  We may have been at the conference in

12 the previous years but was never introduced or

13 interacted.

14 Q.     Have you ever acted as an expert witness in any

15 litigation before?

16 A.     I have not.

17 Q.     Have you ever acted as an expert witness in any

18 capacity?  Not in litigation.  Have you ever been an

19 expert witness in any capacity?

20 A.     No, sir.

21 Q.     How are you being compensated for your work in

22 this matter?

23 A.     Two hundred dollars per hour.

24 Q.     And do you know how many hours you have worked

25 so far in this case?

Nicole Bolton 5/22/2019                                        Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 9

1    A.    Me, personally, or as a collective whole?

2    Q.    Are there other people working on this matter

3    other than you?

4    A.    I have a tech person.

5    Q.    Okay, yeah, collectively?

6    A.    Collectively about 200 hours total.

7    Q.    And who is the tech?

8    A.    James Sacrey.

9    Q.    Can you spell his name?

10   A.    J-a-m-e-s, S-a-c-r-e-y.

11   Q.    And does he work with you at your current

12   employer?

13   A.    He does.

14   Q.    Okay.  And what is his role in terms of the

15   consulting that you're providing for Mr. Block?

16   A.    He was the one that worked with CFL's IT to

17   make the spot quote application work.

18   Q.    Other than providing technical support for the

19   spot quote system that was provided by Central

20   Freight, is Mr. Sacrey involved at all in any of the

21   analysis or compiling data or running data on your

22   behalf for this matter?

23   A.    He pulled some codes behind the application, as

24   requested by me.

25   Q.    And by "the application," you're talking about

Nicole Bolton 5/22/2019 Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 10

1    the spot quote application?

2    A.    That is correct.

3    Q.    Anything else that he is involved, has

4    Mr. Sacrey been involved with in terms of your

5    consulting for Mr. Block?

6    A.    No, sir.

7    Q.    Okay.  The rate, the industry rates that you

8    had run in this matter, did Mr. Sacrey do that, or

9    did you do that yourself?

10   A.    I did that with the assistance of another truck

11   auditor that did some hand entry for me.

12   Q.    Okay.  Who is that other truck auditor?

13   A.    Kelly, K-e-l-l-y, Kirkpatrick, K-i-r-k,

14   Patrick, P-a-t-r-i-c-k, hyphen, Lee.

15   Q.    Okay.  And so she helped you run the rates of

16   the various industry carriers that you used to

17   compare against the Central Freight spot quotes?

18   A.    That is correct.  I gave her the raters to use,

19   and using the data we hand entered rates.

20   Q.    Okay.  So just so I understand, when you say

21   "hand entered rates," so what do you mean by that,

22   "hand entered rates"?

23   A.    So you have to use the other rating software

24   for these other carriers, and the rate that was

25   computed given the factors was then entered into the,

Nicole Bolton 5/22/2019                                      Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 11

1   a new column, so hand entered into a new column for

2   comparison.

3   Q.    So Kelly would take the data off of information

4   that was provided to you by Amazon that had factors

5   such as zip, and weight, et cetera, and then you

6   would hand enter that into the rating software

7   programs of the industry carriers, and then that

8   would spit out the price that they would have

9   charged; is that right?

10  A.    It does produce a price, but just to be clear,

11  we were not interested in the price as much as the

12  rate.

13  Q.    Okay.  So at this point I am just trying to

14  figure out what everybody did.  So Kelly was the

15  person that, you know, sat there and entered all of

16  the information so you could run the rate programs?

17  A.    Not all of it.  It was a combined effort, and I

18  also did a thorough check of what she had entered as

19  well.

20  Q.    Okay.  So she did some of it, and you did some

21  of it?

22  A.    That is correct.

23  Q.    Okay.  Anybody else work on this project with

24  you, other than Kelly and James?

25  A.    Summer Bartczak Zach, my CEO, S-u-m-m-e-r,

Nicole Bolton 5/22/2019                                        Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 12

1    B-a-r-t-c-z-a-k.  Again, she is our CEO.  She just

2    offered some restructuring and editing help on my

3    report, but nothing regarding my opinions, just

4    basically the structure of it, as well as Genie

5    Crooms, G-e-n-i-e, C-r-o-o-m-s.  She is our COO, and

6    she as well offered some editing.

7    Q.    All of these edits that were done internally,

8    do you still have those edited reports?

9    A.    I have several draft versions, that is correct.

10   Q.    Okay.  And you have those, so those are

11   available.  If we ask you to produce them, you can

12   produce those to us?

13   A.    Yes.

14   Q.    You didn't produce those to us in the materials

15   we asked for in terms of your file; is that right?

16   A.    That is correct.

17   Q.    Why didn't you include that in your file?

18   A.    It's my first time.  I didn't realize that that

19   would be necessary, but I do have those saved and

20   will be willing to send them.

21   Q.    Okay.  All right.  Then I would ask that you

22   turn those materials over to Mr. Block, and we will

23   make a formal request to Mr. Block that he produce

24   those draft reports?

25   A.    Yes, sir.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 13

1    Q.    Thank you.  Okay.  So we talked about everybody

2    that was involved in creating your report and doing

3    your consulting for Mr. Block; is that right?

4    A.    That's correct.

5    Q.    Anybody else?

6    A.    No, sir.

7    Q.    Okay.  And the total hours for all of those

8    people, including the CEO and the COO that edited

9    your reports, is that 200, approximately 200 hours?

10   A.    That is the collective, yes.

11   Q.    Okay.  And what is the total amount that you

12   have billed Mr. Block so far for this project?

13   A.    We have not estimated a bill at this point.

14   Q.    And why is that?

15   A.    Because we haven't completed everything --

16   Q.    Okay.

17   A.    -- in terms of the reports.

18   Q.    Okay.  When you say you haven't completed

19   everything in terms of the reports, do you anticipate

20   doing additional work on this matter for Mr. Block?

21   A.    I do.

22   Q.    Okay.  And what specifically do you intend to

23   do in terms of additional work on this matter?

24   A.    I plan to offer rebuttal to Mike Regin's

25   (phonetic), Michael Regin's expert witness report.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 14

1  Q.    Okay.  Anything else?  So you're going to offer

2  rebuttal to Michael Regin's report?  Do you intend to

3  do any more work that's related specifically to the

4  opinions that you have set forth in this case?

5           Do you understand what I'm asking you?  So

6  I'm just asking about your opinions.  Are your, are

7  your opinions completed and done, all of the work

8  regarding the involvement of your opinions?

9  A.    I can't honestly say yes at this point because

10 there could be more information provided along the

11 way that may require some more research, just

12 depending.

13 Q.    What type of information would you anticipate?

14 A.    Sorry, this is difficult to answer because I

15 have not done this before, and so I'm not a hundred

16 percent sure what to be expecting, but I believe that

17 Mr. Regin will be offering a rebuttal report, which

18 will require me to read that and compare to other

19 notes.

20 Q.    Oh, so what I want to know is the report that

21 you provided to Mr. Block and then was, obviously,

22 forwarded on to me as counsel for Amazon, I just want

23 to make sure that -- I want to understand that you

24 feel that you did a complete job on that report.  You

25 had everything you needed at the time you wrote the

Page 15

1   report, and that the report is complete and done.

2           There's not things, like, Oh, I wish I

3   would have had this, and then I would have changed

4   the opinion.

5           That's what I'm asking you.  The report

6   that you submitted is final and complete; is that

7   right?

8   A.    The opinions in my report will not be changed,

9   if that's what you're asking me.

10  Q.    Okay.  Because you had everything that you

11  needed at the time you wrote your report to complete

12  your report; right?

13  A.    As far as I'm aware.

14  Q.    Okay.  Great.  I just want to get a little bit

15  of information about your background.  What year did

16  you graduate high school?

17  A.    2003.

18  Q.    Okay.  And what is your highest level of

19  education?  I know there is some information in here

20  in your C.V., or in your experience, but I just

21  wanted to clarify that.  What is the highest level of

22  education?

23  A.    I have some college.  I'm about three classes

24  short of having a Bachelors of Arts of mathematics

25  with a minor in secondary education.

Page 16

1   Q.    Okay.  And what school is that at?

2   A.    University of Arkansas at Little Rock.

3   Q.    And are you actively enrolled in that

4   university, or you stopped, and you're just short of

5   a, of a -- you were just short of obtaining your

6   degree?

7   A.    I have stopped.  I am not actively enrolled;

8   however, it is a part of my strategic plan with my

9   CEO that I will complete it within the next two

10  years.

11  Q.    Okay.  And other the partial degree from the

12  University of Arkansas, any other post high school

13  education?

14  A.    I have taken classes through the Institute of

15  Logistical Management, specifically Transportation

16  Logistics and the Law, part one, as well as Motor

17  Carrier Operations.

18  Q.    Okay.  And how long are those -- are those

19  classroom programs, or what are those, when you say

20  that they are continuing legal education, can you

21  describe what they are?

22          Are they online classes?  Are they

23  classrooms where you go for a series of weeks, or are

24  they, like, a one-day seminar?

25  A.    Did you ask me continuing legal education?

Nicole Bolton 5/22/2019                          Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 17

1  Q.    Well, you had mentioned, you had mentioned that

2  you're involved in some additional education outside

3  of the University of Arkansas; is that right?

4  A.    That's correct.

5  Q.    So maybe I moved too quickly.  What were those

6  again?  What were the --

7  A.    Transportation Logistics and the Law, part one,

8  and Motor Carrier Operations.

9  Q.    Okay.  So I want to know where are these, are

10  these classes?  Are they seminars?  Are they online

11  courses?  What are these two titles you just provided

12  to me?

13  A.    They are online courses.

14  Q.    And who puts them out, or who puts them online?

15  A.    The Institute of Logistical Management.

16  Q.    And where is that located?

17  A.    I honestly don't remember where they are

18  physically located.

19  Q.    Okay.  So -- and how long are these online

20  courses?  Are they, like, you sit for them one time

21  and complete the course, or is it weekly, or how does

22  that work?

23  A.    It's a six month self-paced course.

24  Q.    Okay.  Is that the same for the motor carrier

25  operations?

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 18

1  A.    That is correct.

2  Q.    And when you say six month self-paced, can you

3  give me a little bit of idea of how that works?

4  A.    We receive a binder with the book or a copy of

5  a book, depending on the materials for the course.

6  There were numerous quizzes to be done for the

7  reading sections that you had in which you submitted

8  to the, the instructors for grading.

9        I believe there were at least seven or

10 eight for each course, which could also include

11 conversations.  There were a lot of questions and a

12 lot of learning, and then it was followed up at the

13 end with case studies, and then a final proctored

14 quiz.

15 Q.    When you say a "final proctored quiz," is that

16 done online, or do you have to actually go somewhere

17 for that?

18 A.    No, we have to have a proctor for that.

19 Q.    Okay.  So you go to a physical location and do

20 the test there?

21 A.    That is correct.

22 Q.    Okay.  And did you pass both of the exams on

23 the first try?

24 A.    With A's.

25 Q.    Okay, good.  The Transportation and the law,

Page 19

1   can you tell me a little bit about what the content

2   of that course was?

3   A.    It focused on a lot of the history of

4   regulation and deregulation in the motor carrier and

5   rail industry.

6   Q.    Did it have anything to do with rating

7   shipments in the LTL area?

8   A.    I honestly can't remember if that was a part of

9   that course.

10  Q.    What about the motor carrier operations, what

11  was that about?

12  A.    Everything from what you expected in a

13  terminal, how shipments would move.  I believe it did

14  details about understanding somewhat of how carriers

15  would rate shipments.

16  Q.    What specifically did it talk about how

17  carriers rate shipments?

18  A.    I can't provide you the specifics.

19  Q.    You don't recall?

20  A.    Not at this time.

21  Q.    Okay.  The title of that seminar or online

22  course was Motor Carrier Operations.  Did it focus on

23  any particular type of motor carrier, LTL, TL?  You

24  know what I'm talking about when I say "LTL"; right?

25  A.    Yes, sir.

Nicole Bolton 5/22/2019                                           Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 20

1    Q.    Less than total load; right?

2    A.    Less than truck load.

3    Q.    I'm sorry.  Less than truck load?

4    A.    Yes, sir.

5    Q.    Yeah.  And TL?

6    A.    Truck load, yes, sir.

7    Q.    Okay.  And what is your definition of LTL?

8    A.    LTL is moved on a 20 -- usually, okay.  Sorry.

9    LTL is not a Point A to Point B shipment style.  A

10   carrier has a city trailer that makes up, that makes

11   several pickups within a terminal area.

12           From there it is taken to the origin

13   terminal where it is sometimes inspected or not

14   inspected, but it's prepared for the long haul

15   portion of this move.

16           All of those shipments are placed on

17   trailers, moved together.  Commonly, it's 228

18   split-type trailers, and these trailers are then

19   moved to the destination terminal where they are

20   removed.  They may or may not be inspected.

21           Then they are placed again on city trailers

22   that move within a terminal area to make deliveries,

23   versus truck load where a shipment requires or uses

24   the entire trailer, whether it fills it or not

25   completely, it is the use of the trailer and usually

Page 21

1   moved most from Point A directly to Point B, so

2   origins and destination unless there are stop-offs

3   involved in this particular shipment.

4   Q.    Do you have any understanding of the finances

5   of an LTL shipment in terms of the capacity of the

6   truck?

7   A.    I'm sorry.  I don't understand your question.

8   Q.    Do you understand how LTL carriers make money

9   based upon selling the capacities of their trucks?

10  A.    Within a fine balance no, I don't know that

11  balance.

12  Q.    Okay.  So you don't have any understanding of

13  whether a shipper takes up more space in an LTL

14  truck, whether they are charged more money for that

15  type of a shipment versus a smaller shipment?

16              MR. BLOCK:  Object to form.

17  Q.    That's something that you're not aware of?

18  A.    I'm sorry?

19              MR. BLOCK:  I said, "Object to form."

20          You might hear me object from time to time,

21          but you will still answer the question.

22  A.    Okay.  So I do understand about pricing of

23  shipments in the aspect of, basically, the more

24  trailer space I take, the more expensive it's going

25  to be.

Page 22

1            I also understand that there are rules

2    implemented, such as capacity load and linear foot

3    charges, as well as cubic capacity and density

4    minimum charges that, basically, set a baseline

5    minimum of what a carrier would expect to bill or

6    accept for those shipments that are requiring more

7    space, if necessary or applicable.

8    Q.    Do you understand the difference financially

9    between an LTL move and a truck load move, why

10   there's a difference financially between those two

11   movements?

12            MR. BLOCK:  Object to form.

13   A.    There are certain aspects that I do understand.

14   With a truck load carrier it is an entire trailer

15   dedicated to a single shipment, and it does not have

16   the stops in between, as far as terminals for loading

17   and reloading, while LTL carriers move multiple

18   shipments within their trailers.

19   Q.    Okay.  Where did you learn about the difference

20   between an LTL carrier and a truck load carrier?

21   A.    Through my experience in my job.

22   Q.    Okay.  Have you ever worked for a carrier?

23   A.    No, I have never specifically worked for a

24   carrier.

25   Q.    And I assume you have never worked for an LTL

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 23

1   carrier; is that correct?

2   A.     That is correct.

3   Q.     Okay.  Let's go back to your background a

4   little bit.  So you graduated from high school in

5   2003; is that right?

6   A.     That's correct.

7   Q.     What did you do immediately after high school?

8   A.     I started college courses and working.

9   Q.     And those are the college courses at University

10  of Arkansas?

11  A.     I also took some at Arkansas State University

12  at Beebe.

13  Q.     Did you obtain a degree at that university?

14  A.     No, sir.

15  Q.     How long were you there?

16  A.     I just took a few classes that transferred to

17  UALR, along my work at UALR.

18  Q.     Okay.  So you were at the first college and

19  then moved, and then transferred to University of

20  Arkansas?

21  A.     I was at the University of Arkansas at Little

22  Rock, but there were some courses that I could take

23  at ASU Beebe that were transferable that worked

24  better with my working schedule and my commuting, and

25  so I took those courses and transferred them to UALR.

Page 24

1   Q.    Okay.  So were you doing them simultaneously?

2   A.    Yes.

3   Q.    Okay.  All right.  And so how long were you

4   actually taking college courses for?  What was the

5   time period?

6   A.    From 2003 to 2008.

7   Q.    Okay.  And then in 2008 you discontinued your

8   education, but you are going to go back to that?

9   A.    That's correct.

10  Q.    Okay.  You said you were working in 2003.  What

11  were you doing in 2003?

12  A.    I believe I was still at -- I'm trying to

13  remember.

14  Q.    So it wasn't like -- it wasn't in the truck --

15  I'm trying to find out when you got in to, what you

16  did before you got into the trucking industry.

17          So if you were working, you know, at a fast

18  food restaurant, or odd jobs, or, you know, the type

19  of jobs that people at college work, I mean, I'm just

20  trying to find out when you got into the

21  transportation business, and what you did in the

22  transportation business.

23  A.    In 2008 is when I started in the transportation

24  business.

25  Q.    Okay.  So from 2003 to 2008, you were basically

Page 25

1  a college student that was also working, I suppose,

2  to support yourself, put yourself through college,

3  but it wasn't the transportation industry; is that

4  right?

5  A.    That is correct.

6  Q.    Okay.  All right.  So let's talk about 2008.

7  A.    Okay.

8  Q.    So in 2008, you left college, and you started

9  working in the transportation industry?

10  A.    That's correct.

11  Q.    And who did you work for?

12  A.    American Truck and Rail Audits, Inc.

13  Q.    American Truck and Rail Audits, Inc, okay.  And

14  what was the position you were hired for there?

15  A.    Originally, I started out as data entry for

16  three months.

17  Q.    Uh-huh.

18  A.    And then moved to an auditor training role.

19  And then six months after that, I was moved into the

20  truck audit manager role.

21  Q.    Okay.  So you received -- first, when you first

22  started working for your -- this is your current

23  employer; right?

24  A.    That's correct.

25  Q.    When you first started working for your current

Page 26

1   employer, you were doing just data entry, and then

2   they moved you into an auditor training program, or

3   was it a role?  I mean, was it a program where they

4   were training you on the job?

5   A.    That's correct.  You received a five-year

6   certificate after five years of training under the

7   CEO and other people on your truck team.

8   Q.    Okay.  So why did you say for a six-month

9   training?  It seems like there was a five-year

10  training?

11  A.    I did not say six-month training.  I said I

12  moved to the management role after six months.

13  Q.    Okay.  So you --

14  A.    Still within truck audit training.  I had not

15  completed my certificate, but I did hold a leadership

16  title.

17  Q.    Okay.  Let me just get this straight.  So from

18  2008, you said it was a five-year program to 2013.

19  You were in a training program at your current

20  employer; is that right?

21  A.    That is correct.

22  Q.    Okay.  And then in 2013, you completed that

23  training program?

24  A.    That's correct.

25  Q.    Okay.  And you said that you also had a

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 27

1   management role, so was it like a management training

2   program?  Is that what you were -- was that like a

3   management training program?

4           So the idea was after you became certified,

5   then you would be in management in the company, or

6   were you simultaneously in management?  Did you

7   supervise people, et cetera, during the five-year

8   period?

9   A.    I did supervise people during that five-year

10  period.

11  Q.    Okay.  So explain to me exactly what you did

12  during the five-year period that you were in the

13  training program at your current employer.

14  A.    I led our truck audits team between being the

15  liaison for our team to our CEO.  I assisted in

16  account decisions with the CEO.

17  Q.    What else?

18  A.    There was a lot of administrative work, as far

19  as being the leader.

20  Q.    Okay.  When you say it was a five-year training

21  program, did you have -- in addition to on-the-job

22  training, did you have formal training?  Like were

23  there manuals?  Was there periodic testing, anything

24  like that?

25  A.    Not necessarily a structured program.  I did

Page 28

1    attend other classes, such as LTL 101 through SMC

2    Cubed, as a learning opportunity.

3            Also, took, again, the two classes.  The

4    transportation logistics and the law class was

5    required by our CEO as a part of our training.

6    Q.    So the certification that you received after

7    five years, who provides the certification?

8    A.    It's by our company.

9    Q.    So that's a company certification?

10   A.    That's correct.

11   Q.    It's not by any kind of a transportation board

12   or any transportation organization?

13   A.    There is not one, as far as my knowledge, that

14   exists to be able to do that.  It's a very unique

15   business.

16   Q.    Okay.  So your company provided the five-year

17   certification program and the actual certification;

18   is that right?

19   A.    Yes, sir.

20   Q.    And what do they, what do they say, that you

21   were, you were a certified auditor?

22   A.    Transportation cost auditor.

23   Q.    Certified transportation cost auditor.  Okay.

24   Let me just go back now.  So I just want to be clear.

25   So other than the certification that you received

Nicole Bolton 5/22/2019                                              Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 29

1    from your current employer, do you have any other

2    certifications in the transportation industry?

3    A.    I do not.

4    Q.    And during the five-year training program that

5    you were in where you became a certified auditor, did

6    you actually engage in audits of carrier billing

7    practices?

8    A.    Yes.

9    Q.    Okay.  How many during that time period?

10   A.    I cannot give you a number.

11   Q.    Was it hundreds or thousands?

12   A.    Thousands.

13   Q.    Thousands of audits?

14   A.    It depends on how you're defining audit.  Are

15   you talking about a single freight bill as an audit?

16   Are you talking --

17   Q.    No.  I'm talking about -- what I'm talking

18   about is a company comes to you and says, I think

19   that my carrier is overcharging me, and, therefore, I

20   would like you to audit their bills.

21         And then I assume they download or upload a

22   lot of data, or give you hard copies of their bills,

23   and this is, you know, hundreds or thousands,

24   depending on the size of the company, and you review

25   that and come to some conclusions as to whether those

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 30

1    bills were properly rated.  Is that what you consider

2    an audit?

3    A.    That is correct.

4    Q.    Okay.  And so in that circumstance over the

5    five years that you were in the training program, how

6    many audits were you involved in?

7    A.    So you're talking about a specific client that

8    -- I'm sorry.  I'm not quite understanding of what,

9    what factors this number is coming from.

10   Q.    Well, let me ask it more generally.  Why don't

11   you tell me exactly what you were doing for that

12   five-year training period, in terms of auditing.

13   A.    We have multiple clients that use multiple

14   different carriers and loads.  Again, my focus is on

15   motor carriers.

16          I worked both pre-audit and post-audit,

17   auditing for these clients across all of their

18   carriers, and audits are ongoing.  It's not just a,

19   Here's all of my data.  Do my audit.  It continues

20   over time.

21          So we receive data on a routine basis,

22   depending on how they would like it set up.  And so I

23   established relationships with clients and carriers

24   as I performed audits.

25   Q.    Okay.  Let's back up a little bit.  So can you

Page 31

1   give the names of some of the carriers or clients

2   that you do work for?

3                    MR. BLOCK:  Does the company hold that

4              confidential?

5                    THE WITNESS:  We do as far as clients.

6              I'm not allowed to name those.

7   BY MR. KALLISH:

8   Q.   So you can't tell me any companies who you have

9   done an audit for while you have been employed by

10  your current employer; you can't give me that

11  information?

12  A.   I can tell you one, as they are a reference on

13  my curriculum vitae, and they agreed to that, but

14  beyond that we have confidentiality clauses with our

15  clients.

16  Q.   Okay.  What is the one that you can tell me?

17  A.   Helena Agri Enterprises.

18  Q.   Okay.  What is it, Helena?

19  A.   Helena, H-e-l-e-n-a, Agri, dash, Enterprises.

20  Q.   What kind of company is that?

21  A.   They do ag chemicals, seed, fertilizer.

22  Q.   What kind of shipping do they utilize?

23  A.   LTL and truck load, and some brokerage, a

24  tanker.

25  Q.   How much shipping do they do per year?

Nicole Bolton 5/22/2019                                        Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 32

1   A.    That, I couldn't tell you.

2   Q.    And so you have done audits for Helena Agri

3   company?

4   A.    I have done audits as well as contract

5   negotiations for this specific client.

6   Q.    Okay.  Tell me about the audits that you have

7   done for this client.  What do these consist of?

8   A.    As in the process we use or?

9   Q.    Yeah.  Tell me -- well, tell me, first, the

10  process that you use, and then tell me what your role

11  was in that process.

12  A.    So for this specific client, they code their

13  invoices with their accounting code.  They mail them

14  to our company.

15          We previously hand entered those.  Now, we

16  are using OCR technology for data entry on those.

17  Then those bills are handed to auditors.

18          For many years I was the sole auditor for

19  that account.  I went through each individual invoice

20  and rated it according to its contractual agreement.

21          If it was correct, I would approve the bill

22  for payment for the carrier, and if it was incorrect,

23  if there were overcharges, I would make corrections

24  and instruct the client on the correct amount in

25  which to pay, and then a file was sent routinely to

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 33

1   Helena Agri Enterprises to pay their freight bills to

2   the carriers.

3   Q.    So you would actually read the contract between

4   Helena Agri and the carrier --

5   A.    That is correct.

6   Q.    -- and determine what the pricing mechanism was

7   agreed upon?

8   A.    Correct.

9   Q.    And then you would actually sit and look at

10  each invoice that the carrier shipped product for

11  Helena Agri and determine whether they properly rated

12  that shipment; is that right?

13  A.    That is correct.

14  Q.    And when you would do that, would you look at

15  the entire set of invoices, or would you do a subset,

16  and then -- would you look at the whole amount of

17  invoices between the parties, or would you create a

18  subset?

19  A.    They were put into what we called batches for

20  processing just to move the processing smoothly.

21  Invoices come in on a daily basis and have to be

22  processed in a specific way.  So saying to look at

23  all of them at the same time, I'm not, I'm not sure

24  what you're asking.

25  Q.    So this is where I am going, as the carrier

Page 34

1    issued invoices, you were looking at them in real

2    time?  The invoices were issued.  They were sent over

3    to you to look at them.  You saw if there was an

4    overcharge, and then you authorized payment?

5    A.    That is correct.

6    Q.    Okay.  So these weren't invoices that were

7    already paid.  These were invoices to be paid?

8    A.    That is correct.  This is specifically a

9    pre-audit account, is the only one that we still

10   continue with.  Our focus is mainly post-audit.

11   Q.    Okay.  But you can't tell me about any of the

12   clients that you do post-audits on; right?

13   A.    That's correct.

14   Q.    So that is a pre-audit client, but you have

15   multiple other post-audit clients?

16   A.    That's correct.

17   Q.    Okay.  And so as a pre-audit client, but you

18   have multiple other post-audit clients?

19   A.    That is correct.

20   Q.    Okay.  And so when you do post audit, how do

21   you do that?

22   A.    When we receive the data or the bills that are

23   to be reviewed, we have or will collect pricing, the

24   contracts with pricing tariffs.

25           We have access to carrier tariffs online,

Nicole Bolton 5/22/2019                                              Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 35

1    as those are made public.  We will obtain the rating

2    software that is needed to rate the invoices.

3              We will obtain bills of lading and any

4    other supplemental documents that we need, as in

5    delivery receipts, inspection reports, weight

6    certificates, letters of authorization for

7    reconsignment, if there are ever any emails that were

8    about the shipment, any of this information, and it

9    could span to many different things, as you can

10   imagine.

11             Collectively pulling all of that together,

12   we review everything on the freight bill, everything

13   from the freight charges to class, the discounts, the

14   accessorials, anything that needs to be checked, as

15   it should be derived from the bill of lading

16   information, and not backwards, not freight bill to

17   bill of lading.

18             Once we check all of that, if it is good,

19   then we move on, and then we continue our audit

20   through the bills that we have.  And if there is an

21   overcharge claim, then we will file a claim on behalf

22   of the shipper with the carrier.

23   Q.    Okay.  Can we just go back?  Can you give me a

24   list of all of the documents that you look at in a

25   post-audit situation?  You mentioned a bunch of them.

Page 36

1    A.    I did.  So the bill of lading.

2    Q.    Okay.  What else?

3    A.    Delivery receipt.

4    Q.    Okay.

5    A.    Inspection certificate.

6    Q.    Okay.

7    A.    Weight certificate.  Letter of authority for

8    reconsignment.

9    Q.    Okay.  What else?

10   A.    There could be emails.

11   Q.    What else?

12   A.    There could be inspection photos.

13   Q.    What else?

14   A.    Again, carrier rules, tariffs, any pricing

15   tariffs or contracts.

16   Q.    Okay.  Anything else?

17   A.    These are the ones that we deal with, for the

18   most part.  There could be other documents available.

19   I can't specifically think of any at this moment, but

20   could be.

21   Q.    Okay.  And then in a post-audit, after you

22   review all of those documents, then what do you do?

23   A.    As I said, we audit the freight bills as per

24   all of this and what is applicable, if it's good.

25   Then we move on.

Nicole Bolton 5/22/2019                                     Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 37

1        If it is billed incorrectly, and there are

2   overcharges to be claimed, we file that on behalf of

3   our client.

4   Q.    How do you determine if it's billed correctly?

5   A.    If it is in alignment with the pricing and the

6   bill of lading and any other documents that are

7   applicable to the shipment.

8   Q.    Do you actually physically re-rate the shipment

9   based upon the information that is provided on all of

10  the collection of documents that you just told me?

11  A.    Yes.

12  Q.    So you look at all of the collection of all of

13  the documents, the delivery receipt, and the weight

14  information, and the bill of lading, and all of that,

15  and then you actually re-rate the shipment and

16  compare that to what the carrier billed?

17  A.    That is correct.

18  Q.    Is that how you do an audit?

19  A.    Yes, sir.

20  Q.    Is that how you do all of your audits?

21  A.    Yes, sir.

22  Q.    Okay.  So that's the standard, standard way at

23  your current employer that you perform a post audit;

24  is that right?

25  A.    That is correct.

Page 38

1  Q.    Okay.  What you did in this case, was that a

2  post-audit?

3  A.    I was not asked to perform a post-audit, so I

4  did not perform one.

5  Q.    So you didn't audit the Central Freight

6  invoices and billing information the same way that

7  you normally do a post-audit; is that right?

8  A.    I would not be able to necessarily do that.

9  There were charges provided from, in the data as to

10  what was billed, and so that was, that data was

11  available, as well as we ran the CzarLite rate.  The

12  Czar 2011 rate, as per the contract.  We did not do a

13  post-audit necessarily.

14  Q.    Okay.

15  A.    That's not what was asked of us.  It was a

16  comparison between what was billed versus an industry

17  rate.

18  Q.    Okay.  So I just want to be clear that when you

19  normally audit carriers for the client that you work

20  for, you perform a post audit in the manner in which

21  you just described to me, but what you did for

22  Central Freight was not a post audit; is that right?

23  A.    This is a full post-audit process.  Now, there

24  can be a comparison to determine overcharges if I

25  know what should have been billed and what was

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 39

1   billed.

2   Q.    No, I'm asking you a very simple question.

3   A.    I'm --

4   Q.    You described to me what is a post-audit that

5   you perform at your place of business?

6   A.    That's correct.

7   Q.    On a normal basis; correct?

8   A.    That's correct.

9   Q.    All right.  So I just want to be sure what you

10  performed for Central Freight was not a post-audit.

11  A.    That's correct.

12  Q.    It was something else?

13  A.    It was an analysis of rates.

14  Q.    Okay.  How many -- how frequently do you do

15  exactly what you did to analyze the Central Freight

16  billing?  Have you done that in your career at your

17  current job?

18  A.    I have never been asked to do that.  It is

19  similar to what we do as, again, we are comparing

20  rates.

21  Q.    Okay.  So I want to be clear about a couple of

22  things.  So the process that you engaged with Central

23  Freight to analyze their billing is a process that

24  you had never done before in your years at your

25  current employer and in your transportation

Page 40

1    experience; is that right?

2    A.    It is not this exact process, no.  It was not a

3    post-audit, and that was not what I was asked to

4    perform.

5    Q.    Okay.  What were you asked to do?

6    A.    To make a comparison to what industry rates,

7    expectations would be.  I was asked to analyze the

8    spot quote application, and I was asked about some

9    practices within the motor carrier industry.

10   Q.    Okay.  So doing the comparison to industry

11   rates, you have never done that before in your

12   experience.  This is the first time you have engaged

13   in that procedure; is that right?

14   A.    Yes, sir.

15   Q.    Okay.  How did you come up with the methodology

16   in order to do the comparison to industry rates that

17   you used?

18   A.    So we used the JOC, dot, com, top 25 LTL

19   carrier list.  We chose carriers within that top

20   rating list as industry leaders.

21        We chose at least two carriers specifically

22   that operate in a very similar market area as Central

23   Freight as well, to make sure that we give notice to

24   that market area.

25        And as a collective, instead of using one

Page 41

1   as a standard, we used a collection of LTL industry

2   leader carrier rates using their rating software,

3   with the same information, the information as

4   provided in the data for the shipments and compared

5   the weight rates, not necessarily the dollar amounts,

6   because the issue becomes being net neutral.

7          We are working in net charges and not gross

8   charges.  So because we are working in net charges,

9   we had to do a simple calculation on top of that.

10         Once we determined the average carat weight

11  for what we would call an industry standard among

12  industry leaders, we multiplied that out to determine

13  a net value, because the spot quote amount used was a

14  net charge, not a gross charge, there could be a net

15  charge determined using CzarLite 2011 rates, compared

16  to an industry net charge.

17  Q.   Okay.  I want to back up a little bit.  So I'm

18  not asking you how you, what specifically you did

19  yet.  I want to know how did you develop the

20  methodology?

21         How did you determine that the way that you

22  analyzed the Central Freight billing information was

23  a proper way to analyze it?  Who came up with the

24  methodology?

25  A.   I did.

Page 42

1   Q.    You did?

2   A.    Yes, sir.

3   Q.    Okay.  And is that methodology set forth in,

4   say, an audit manual or some type of industry

5   standard for auditing or anything of that nature?

6   A.     There is no such thing that exists.

7   Q.    Okay.  So you just made it up; is that right?

8   A.    I mean, the methodology, the step-by-step

9   approaches that I took, that's correct.

10  Q.    Okay.

11  A.    I did not make up rates.

12  Q.    No.  No, I'm not suggesting you made up rates.

13  I am saying you made up the methodology.  You came up

14  with a way that you wanted to analyze the Central

15  Freight invoices; right?

16  A.    It wasn't necessarily what I wanted to do.  I

17  took industry leaders, which is the expectation of

18  the industry, and used them for comparison.

19  Q.    Right.  But what I'm trying to understand is

20  the process that you used.  You already testified

21  that it was not a process that you had ever used

22  before in your experience in the audit, trucking

23  auditing business; is that right?

24  A.    That's correct.

25  Q.    Okay.  So I'm trying to understand where you

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 43

1    came up with the formula or the methodology or the

2    manner in which to compare rates.  Where did that

3    come from?  Just you thought it through, and that's

4    the way you thought was a best way to do it?

5    A.    If you are looking for an industry comparison

6    using industry leaders, as well as those in a similar

7    market, would logically lead you to a rate that would

8    be considered an industry average.

9    Q.    Okay.  Who told you that what was necessary in

10   this case was an industry comparison?

11   A.    I was just asked if compared what the industry

12   rates comparatively would be.

13   Q.    Okay.  If you wanted to, you could have done

14   the full blown post-audit like you normally do with

15   your audit clients, right, to come up with whether

16   Central Freight's rates were proper or not?

17   A.    I could be asked to do a post-audit, that is

18   correct.  Within the timeframe that I had, you could

19   not complete a full post-audit.

20   Q.    Right, but I'm saying that you could have done

21   what you do for most of your clients that you get

22   paid for in the normal course.

23         You could have reviewed all of the

24   documentation on the shipping, and you could have

25   rated each one of those shipments and compared it to

Page 44

1  the Central Freight price; is that right?

2  A.    I could.

3  Q.    But you didn't do that?

4  A.    No, sir.

5  Q.    You chose to do this alternative methodology;

6  is that right?

7  A.    That is correct.

8  Q.    Okay.  And, now, did your CEO and your COO, did

9  they help you develop this methodology, or was this

10  all on your own?

11  A.    This is myself.  My CEO does not have much of a

12  background in the industry.  My COO, her background

13  is rail.

14  Q.    Okay.  So this is all you?

15  A.    Yes, sir.

16  Q.    Okay.  Did Mr. Block help you develop this

17  industry standard?

18  A.    No, sir.

19  Q.    He didn't tell you what to do?

20  A.    No, sir.

21  Q.    No, okay.  So let me just understand.  So when

22  you were giving this project, what was your

23  understanding of what you were supposed to do?

24  A.    Determine if this, these shipments were moved,

25  what would the industry expectation be, as far as

Page 45

1   charges, and provide that information and, again, the

2   practices, a few practices within the industry, and

3   the, reviewing the software application.

4   Q.    Okay.  And just so -- and at no point you

5   didn't just, like, pull out a couple of random

6   shipments here and just re-rate them just for, just

7   to see if you re-rated them how they would come out.

8   You didn't do that; right?

9   A.    I did.  As far as using the Czar 2011 rater, I

10  did.  I cannot with the volumes of spot quote rider,

11  because CFL has informed us that they don't have the

12  historical version used at that time.

13  Q.    Okay.  Going back to the CzarLite rating of the

14  shipments, did you ever look at an audit that was

15  prepared by Central Freight that ran all of the

16  shipments through the CzarLite and came up with a

17  total amount that would have been owed if they had

18  used the contract rates that were in the

19  Transportation Agreement, not the spot quote?

20  A.    I'm sorry.  That was a really long question.

21  Can you ask me again?  I'm so sorry.

22  Q.    It probably was not a good question.  In your

23  report you came to the conclusion that the spot

24  quotes that were performed by Central Freight, or the

25  spot quotes that were submitted by Central Freight

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 46

1    were 98 percent higher than the CzarLite contractual

2    rates.  Was that one of your findings?

3    A.    I would have to review my report, as far as the

4    specific number, but I did find that they were

5    overbilled.

6    Q.    Okay.  In any event, you did a comparison of

7    the spot quote rates that Central Freight billed

8    versus the contractual CzarLite amount; is that

9    right?

10   A.    There were two columns in the data that was

11   provided to me.  One was the net charges for the

12   spot, the volume rate that was applied and billed,

13   the invoice amount I believe was what the problem

14   was, and then the net amount for the 2011 rate.

15   Q.    Okay.  Who calculated the net amount for the

16   2011 rates?

17   A.    It was in the data provided to me.

18   Q.    So Mr. Block provided you with a spreadsheet,

19   and one column had what he said were the, the

20   CzarLite rates for each shipment, and the other one

21   was, the other column was what he said were the spot

22   quote rates from Central Freight?

23              MR. BLOCK:  Object to form.

24   A.    I don't know that he said that.  That was the

25   data that was provided to me.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 47

1    Q.    Okay.  I'm just trying to understand where that

2    data came from.  Is that from the tip system, the

3    Amazon tip system; do you know?

4    A.    I believe it was titled with TIPS.

5    Q.    Okay.  So you didn't pull that data.  That data

6    was provided to you by Amazon's lawyers; right?

7    A.    That is correct.

8    Q.    So you have no way to verify whether that data

9    was correct or incorrect; right?

10   A.    I ran a 2011 raters and did check some of those

11   with the contract, the 2011 rater with the discount,

12   and checked some of those in that column.

13   Q.    So you spot checked some of the information

14   that Mr. Block provided to you?

15   A.    I'm not even sure that it came -- it did not

16   come from Mr. Block specifically.  I don't know if --

17   Q.    I'm trying to understand.  I mean, obviously

18   you had to get some data to do your work here.  Where

19   did that data come from?

20   A.    It was provided, I believe, by Kelsey in a

21   box.com transfer.

22   Q.    Okay.  Who is Kelsey?

23   A.    The paralegal.  Correct?

24                  MR. BLOCK:  Yes.

25   A.    Yes.

Page 48

1    Q.    At Mr. Block's office?

2    A.    Yes, sir.

3    Q.    So the data came from Mr. Block's office;

4    correct?

5    A.    Correct.

6    Q.    Okay.  Again, in your folder where it contains

7    the information that you, you know, your file folder,

8    I didn't see any transmission from Mr. Block's office

9    to you with that data.  Do you recall that being in

10   your folder?

11   A.    I'm sorry.  I must have misunderstood.  I

12   provided all paper documents.  If I need to provide

13   all emails, I can.  Again, that was in a box.com.

14   Q.    Yeah.  So, you know, when we asked for your

15   full file, we anticipated that you would give us all

16   communications, transmissions with Mr. Block's

17   office, all of the data you received from Mr. Block's

18   office, all of your working papers, all of your

19   audits that you performed, all of the spreadsheets

20   that you utilized, anything that you used to develop

21   your opinions.

22          So it's very clear, and we will mark it as

23   an exhibit, but it's very clear that we didn't

24   receive any of that information from you.

25          So I would ask that you do provide that

Page 49

1    information to Mr. Block, and I will make a formal

2    request to Mr. Block that he supplement your

3    response.

4              I also reserve the right to re-depose you

5    at a later time if there is any information in there

6    that would be relevant to your deposition, but I

7    still want to understand what information you have.

8              So the data that you analyzed came from

9    Mr. Block's law firm in two columns on an Excel

10   spreadsheet; is that right?

11   A.    It wasn't an Excel spreadsheet.  There were

12   more than two columns within the data.

13   Q.    Okay.  There were multiple columns?

14   A.    Yes, sir.

15   Q.    What were the multiple columns?

16   A.    I cannot list all of those for you.  I can list

17   some of the relevant ones that I can recall at this

18   time, but I cannot list them.

19   Q.    Okay. Do you know how Mr. Block created that

20   Excel spreadsheet or that data?

21              MR. BLOCK:  Object to form.

22   A.    I do not know if he created it, received it, or

23   any of that.

24   Q.    In your report, there is a reference to the

25   TIPS system.  Did you ever have access to the Amazon

Page 50

1   TIPS system in order to pull information to analyze

2   for this case?

3   A.   If you are talking about a reference to the

4   name of the file received, I do not know the TIPS

5   system.  I did not have access to it.  I have not

6   used it.

7   Q.   Okay.  So you referenced the TIPS systems in

8   your report, but you didn't pull data from the TIPS

9   system?

10  A.   The name of file may have included TIPS, but I

11  did not use the system.

12  Q.   Okay.  Do you know what the TIPS system is?

13  A.   I am not aware of what a TIPS systems is.

14  Q.   Okay.

15  A.   Can I go to the restroom?

16  Q.   Sure.

17                MR. KALLISH:  Let's take a break.

18                (Five-minute break.)

19  BY MR. KALLISH:

20  Q.   So back on the record.  So Mr. Block mentioned

21  that there may be a -- you may have a medical issue

22  or something in terms of needing to eat or something

23  like that.

24                We talked about going until, like, 12:30

25  and taking a half hour break.  Is that okay with you?

Page 51

1    Or if not, if you need to eat now, or something, we

2    can eat now.

3              I don't want you to feel ill or, you know,

4    not be able to continue with the deposition, and we

5    certainly don't want to hurt you.  So you just tell

6    me what you need, and I will accommodate you.

7    A.    I appreciate that.  I'm good at this time.

8    Q.    Okay, all right.  So if something changes or,

9    you know, let me know.

10   A.    Yes, sir.  Thank you.

11   Q.    Okay.  All right, thanks.  Okay.  So we were

12   talking about the TIPS system, and you mentioned that

13   you didn't pull any data out of the TIPS system.  All

14   of the data that you analyzed was provided by

15   Mr. Block's office in a, in an Excel spreadsheet?

16   A.    That's correct.

17   Q.    Okay.  Were you able to pull data off of that

18   and then run that data through your systems?

19   A.    So we moved the data into an access database so

20   that I could query and use a form to enter the

21   figures that I needed to.  We don't necessarily have

22   any systems that we run it through.

23   Q.    Okay.  All right.  Did you ever ask -- strike

24   that.  You didn't look at the weight and research and

25   inspection reports for the shipments that are at

Page 52

1    issue in this case; did you?

2    A.    No, sir.

3    Q.    Okay.  You didn't look at the bills of lading

4    for the shipments that are at issue in this case; did

5    you?

6    A.    No, sir.

7    Q.    Did you ever ask Mr. Block if those documents

8    were available?

9    A.    I asked if they were available, and I was

10   provided a file.  It mainly contained delivery

11   receipts.

12   Q.    Okay.  So you asked if the weighing and

13   research inspection reports were available, and

14   Mr. Block told you they weren't available, or he just

15   sent you something else?

16   A.    I'm not sure that I even requested those.  I

17   did ask for bills of lading.  I do recall those.

18   Q.    Did you ever review any bills of lading?

19   A.    I did not.

20   Q.    They weren't provided to you by Mr. Block?

21   A.    Again, there was a file sent to me that was a

22   massive PDF file, and I'm not sure where that came

23   from, but, again, it mainly contained delivery

24   receipts.

25   Q.    Okay.  And what is on a delivery receipt?

Nicole Bolton 5/22/2019                                        Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 53

1   A.    It can have a multitude of information, and it

2   identifies the shipment, the origin destination.

3   Sometimes they pertain notes to billing, the

4   signature for receipt, how many pieces were received.

5   Most of the time it notates a weight.

6            Again, some of the notes from delivery

7   receipts that I have seen range almost directly to

8   what the freight bill provides.

9   Q.    Okay.  The delivery receipt doesn't have the

10  density calculations on it; does it?

11  A.    There are some carriers that provide that, yes.

12  Q.    The stuff that you looked at, did it have the

13  density calculations on it?

14  A.    I did not review any of those, no.

15  Q.    Did you review any data regarding the height or

16  length of the shipments that were involved that you

17  reviewed?

18  A.    I did not.

19  Q.    Okay.  Do you think that would be helpful

20  information to your analysis, if you knew the height

21  and the length of the shipments that you were looking

22  at?

23  A.    I do not find that it's pertinent information,

24  based on the fact that in my expert opinion that the

25  contract rating applies, which would not require me

Page 54

1  to necessarily know any of that information.

2  Q.    When you say "the contract rating applies,"

3  what do you mean by that?

4  A.    Czar 2011 rates.

5  Q.    So your expert opinion is that Central Freight

6  should not have spot quoted these shipments?

7  A.    That is correct.

8  Q.    Okay.  And what is the basis of that opinion?

9  A.    Because the contract does not allow for any

10  charges, as far as lineal foot or capacity loads.

11  Czar 2011 rates with discount and contract fuel,

12  there is a density minimum charge, which would not be

13  necessary in this case, however, they are LTL

14  shipments.

15  Q.    Okay.  Did you review any of the depositions of

16  the people that were involved with the negotiation of

17  the transportation contract in this case?

18  A.    I reviewed no depositions.

19  Q.    Okay.  So you didn't review any of the

20  depositions of the people at Central Freight who did

21  the spot quoting; is that right?

22  A.    I did not review any depositions.

23  Q.    And you didn't review the depositions of the

24  rating personnel or the pricing people at Central

25  Freight, you didn't look at any of that?

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 55

1    A.    I did not review any depositions.

2    Q.    You reviewed no depositions?

3    A.    That is correct.

4    Q.    Okay.  Did you ask Mr. Block to review

5    depositions in this case?

6    A.    No, sir.

7    Q.    Do you think that's pertinent to your analysis?

8    A.    Again, my opinion is based on the contract, and

9    my expert opinion, therefore, is the contract

10   applies.

11   Q.    Okay.  But you don't, you don't have any

12   knowledge whether the contract was modified, whether

13   there was a side agreement between Amazon and Central

14   Freight, or anything that took place after the date

15   that they signed that contract?

16   A.    I reviewed some emails that were part of

17   discovery, I believe, or whatever the term would be,

18   correct, and I reviewed those emails, as well as I

19   did find the email and the addendum that was offered

20   to add the eight foot stipulation into the contract,

21   and I reviewed where it was never signed.

22   Q.    Okay.  The eight foot -- what did you say?

23   What do you mean --

24   A.    I'm sorry.  Not foot, eight pallet.

25   Q.    Okay.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 56

1   A.    I'm not sure what you guys are all referring it

2   to as directly, as the eight pallet.

3   Q.    Are you providing an opinion that the addendum

4   that addressed the eight pallet issue is invalid; is

5   that an opinion you're offering in this case?

6   A.    That is my opinion, yes.

7   Q.    And what is that based on?

8   A.    It is not signed.  It is not in the contract.

9   The contract stands.  That is my opinion.

10  Q.    Okay.  And you think that the testimony of

11  Amazon employees in terms of whether or not they

12  entered into an agreement with Central Freight are

13  irrelevant?

14               MR. BLOCK:  Object to form.

15  A.    Can you ask the question again?  I'm sorry.

16  Q.    So in your expert analysis of whether that

17  addendum modified the contract, you don't believe

18  it's pertinent, the testimony of Amazon employees as

19  to what they did or did not contract with Central

20  Freight?

21  A.    My review is of the documents.

22  Q.    Okay.  Is it your opinion that that document

23  can never be modified, even if Amazon and Central

24  Freight agreed to modify it?

25  A.    Ask me again.  I'm sorry.

Page 57

1        MR. KALLISH:  Can you read it back to

2           her?

3        THE WITNESS:  I'm sorry.

4     (The court reporter read back pending question.)

5  A.    Agree how to modify it?  I mean, it's a very

6  vague question.  I'm sorry.

7  Q.    Well, it's not really vague.

8  A.    I'm trying to --

9  Q.    Let's say that s transportation manager at

10 Amazon agreed to allow Central Freight to spot quote

11 eight pallet plus shipments, and Central Freight

12 agreed to spot quote eight pallet plus shipments,

13 would your opinion change then as to whether the

14 contract stands or whether it was not modified?

15        MR. BLOCK:  Object to form.

16 A.    It would not change my opinion.

17 Q.    And why not?

18 A.    Because, again, it comes down to the documents.

19 Q.    So just so I understand, your opinion is that

20 in the transportation industry when there is a

21 contract, whatever is said in the contract is the,

22 the end all be all, and it's never modified, changed,

23 or, or the parties deviate from that in any way; that

24 is your opinion?

25        MR. BLOCK:  Object to form.

Nicole Bolton 5/22/2019                                          Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 58

1   A.    That is not what I said.  It can be modified.

2   Q.    Okay.  So how do you know this, this contract

3   wasn't modified?

4   A.    The only document that I reviewed, as in

5   modifying this contract, would be the addendum.  I

6   did review emails.

7         I'm not quite sure of the whole history of

8   those, because it was bits and pieces, but that there

9   was the fact that there was an addendum, and the

10  addendum was not signed.

11  Q.    Okay.  So you reviewed bits and pieces of

12  emails.  Who provided you those emails?

13  A.    It was -- there were a few in Regin's report,

14  Michael Regin's report.  I did receive some from

15  Mr. Block's office.

16  Q.    Okay.  And in -- when you produced your file,

17  again, you didn't produce the emails that you

18  reviewed in order to form your opinions in this case;

19  is that right?

20  A.    Yes, sir.  I apologize.  I did not provide the

21  electronic versions of anything.

22  Q.    Okay.

23  A.    And I will be happy to do so immediately.

24  Q.    Okay.  How many emails did Mr. Block provide

25  you?

Page 59

1   A.    I don't have a number for you.  I'm sorry.

2   Q.    Thousands?

3   A.    No, sir.

4   Q.    Hundreds?

5   A.    No, sir.

6   Q.    Do you know how many emails have been exchanged

7   amongst the parties in this case?

8   A.    No, sir.

9   Q.    Do you know how many email conversations have

10  been marked as deposition exhibits in this case?

11  A.    No, sir.

12  Q.    Do you think that's, the communication between

13  the parties, other than what Mr. Block handpicked or

14  cherry picked for you, you don't think that's

15  relevant to your opinion?

16              MR. BLOCK:  Object to form.

17  A.    I would like to state that they were not cherry

18  picked.  There were a few that they sent on the front

19  end, and there were plenty that I requested and have

20  seen along the way that were not, again, directly

21  provided from his office but, again, in the Regin

22  report as provided for his witness testimony.

23          I do believe that there is some information

24  within these emails, but does it, again, change my

25  opinion, no.  My opinion is based on the contract.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 60

1   Q.    Okay.  And, again, can you give me a number of

2   how many emails you looked at?  Is it less than ten?

3   A.    If I'm guessing, and this is a complete guess,

4   maybe 20.

5   Q.    Okay.  When you perform a post-audit, do you

6   look at the communications between your client and

7   the carrier regarding agreements that they made

8   during the relationship?

9   A.    I have.  Usually there's not a lot of email

10  traffic once a contract is created, unless there is a

11  specific issue.

12  Q.    And your ability to determine whether or not

13  there was a valid contract, is that based upon you

14  taking the course on transportation and the law; is

15  that how you based that opinion on?

16  A.    It's from my work in the industry.

17  Q.    Okay.  Not based upon the course where you took

18  a course on transportation and the law?

19  A.    No, sir.

20  Q.    Okay.  Did that, did that course talk about

21  contracts between carriers and shippers?

22  A.    I believe that it did talk about some

23  contracts.

24  Q.    Did that course say that if it's not in the

25  contract, and there can never be a modification, and

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 61

```
 1   the carriers are held to the boilerplate of the

 2   contract.

 3   A.    I'm sorry?

 4   Q.    Was that something that you learned in your

 5   class?

 6   A.    That a contract can never be modified?

 7   Q.    Yeah.

 8   A.    No, sir.  And I'm not saying that that's my

 9   opinion, that it cannot be modified.  It can.

10   Q.    Okay.  Under what circumstances can a

11   transportation contract be modified?

12               MR. BLOCK:  Object to form.

13   A.    Addendum, appendix.

14   Q.    Oral modification?

15               MR. BLOCK:  Object to form.

16   A.    I do not know the laws regarding that.

17   Q.    How about a course in conduct, can that modify

18   a contract?

19               MR. BLOCK:  Object to form.

20   A.    I'm sorry.  I don't understand your question.

21   Q.    Do you know what a course of conduct is?

22   A.    No, sir.

23   Q.    If a shipper asks a carrier to do something and

24   they do something over and over and over again, and

25   the career knows about it, and the carrier pays for
```

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 62

1    those services, and it goes on for years and years

2    and years, and the carriers -- strike that.  Let me

3    ask another question.

4              So you're not familiar with the term

5    "course of conduct"?

6    A.    No, sir.

7    Q.    Okay.  Could a transportation contract be

8    modified if a shipper asks a carrier to do something

9    over and over and over again, and the carrier does

10   what the shipper asks it to do, and the shipper pays

11   the carrier, could that act as modification of the

12   contract?

13              MR. BLOCK:  Object to the form.

14   A.    In my opinion, no.

15   Q.    Okay.  What is the basis of that opinion?

16   A.    Simply, two wrongs don't make a right.

17   Q.    Okay.

18   A.    I'm sorry.  Just because a shipper may pay a

19   carrier, it is not indicative of an agreement of

20   rates or how they were billed, thus the post-audit

21   claims industry exists.

22   Q.    Okay.  How many conversations did you have with

23   Mr. Block leading up to the drafting of your report?

24   A.    Conversations before the report?

25   Q.    Yes.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 63

1   A.    I didn't document all of the times that we

2   spoke, but there were a few times about the

3   information that they were seeking and basically what

4   my role would be, and continued conversation about

5   receiving documents and the rating software.

6   Q.    Okay.  So how many times did you talk to him?

7   A.    It would be an absolute guess.

8   Q.    Okay.

9   A.    Five or six times.

10  Q.    Okay.  And for how long did you talk with him?

11  A.    Usually no longer than 20 or 30 minutes.

12  Q.    Okay.  Did you talk with anyone else in his

13  office?

14  A.    I have talked to Chris Rogers.

15  Q.    How many times did you talk to him?

16  A.    We have corresponded by email several times.

17  Q.    And you have copies of those emails?

18  A.    Yes, sir, and I will be happy to provide them.

19  Q.    Okay.  Other than Mr. Block and Mr. Rogers, did

20  you talk to anyone else at Foster Pepper about this

21  case?

22  A.    I know that Kelsey was on a phone call or two

23  and had helped provide information.

24  Q.    Why did you review the other unsigned addendums

25  that are referenced in your report?

Page 64

1    A.    Why did I review them?

2    Q.    Yeah.

3    A.    They were just submitted in the contract file,

4    and I opened it up and read it.

5    Q.    Did you find it odd that there were so many

6    unsigned addendums in this matter?

7                 MR. BLOCK:  Object to form.

8    A.    You know, that's a difficult question to

9    answer, because there can be lots of versions that go

10   back and forth before an agreement is reached to any

11   additions to a contract.  You know, over years

12   there's going to be a lot of documents and

13   conversations.

14   Q.    Do you know a gentleman by the name of

15   Christian Pillar (phonetic)?

16   A.    I have seen the name on some emails, but other

17   than that, no.

18   Q.    Okay.  Are you aware that Christian Pillar

19   testified at his deposition that it is the policy of

20   Amazon not to countersign any affidavit that is

21   drafted by a carrier, although they will often comply

22   with those terms but not execute the addendum?

23                 MR. BLOCK:  Object to form.

24   A.    I have not heard this, and I don't offer an

25   opinion.

Page 65

1    Q.    Would that have been relevant to your

2    assessment of these addendums that you looked at?

3    A.    No, sir.

4    Q.    Would that be relevant to your assessment of

5    whether there was a modification of the contract.

6    A.    No.

7    Q.    Do you think that's irrelevant?

8    A.    I do.

9    Q.    Is that a normal practice in the transportation

10   industry, to have a shipper that has a policy where

11   they won't countersign written addendums unless they

12   draft them, but they often honor them?

13                    MR. BLOCK:  Object to form.

14   A.    I'm not privy to that with most of my clients.

15   Q.    Okay.  That's not relevant to your opinions,

16   though, in this case?

17   A.    That's correct.

18   Q.    Anything that Christian Pillar said concerning

19   the relationship between him and Central Freight

20   that's not relevant to your analysis, in terms of

21   whether there was a contract modification?

22   A.    No, sir.

23   Q.    Do you know who Joseph Crenager (phonetic) is?

24   A.    I'm sorry.  Who?

25   Q.    Joseph Crenager.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 66

1    A.    No, sir.

2    Q.    Okay.  You don't even know who he is; right?

3    A.    No, sir.

4    Q.    Okay.  In your report you referenced that you

5    reviewed the Complaint in this matter.  Are you aware

6    that there was an Amended Complaint that was filed in

7    this case?

8    A.    I did after I had rendered my opinion or

9    report.

10   Q.    Okay.  So when you rendered your opinion, you

11   never reviewed the Amended Complaint, right, just the

12   initial Complaint?

13   A.    I did review the Amended Complaint.

14   Q.    After you rendered your report?

15   A.    Yes.

16   Q.    So did that change anything in your report?

17   A.    No, sir.

18   Q.    Okay.  Who provided you with the Complaint to

19   review?

20   A.    I actually found the Complaint online.

21   Q.    And you did your own researching and found the

22   Complaint?

23   A.    Yes, sir.

24   Q.    But you missed the Amended Complaint?

25   A.    I was not aware that one existed, and I, again,

Page 67

1   don't understand all of the processes, so I was not

2   aware that there would be one.  However, it was

3   provided to me, and I have reviewed it at a later

4   time.

5   Q.    Okay.  The Complaint that you reviewed was the

6   redacted version that was online?  Do you know what

7   "redacted" means?

8   A.    That some of it was...

9   Q.    Blocked out?

10  A.    Blocked out.

11  Q.    Yeah.

12  A.    There was no blocking in this version.

13  Q.    And of the original Complaint, there was no

14  blocking?

15  A.    Not that I recall.

16  Q.    Okay.  What about in the Amended Complaint?

17  A.    No, sir.

18  Q.    Have you signed a confidentiality agreement to

19  review documents that are marked "attorney's eyes

20  only" or "confidential" in this case?

21  A.    Yes, sir.

22  Q.    Okay.  Can you produce a copy of that as well?

23  A.    Yes, sir.

24  Q.    Okay.  In your report you talk a lot about

25  carrier tariffs; is that right?

Page 68

1    A.    That's correct.

2    Q.    What is a carrier tariff?

3    A.    So it's their rules tariffs, which is provided

4    by the carrier.  It is basically their standard

5    practices and charges.

6    Q.    Okay.  In what circumstances does a carriers

7    tariff apply?

8    A.    It is understood to be applied as that as their

9    common practices and charges, unless there are

10   exceptions provided.

11   Q.    Okay.  If there is a contract between a carrier

12   and a shipper, and that contract specifically

13   identifies specific tariffs that apply, does that

14   exclude all other tariffs?

15             MR. BLOCK:  Object to form.

16   A.    I'm sorry.  Could you ask the question again?

17   I'm so sorry.

18             MR. KALLISH:  Could you read it back?

19      (Court reporter read back pending question.)

20             MR. BLOCK:  Object to form.  Go ahead.

21   A.    If it is applicable, and it is not waived.

22   Now, if it is not applicable to begin with, then it

23   does not apply.

24   Q.    If it's not applicable, then it doesn't apply.

25   But in a situation where you have a contract that

Nicole Bolton 5/22/2019                                            Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 69

1   specifically identifies the governing documents, and

2   those governing documents do not reference the

3   carrier's tariff, does the carrier's tariff have any

4   relevance to the, to the relationship of the parties?

5                    MR. BLOCK:  Object to form.

6   A.    It may not be applicable with that specific

7   shipper; however, it represents the carrier's

8   standard practices and prices, and, therefore, may

9   not be applicable but representative of the carrier.

10  Q.    So when analyzing a contract between the

11  parties where the contract specifically states what

12  other governing tariffs and the carrier's tariff is

13  not one of those, one of those documents, then would

14  you say it has no application?

15                   MR. BLOCK:  Object to form.

16  A.    Again, it isn't being applied; however, it's

17  representative of the carrier and their practices.

18  Q.    Okay.  If you were going to do an industry

19  comparison of Central Freight's rates, spot quote

20  rates versus an industry -- strike that.

21             When you did your industry analysis, you

22  rated the shipment that Central Freight had spot

23  quoted using industry leaders' rating systems; is

24  that right?

25  A.    That's correct.

Nicole Bolton 5/22/2019                                           Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 70

1   Q.    Did you apply those industry leaders' tariffs

2   when you used their rating system?

3   A.    In what, what form?

4   Q.    In any form did you consider the industry

5   leaders' tariffs when you calculated the rate that

6   went into your industry average for shipments that

7   Central Freight spot quoted?

8   A.    No.  I used the rate from the rating software.

9   Q.    Okay.  And would the rating software take into

10  account the carrier's tariffs?

11  A.    They do not.

12  Q.    They do not.  So if a carrier, one of the

13  industry leader carriers that you compared to Central

14  Freight had a linear foot rule, would that linear

15  foot rule have been applied when you ran the ratings

16  in order to create the comparison?

17              MR. BLOCK:  Object to form.

18  A.    It would not, and I didn't find that relevant

19  because, in my opinion, because we -- it has been

20  stated that these are boilerplate agreements that

21  Amazon uses with their carriers, then most likely all

22  other carriers would be on the same type of contract,

23  and that contract would, again, not include linear

24  foot or capacity load charges, and, I believe, again,

25  that these are LTL shipments.

Page 71

1   Q.    Okay.  But you would agree that when Central

2   Freight spot quoted the shipments at issue, they were

3   spot quoting them because they wanted to get more

4   money than they would get under the contract, because

5   they believed these were volume shipments; correct?

6                 MR. BLOCK:  Object to form.

7   A.    I don't know what they were thinking.

8   Q.    Okay.  You would agree that their spot quote

9   generates higher fees than the contractual rate;

10  right?

11  A.    From my analysis, that's the opinion I

12  rendered.

13  Q.    Okay.  And that at least it was Central

14  Freight's position that the reason why they were spot

15  quoting it, as opposed to going under the standard

16  contract rates, was because they needed to get more

17  revenue, because these were larger shipments or

18  volume shipments; right?

19                 MR. BLOCK:  Object to form.

20  A.    I'm sorry.  I do not know what their course of

21  action or reasoning was.  I was not necessarily

22  provided with all of that detail.

23  Q.    Okay.  When you ran the industry leaders, and

24  you created what the rates they were charged, there

25  was no accommodation at all in those rates for the

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 72

1  fact that these were large volume shipments; is that

2  right?

3  A.    I would not have applied that because, again,

4  not applicable, in my opinion.

5  Q.    Okay.  Based upon the size of the shipments,

6  would it have triggered any of the leading industry

7  carrier's linear foot rule?

8              MR. BLOCK:  Object to form.

9  A.    I would have to review each of their carrier

10  rules tariff effective at time.

11  Q.    So you didn't do that for your analysis?

12  A.    No.

13  Q.    You just ran a regular rate with no

14  consideration whatsoever as to the size of these

15  shipments, and spit out whatever the carrier's rate

16  calculator spit out; is that right?

17  A.    That is correct, because the volume of these

18  shipments did not need to be relevant at this point.

19  Again, leading back to the boilerplate agreement,

20  they were not subject to these rules, these linear

21  foot rules.

22              MR. BLOCK:  When you get to a good

23          stopping point, we can take a break.

24  BY MR. KALLISH:

25  Q.    So, again, I just want to be very clear what

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 73

1    you did here.  You took a number of leading LTL

2    carriers' rate software, and you ran what through

3    that process?

4    A.    The class and weight that was billed.

5    Q.    Class?

6    A.    Weight.

7    Q.    Weight?

8    A.    Weight, origin, destination.

9    Q.    Anything else?

10   A.    That's what's required in the software.

11   Q.    You didn't put in any dimensions of the

12   freight?

13   A.    No.

14   Q.    You didn't put any pallet counts in the

15   freight?

16   A.    No.

17   Q.    That's all you put in is those four characters?

18   A.    That is correct.

19   Q.    And that's what created a rate; is that right?

20   A.    That is correct.

21   Q.    And then you took that rate and averaged it

22   with how many other carriers' rates?

23   A.    There were between four and six examples.

24   Q.    Okay.  Who were the example -- first of all,

25   why did you average those rates?

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 74

1    A.    Because we wouldn't want to give one carrier

2    the rule on the industry.  If these were the leading

3    carriers, we wanted to average these to get a

4    collective of what was expected in the industry, and,

5    again giving relevance to those that also perform in

6    the specific market only.

7    Q.    When you perform an average, there can be some

8    really low carrier rates and some really high carrier

9    rates; is that right?

10   A.    Sure.

11   Q.    And when you average them together, it

12   diminishes the low end and the high end; right?  It

13   gets averaged all together; right?

14   A.    It could if there was a large difference.

15   Q.    Okay.  Why, why did you have to create an

16   average?  First of all, why didn't you use a median?

17   Do you know what a median is?

18   A.    Yes, sir.

19   Q.    What is a median?

20   A.    It is -- how do you explain it?  Not the

21   average, but -- how do you explain it?  I'm sorry.

22   Q.    You don't know what a median is?

23   A.    I have used a median.  I'm sorry.  I can't

24   define it.

25   Q.    Right now?

Page 75

1   A.     Yes, sir.

2   Q.     Okay.  You didn't consider using a median when

3   you were doing your analysis in this case; right?

4   A.     Right.

5   Q.     Why do you think that an average is the right

6   way to do this?

7   A.     Because it took into consideration, you know,

8   it could be -- it could go either way.  All of my --

9   you know, I could have two carriers with extremely

10  high averages, and it pulled the rate higher.

11          I could have with lower, I could have on

12  either side, but it's the collective of the industry

13  leaders.

14  Q.     So it's possible that in the six industry

15  leaders that you looked at, two of them could have

16  every time been more expensive than Central Freight's

17  spot quotes, but when you averaged them with the

18  lower ones, that brought the entire average of the

19  whole group to be less than Central Freight;  is that

20  correct?

21  A.     I'm sorry.  Ask that question again.

22                MR. KALLISH:  Can you read it back?

23      (Court reporter read back pending question.)

24  A.     If -- is it possible, sure.  Is it what

25  happened in this instance, we would have to go back

Nicole Bolton 5/22/2019                                          Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 76

1   to the data and review to confirm.

2   Q.    Okay.  So you don't know if that's the

3   situation that I just described, if that occurred in

4   this instance; is that right?

5   A.    I would have to go back to the data and review.

6   Q.    Okay.  So you have the data.  So you have all

7   of the, all of the rate runs that you did for each of

8   the industry leaders, and I can look at those and see

9   if they were higher or lower than the Central Freight

10  shipments; right?

11  A.    Yes, sir, that is correct.

12  Q.    Okay.  And you have that for six carriers.

13  That's what you used to create the industry standard?

14  A.    Four to six.

15  Q.    What does that mean, four to six?

16  A.    There are some carriers that it was outside of

17  their operation, so if they did not operate in that

18  area, there were some that we could not pull

19  historical rates for.

20  Q.    So I'm not understanding, how did you come up

21  with your analysis if that, if you had those issues?

22  A.    Because each line was individually averaged.

23  Q.    Okay.  What are the names of the carriers' rate

24  systems that you used?

25  A.    It's listed in my report.  I can't remember

Page 77

1  them specifically.  I can give you some that I
2  remember.  FedEx Freight, Oak Harbor Freight Lines,
3  USF, which is representative of USF Holland and USF
4  Reddaway.
5  Q.    Uh-huh.
6  A.    UPS Freight, XPO Logistics, formerly known as
7  Con-way Freight.
8  Q.    Okay.  What else?
9  A.    I reviewed a lot of carrier stuff for this.
10 Q.    Okay.  I will show you your report.  It's not a
11 memory test.  I just wanted to try to get those down.
12 So at least for those -- let me finish those this
13 way.
14        At least for those carriers that you just
15 named, so you would have a file where for FedEx
16 Freight you took every one of the spot quotes subject
17 to the, the whittling down that you described in your
18 report, so the subset.
19 A.    Right.
20 Q.    You took each one of the subsets.  You ran it
21 through the FedEx Freight software, and for each spot
22 quote, you have a price that FedEx Freight would have
23 charged to move the same shipment; is that right?
24 A.    I do not have the price.  I have the rate.
25 Q.    What does that -- what is the difference

Page 78

1   between the rate and the price?

2   A.    So the rate is the carat weight for the

3   hundredth rate multiplier used.  It's the weight that

4   is determined that is multiplied by the weight.  You

5   know, it's produced from the class, origin,

6   destination.

7            It is multiplied by the weight to give you

8   a gross value.  Again, because we weren't working in

9   gross values, we used the rates, the carat weight

10  rate.

11  Q.    So you didn't look at what FedEx Freight would

12  ultimately charge a customer to ship the rate versus

13  what Central Freight charged to ship the rate?

14  A.    That would -- it couldn't be an

15  apples-to-apples comparison because we are not

16  working in gross charges, and there is not a standard

17  industry discount.  So therefore you couldn't produce

18  an apples-to-apples comparison.

19  Q.    So you didn't look at the price that Central

20  Freight actually charged Amazon to compare at what

21  the rating systems would have charged Amazon if they

22  did the movement?

23  A.    I'm sorry.  Ask that --

24            MR. KALLISH:  Can you read that back?

25            THE WITNESS:  I'm so sorry.

Page 79

1        (Court reporter read back pending question.)

2   A.    We did look at the net value because that is

3   what is provided by the spot quote system.  There was

4   a comparison of 2011 net rates.

5            That is post discount prior fuel or

6   accessorials or any of those charges added, and we

7   were able to use the carat weight rate to produce a

8   comparable net charge.

9   Q.    Why not use gross charges?

10  A.    Because, again, gross charge was not available

11  per the quote system in what we were able to analyze.

12  So if we can't have gross of one, we can't compare

13  gross of others.

14  Q.    Where was the gross amount not available?

15  A.    I'm sorry?

16  Q.    Where was the gross amount not available?

17  A.    For the spot quote volume rate.

18            MR. BLOCK:  We have got to take a

19        break, Marc.

20            MR. KALLISH:  All right.  Let me ask

21        this one question.

22  BY MR. KALLISH:

23  Q.    So the spot quote ultimately has an invoice

24  number of what they billed Amazon for the shipment;

25  isn't that the gross amount?

Nicole Bolton 5/22/2019                                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 80

1    A.    No, sir.

2    Q.    What is it, then?

3    A.    The net value, and there was a net value

4    pre-fuel surcharge and accessorial imposed.  It was a

5    net value.  There was no gross value.  There was no

6    carat weight offered, as per this spot quote system.

7    Q.    Okay.

8                   MR. KALLISH:  All right, break.

9              (Forty-two minute lunch break.)

10   BY MR. KALLISH:

11   Q.    Back on the record.  All right.  Ms. Bolton,

12   I'm going to mark as deposition Exhibit 1 copies of

13   your report.  It's two pieces.  It's your initial

14   report and your supplemental report.

15              (Exhibit No. 1 was marked.)

16   BY MR. KALLISH:

17   Q.    So I'm showing you what has been marked as

18   deposition Exhibit 1.  Again, it is a two-part

19   document that contains your report.  Is that true and

20   correct?

21   A.    Yes.

22   Q.    Okay.  And this is the report that you prepared

23   analyzing the Central Freight billing that is the

24   subject of this dispute; correct?

25   A.    Yes, sir.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 81

1   Q.    In terms of actually writing this report, were

2   you the one that actually typed it up, so you're the

3   one that actually wrote the report?

4   A.    Yes, sir.

5   Q.    Okay.  Just subject to some other people kind

6   of looking it over and editing it; is that correct?

7   A.    That's correct.

8   Q.    I just want to rip through it kind of quickly.

9   Oh, you know what, before we get to that, I just want

10  to follow up on what we were talking about before.

11          So you told me that when you created the

12  industry average in order to compare to the Central

13  Freight spot quote billing amounts that the numbers

14  that you used were net amounts or gross amounts?

15  A.    From what I used from the rater or the overall

16  comparison -- I'm sorry.  Ask it again.  I'm sorry.

17  Q.    So, well, let's -- the information that you

18  were provided regarding the Central Freight spot

19  quote, what is your understanding of what that was

20  compiled of or consisted of?

21  A.    There was a net amount from the freight volume

22  quote system, a net amount for the CzarLite 2011

23  rating for the contract.

24          There were also no gross amounts provided,

25  but a difference between net pre fuel surcharge and

Page 82

1  accessorial imposed, fuel surcharge and accessorial.

2  Q.    Okay.  So the number that you were giving

3  regarding the Central Freight spot quote, did that

4  number contain the Amazon fuel surcharge amount?

5  A.    No, sir.  It was -- there were two different

6  versions, one pre fuel and accessorial, and one post

7  the application.

8  Q.    So on the spreadsheet that you were provided

9  from Mr. Block's office, there were two columns that

10  related to the spot quote.  One was the spot quote

11  without the fuels surcharge included and without any

12  accessorials?

13  A.    Yes.

14  Q.    And then there was another number, and that

15  number included the fuel surcharge and the

16  accessorials?

17  A.    Yes.

18  Q.    Okay.  So which number did you compare to your

19  industry average for each of those, the one with the

20  fuel charge, or the one without the fuel charge?

21  A.    Without.

22  Q.    Without the fuel charge.  Okay.  And then when

23  you ran the, the rates of the industry leaders, when

24  you ran the shipments through those systems, what

25  number came out that you used to compare?

Page 83

1   A.    I used the carat weight.

2   Q.    Okay.  Explain to me what that is.  I'm not

3   sure I'm following that.

4   A.    Okay.  I'm a better with pictures, but I know

5   that doesn't help you; does it?  Okay.  So when you

6   input the necessary information for the rating

7   software, it consists of you have to give it an

8   origin and destination, a weight, and a class.

9        It can involve a discount or a minimum

10  charge, but those were not used here, and it's not

11  required to produce the rate.

12       What it produces is based on your lane, so

13  your origin and your destination.  It creates a scale

14  in the background, and the scale is based on, it goes

15  increasingly with class, and then it moves with the

16  weight increase.  So you have a scale that's created.

17       And these are rates that are provided.  And

18  depending on where it meets for your weight break in

19  your class, it provides a carat weight, which is a

20  hundred weight rate.

21       That is multiplied by the weight of your

22  shipment to determine gross charges.  So it's a rate.

23  It's not a monetary value.

24  Q.    Okay.  And then ultimately, though, that gives

25  you the price that they would have hypothetically

Page 84

1    charged?

2    A.    Not a gross.  The gross is not what is charged.

3    The net is what is charged.

4    Q.    Okay.  But after you, after it creates a carat

5    weight, and you multiply that times the weight of the

6    shipment, what comes out then?

7    A.    The gross charge.

8    Q.    Okay.  And then what -- so, then, what do you

9    have to add to that in order to compare it to the

10   spot quote?

11   A.    I did not use the gross charges to compare it

12   to the spot quote, because I did not have gross

13   charges of the spot quote.

14   Q.    So tell me what you compared.

15   A.    So the carat weight rate that can be produced

16   by all of these raters, including the Czar 2011

17   rater, because, again, I have to produce a net value

18   to be comparative to the net value as provided by the

19   quoting software.

20           So once the average industry carat weight

21   rate was determined, then it was compared different

22   of the increase over the Czar 2011 rate.  Okay?

23   Q.    Okay.

24   A.    I just want to make sure.  And then that was

25   multiplied into a number value as an increase of the

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 85

1    2011 amount.  So, therefore, you have net charges, so

2    you can have an apples-to-apples comparison.

3    Q.    So, then, that a number that came out of that,

4    you compared that to the spot quote?

5    A.    That is correct.

6    Q.    Okay.  When you put in the origin, destination,

7    weight and class into the industry rating mechanisms,

8    did you compare that amount that came out from that

9    system to the Amazon contract rate under CzarLite?

10   A.    I'm sorry.  You're going to have to ask that

11   question again.  I'm not sure.

12   Q.    Did you ever compare any of the industry, any

13   of the industry leaders' rates to the Amazon CzarLite

14   contract rate that Central Freight was subject to?

15   A.    You are asking the carat weight rate for my

16   industry leaders to my CzarLite 2011 carat weight

17   rate?

18   Q.    Yes.

19   A.    Yes.  There was a comparison, because we

20   determined the percent difference between the two.

21   Q.    Okay.  So what was the percent difference

22   between the two?

23   A.    I mean, it would be different for all of the

24   different moves.

25   Q.    When you compared -- did you ever take your

Page 86

1    average of your industry leaders average and compare

2    that to a straight CzarLite calculation of the

3    shipments using CzarLite 2000 and the contractual

4    discount?

5    A.    Okay.  I'm sorry.  There's a lot in that

6    question.  Can you ask that again?  I'm so sorry.

7    Q.    Okay.  What I want to know is -- let me back

8    up, because I may not even understand how you came up

9    with this industry standard.

10            It's my understanding you looked at six,

11   four to six industry LTL carriers.  You then took the

12   origin, destination, weight, and class information

13   that was available for all of the spot quote

14   movements.

15            You fed those through the rate software of

16   each of those industry carriers, and somehow you came

17   up with a price that they would have charged for the

18   same movements that Central Freight charge under

19   their spot quote; is that correct?

20   A.    I believe I follow you correctly on that.

21   Q.    Is that what you did?

22   A.    That's a lot of steps, so can I regurgitate

23   that back to you?  Is that okay?

24   Q.    Okay.  Let's try it again.

25   A.    I'm sorry.  There's a lot.

Page 87

1  Q.    Why don't you walk me through step by step

2  everything you did in order to come up with the

3  industry standard number?

4  A.    Okay.  Sure.  So using what was used to bill

5  and determine the spot quote, which would be the

6  origin, destination, weight, and class, we put those

7  into the rating software, determined the carat weight

8  rates for those leading LTL carriers, found an

9  average, compared the average increase over the Czar

10 2011 rate increase, and then from there were able to

11 produce a net neutralized amount that would give us a

12 comparison of net, versus net, versus net.

13            So it would be the spot quote rater net,

14 versus the Czar 2011, CzarLite 2011 net, and then the

15 industry average net.

16 Q.    Why do you, why do you compare when you put the

17 origin, destination, weight class into the industry

18 rates offer, why do you then compare that to the

19 CzarLite rate?

20 A.    Because, again, we have to produce a net

21 number, and because there's not an industry discount

22 that is applicable here.  There's not an industry

23 discount.

24            It's, it's produced from negotiations;

25 however, there was a discount already applied to the

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 88

1    2011 net.  There's not necessarily a discount from

2    the Czar 2011 net, and so, therefore, we had to

3    produce a net charge.

4    Q.    Okay.  So I think maybe I'm understanding it

5    now.  So when you just ran origin, destination,

6    weight, and class through an industry rate software,

7    it spits out a rate, but that rate doesn't have the

8    discount like the, which was provided to Amazon,

9    because the large amount of work that carriers were

10   doing for Amazon.  So it didn't have a discount that

11   the contract had off of the CzarLite rate; is that

12   right?

13   A.    There was not a discount applied to, right, the

14   rate that was produced by the rating software.

15   Q.    So you had to apply some discount to bring the

16   numbers down that were coming out of the industry

17   leaders rate software.

18           You had to reduce that amount, because it

19   didn't have the discount that was built into the

20   contractual rates; is that right?

21   A.    It was a gross amount, which is not inclusive

22   of a discount, and so that's why there was the

23   percent change from the Czar 2011 carat weight rate

24   to the industry carat weight rate, because it would

25   move basically at the same rate, given if they were

Page 89

1    to get an applicable discount, again producing net

2    charges, which is after the discount, which is what

3    was provided in the spot quote, the CzarLite 2011,

4    and then in the industry.

5    Q.    So in the industry, in the industry rating

6    system, they don't use CzarLite as the basis to get

7    their base rate?

8    A.    It depends.  Carriers are, have their own

9    proprietary software that they produce that is

10   available to the public and on their websites.

11          Now, CzarLite is a very common rater in the

12   industry because, again, it began with the rate

13   bureau, and so it's more balanced, I would say, among

14   the country.

15          And so a lot of carriers do, not carriers,

16   excuse me, shippers negotiate, and shippers and

17   carriers will use the CzarLite whatever year version

18   they would like, but carriers themselves do also have

19   their own proprietary software.

20   Q.    So let me ask you this.  When you plug in the

21   origin, destination, weight, and class into the

22   industry rating system, does that create a base rate?

23   A.    Could you please define what you mean by "base

24   rate."

25   Q.    Well, for instance, in the Amazon contract with

Nicole Bolton 5/22/2019                                           Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 90

1    Central Freight, there was a -- you plugged in

2    origin, destination, weight class, et cetera, into

3    the CzarLite system, and it creates a base rate.

4            And then each carrier that worked for

5    Amazon would then subtract their contractual discount

6    and then apply a fuel surcharge, Amazon fuel

7    surcharge.  That's how they got the rate?

8    A.    Correct.  I understand that.

9    Q.    Okay.

10   A.    By "base rate," you mean the carat weight rate?

11   Q.    Is that synonymous?

12   A.    Yes, sir.

13   Q.    Okay.

14   A.    Yes, sir.

15   Q.    Okay.  So let me ask you this then.  In your

16   analysis, why didn't you just take the industry

17   rating system, plug in the origin, destination, and

18   weight class, and then take the discount that Central

19   Freight was using under the CzarLite calculation and

20   discount it off of that?

21   A.    Because that wouldn't be an apples-to-apples

22   comparison necessarily.  My 80 percent discount, or

23   whatever your discount may be applied to Czar 2011,

24   CzarLite 2011 base rates will not equate to the same

25   discount in the industry.

Page 91

1          A lot of times the older the rater version

2     you use, and depending on all of the negotiation

3     factors, it's going to produce somewhat of a lesser

4     discount, because the rates haven't been subject to

5     over the years the general rate increase percent

6     average about 4.9 to 5.9 increase a year.

7     Q.     So if you did it the way that I said, took your

8     rating information and put origin, destination,

9     weight and class and created a base rate, and then

10    took the contractual discount under the CFL Amazon

11    contract, would that number be less than the industry

12    average that you came up with for a specific

13    movement?

14    A.     If I added an 80 percent discount?

15    Q.     Yes.

16    A.     To the industry raters that I was using --

17    Q.     Yes.

18    A.     -- would it be what?  I'm sorry?

19    Q.     Would it be less than what your industry

20    average came out to be?

21    A.     Honestly, I would have to do that

22    calculation --

23    Q.     Okay.

24    A.     -- to be able to confirm either way.

25    Q.     So I don't understand why you didn't do it that

Nicole Bolton 5/22/2019                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 92

1   way.  Why, why do you take a base rate and then apply
2   some other discount, not the contractual discount, if
3   you're going to compare it?
4   A.   Because it goes back, again, to we are working
5   in net values, and I'm not just comparing CzarLite
6   2011 rate versus the industry rate.  You have the
7   third factor of the spot quote application net rate.
8           So, again, I have to work in net rates,
9   sorry, net rates, and so I have to give a net rate.
10  And it moves at the same difference as a Czar 2011
11  rater discount.
12          Again, these rates are different than those
13  rates.  The 80 percent discount doesn't necessary --
14  it would not be acceptable in the industry that 80
15  applies to this, 80 applies to that.  It wouldn't be
16  a correct comparison.
17  Q.   Okay.  And then the information that you put
18  into each one of the industry standard carrier's
19  rating systems, you made no accommodation for volume
20  of shipment or the dimensions of the shipment;
21  correct?
22  A.   I did not.  I did not find it applicable.  I
23  was using LTL ratings.
24  Q.   Okay.  And you did not provide any additional
25  charge for the size of the shipment or account for

Page 93

1    the size of the shipment whatsoever?

2    A.    No, sir.

3    Q.    And you did not apply any of the carriers

4    linear foot rules; is that correct?

5    A.    That is correct.

6    Q.    If you were to apply a carrier's linear foot

7    rule and then run the rate software, do you think

8    that the carrier's pricing would be higher or lower

9    than Central Freight spot quote?

10                MR. BLOCK:  Object to form.

11   A.    I could not answer that in any form.  I would

12   have to go back to every single carrier's rule

13   tariffs, determine what their rules are for linear

14   feet, which is usually a per mile rater, so I

15   wouldn't even use a rating software at that point,

16   and the applications are different.  It would have to

17   all be thoroughly done in order to say at all other

18   ways.

19   Q.    Do you think that's a valid way to analyze

20   whether Central Freight's spot quotes were

21   reasonable, to take the same industry leaders that

22   you have chosen to look at, to look at their tariffs

23   to understand their linear foot rule, and then apply

24   their linear foot rule based upon dimensions, weight

25   class, destination information that's contained on

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 94

1    the documentation regarding the CFL shipment, and

2    then create a rate for a shipment and compare that to

3    the CFL spot quote?

4                    MR. BLOCK:  Object to form.

5    A.    I did not find it necessary because I don't

6    necessarily find these shipments to be applicable to

7    linear foot rules.

8              Again, in my opinion, it wasn't applicable

9    for CFL.  That is not how they are rating these

10   shipments as lineal feet, so I wouldn't compare it to

11   other carriers as lineal feet.

12   Q.    But what if the shipments fell under their

13   linear foot tariff?  Just based upon the size and the

14   dimension of the shipment, then would it be

15   appropriate to use their linear foot rule to

16   determine a proper rate?

17   A.    That question is assuming that they would be

18   subject to it, and I do not -- I cannot confirm

19   either way whether they would or would not be.  If

20   they were subject to it and met the threshold

21   standards, of course, it would be applicable.

22   Q.    And so that would be a valid way to compare

23   Central Freight's volume quotes in terms of their

24   reasonableness?

25   A.    I do not agree.

Page 95

1   Q.    Why not?

2   A.    Because their volume quote rater was not based

3   on lineal foot, so you're not making a direct

4   comparison there.

5          We don't know whether or not it's

6   applicable, and so if it was applicable, sure, that

7   would make sense.  But that's the assumption, that it

8   was applicable, and to most everything that I have

9   reviewed on this, again, these are LTL shipments, and

10  LTL rating would apply.

11  Q.    Don't you think, don't you think it's unfair

12  when we know that Central Freight was charging

13  additional amounts because of the size of the

14  shipment to make no accommodation whatsoever for the

15  size of the shipment when you compare it to the

16  industry standard average that you created?

17               MR. BLOCK:  Object to form.

18  A.    They may have been doing that, but whether or

19  not that was applicable is, is the basis of this

20  whole thing.

21  Q.    In an LTL, in an LTL scenario, if you had a

22  shipment that was -- if you had a shipment that was

23  750 cubic feet, do you think that you need to make

24  some accommodation for the size of the shipment when

25  you rate it?

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 96

1           MR. BLOCK:  Object to form.

2    A.    It depends.

3    Q.    What does it depend on?

4    A.    It depends on what rules that they are subject

5    to.  You are talking about moving pieces and parts as

6    far as what the contract says they are subject to,

7    also depending on what the carrier's definition of

8    these volume shipments would be.

9    Q.    So just so I understand, when you did your

10   industry average, you didn't make any accommodation

11   whatsoever for the number of pallets, the size of the

12   shipment, or the volume of the shipment; is that a

13   correct statement?

14   A.    That is correct.

15   Q.    And you believe that it's fair to compare LTL

16   shipments without taking into any of those factors to

17   the volume quotes that Central Freight did here?

18   A.    That is correct, in my opinion.

19   Q.    Okay.  All right.  I want to just go to, turn

20   to page three of your report.  And this is a list of

21   the documents that you reviewed; is that right?

22   A.    That's correct.

23   Q.    So, again, you looked at the Complaint, not the

24   Amended Complaint; right?

25   A.    That is correct.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 97

1   Q.    Okay.  On the parts of the documents you looked

2   at, was it the Transportation Agreement and all of

3   its exhibits?

4   A.    That is correct.

5   Q.    You looked at B through K.  Those were related

6   to addendums to the contract?

7   A.    I have various forms of Exhibit B, as well as

8   Exhibit A.

9   Q.    Okay.  Let me -- here, let me go to 2-B.  It

10  says Addendum 1 to Exhibit B-1 effective 8-26-2011,

11  not signed; do you see that?

12  A.    Yes, sir.

13  Q.    Do you know whether Amazon honored the terms of

14  that addendum?

15  A.    Whether Amazon did, I'm not sure.

16  Q.    Okay.  Based upon your opinions you have

17  previously given through your deposition, would you

18  expect Amazon not to honor those provisions in that

19  addendum, because it's not signed, as you indicate on

20  2-B?

21              MR. BLOCK:  Object to form.

22  A.    I'm sorry.  Can you ask your question again?

23  Q.    It's a pretty simple question.

24  A.    I'm sorry.

25  Q.    If you look at 2-B, it says Addendum 1 to

Page 98

1   Exhibit B-1, effective 8-26-2011, and then in

2   parenthesis it says, Not signed by AFS, which is

3   Amazon; right?  Okay?

4   A.    That's correct.

5   Q.    Do you see that?

6   A.    Yes.

7   Q.    Okay.  So you reviewed that addendum, and you

8   determined that it was not signed by Amazon; is that

9   right?

10  A.    That's correct, the version that I had.

11  Q.    Okay.  So based upon your previous testimony,

12  would you then expect Amazon not to have honored the

13  terms in Addendum 1 to Exhibit B-1, because it was

14  not signed?

15              MR. BLOCK:  Object to form.

16  A.    That is correct.

17  Q.    Okay.  Same question as to 2-D.  It says

18  Addendum 2 to Exhibit B-1 not signed; do you see

19  that?

20  A.    Yes, sir.

21  Q.    Okay.  The fact that that addendum was not

22  signed by Amazon, would you then assume based upon

23  the opinion that you previously gave in this case

24  that Amazon would not honor the terms set forth in

25  Addendum 2?

Page 99

1   A.    Yes, sir.

2   Q.    Okay.  Going on to letter F.  It says Amazon

3   freight consolidation at Mira Loma Exhibit B-1

4   effective 11-19-2012, not signed by AFS.  Do you see

5   that?

6   A.    Yes, sir.

7   Q.    Okay.  Based upon your previous testimony,

8   would you agree that since that exhibit was unsigned

9   that Amazon would not have honored the terms of that

10  exhibit?

11                MR. BLOCK:  Object to form.

12  A.    Yes, sir.

13  Q.    Okay.  Going down to G, it says, Amazon Freight

14  Consolidation of Fort Worth, Texas at Exhibit B-1a

15  effective 11-19-12.  It says, Not signed by AFS.  Do

16  you see that?

17  A.    Yes, sir.

18  Q.    So based upon your previous testimony, would

19  you assume that Amazon would not honor the terms that

20  were set forth in Exhibit B-1a?

21                MR. BLOCK:  Object to form.

22  A.    Yes, sir.

23  Q.    Same question for H, Amazon Freight

24  Consolidation of Chicago, Illinois, Exhibit B-1b

25  effective 11-12, 11-19-12, and it says, Not signed by

Page 100

1    AFS.

2    A.    Yes, sir.

3    Q.    You would believe that Amazon would not honor

4    the terms of that contract because it was not signed?

5              MR. BLOCK:  Object to form.

6    Q.    That addendum because it was not signed?

7              MR. BLOCK:   Object to form.

8    A.    Yes, sir.

9    Q.    Addendum 3 to B-1 effective 12-23-2011, not

10   signed by either party.  Would you agree that Amazon

11   did not have to be bound by that addendum and would

12   not honor the terms of that addendum?

13             MR. BLOCK:  Object to form.

14   A.    Yes, sir.

15   Q.    Okay.  Same question for Addendum 4 to Exhibit

16   B-1 and Exhibit A-1 effective 1-17-2014 where it

17   says, Not signed by Amazon?

18             MR. BLOCK:  Object to form.

19   A.    Yes, sir.

20   Q.    And number three has those Journal of Commerce

21   articles relating to top 25 LTL carriers.  What is

22   that information that you reviewed?

23   A.    It was regarding those that were the top

24   industry leaders for LTL within those specific years.

25   Q.    So that just identifies who are the top 25?

Page 101

1   A.    Yes, sir.

2   Q.    That's all the information that you obtained

3   from those articles that are listed?

4   A.    Yes, sir.

5   Q.    In section three, three A, B, C and D?

6   A.    Yes, sir.

7   Q.    Okay.  And that's what you used to create your

8   industry sampling?

9   A.    Yes, sir.

10  Q.    Okay.  Okay.  Then four says a lot -- you

11  reviewed a wide array of carrier rules tariffs for

12  focusing specifically on the topic of consolidation

13  of combining multiple shipments, multiple bills of

14  lading into one invoice; do you see that?

15  A.    Yes, sir.

16  Q.    So that was in regards to your analysis of the

17  NBOL issue, which is an issue between Amazon and

18  Central Freight regarding combining multiple bills of

19  lading?

20  A.    Yes, sir, that's correct.

21  Q.    Okay.  And, again, would -- do you believe that

22  Central Freight's tariff would apply to this

23  situation?

24  A.    It is not applicable, in my opinion, per the

25  contracting; however, it does represent the standard

Page 102

1   practices of the carrier.

2   Q.    Okay.  And the tariff regarding Central Freight

3   -- strike that.  CENF 100 effective 7-29-2013, do you

4   know what that relates to?

5   A.    It's their rules tariff, Central Freight's

6   rules tariff.

7   Q.    Okay.

8   A.    Effective of that date.

9   Q.    Is that the whole rules tariff?

10  A.    Yes, sir.

11  Q.    And is there a section that relates to multiple

12  shipments, multiple bills of lading?

13  A.    There are instances where it states that

14  shipments that are picked up on the same day from the

15  same location going to the same destination can be

16  combined for invoicing purposes.

17  Q.    When you say they -- you used the word "can be

18  combined for invoicing purposes."  Is that directed

19  to the discretion of the carrier?

20  A.    Yes.

21  Q.    Would you agree that that tariff or that

22  provision being contained in Central Freight's tariff

23  is put there in order to protect the carrier from a

24  situation where a shipper wanted to get around the

25  linear foot rule contained in CENF's tariff and tries

Page 103

1    to combine shipments in order to avoid the linear

2    foot rule?

3    A.    Well, shipments combined wouldn't avoid the

4    lineal foot rule.  I think they were two thoughts in

5    that question.  Do you mind rephrasing for me,

6    please?

7    Q.    Let me ask you this.  You agree that the tariff

8    regarding multiple shipments, combining multiple

9    shipments and multiple bills of ladings, those

10   tariffs are put in place to protect the carrier from

11   a shipper that's trying to get around the carrier's

12   rules tariff; right?

13              MR. BLOCK:  Object to form.

14   A.    The lineal foot rule specifically or --

15   Q.    Well, let's say is it to protect a carrier from

16   a shipper trying to get around the linear foot rule?

17   A.    It is a result of the history of the industry

18   where shippers were known to divide shipments onto

19   multiple bill of ladings to avoid a larger shipment

20   that would be applicable to other such rates as

21   lineal foot rule.

22   Q.    Okay.  So it was actually the reverse of what I

23   said.  Is that, the protection, is that when a

24   shipper separates out a bunch of shipments, it all

25   could go in one shipment, but if they went in one

Page 104

1    shipment, they would be subject to a linear foot

2    rule, which would raise the overall rate on the

3    shipment?

4    A.    They could be subject to a lineal foot rule.

5    It's a possibility.

6    Q.    Okay.  That is why the tariffs concerning

7    multiple shipments and multiple bills of ladings are

8    in the Central Freight tariff, to protect the carrier

9    from a shipper trying to circumvent the lineal foot

10   rule of the carrier; is that right?

11                 MR. BLOCK:  Object to form.

12   A.    Yes.

13   Q.    Okay.  It has nothing to do with saving money

14   for shippers by combining multiple bills of lading;

15   right?

16                 MR. BLOCK:  Object to form.

17   A.    Can you ask the question again, please?

18   Q.    Yeah.  The purpose of those tariffs being in --

19   the purpose of the tariff that we just discussed

20   being in the Central Freight tariff rules is not to

21   provide cheaper shipping rates for shippers; right?

22   It's to protect the carrier from a shipper trying to

23   avoid the linear foot rule in the Central Freight

24   tariff; correct?

25                 MR. BLOCK:  Object to form.

Nicole Bolton 5/22/2019                                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 105

1  A.    It is there for the purposes which we discussed

2  about combining shipments, when shippers were

3  dividing them; however, it's not stating that they

4  can't be combined if it doesn't subject it to a

5  lineal foot rule.  That's an assumption, but that's

6  not what's stated.

7  Q.    It's at the, it's at the carrier's discretion

8  whether they choose to combine shipments or not;

9  right?

10  A.    Depending on the wording.

11  Q.    Okay.  Did you look at the Central Freight

12  wording?

13  A.    I did.  I looked at several versions.  I don't

14  have that one specifically with me at this time.

15  Q.    Okay.  So you don't know whether it was

16  discretionary or not in terms of the carrier's choice

17  of whether they want to break up the shipments or

18  not?

19  A.    I can't confirm that at this moment without

20  re-review.

21  Q.    Okay.  All right, moving on.  So on part four

22  there is a number of other tariffs that you looked

23  at, I guess; is that right?  Those are from all of

24  the different carriers?

25  A.    That is correct.

Page 106

1    Q.    Did you look at any of the linear foot rules

2    for any of those other, other carriers that are

3    listed there?

4    A.    That was not the subject of my review, no, sir.

5    Q.    So you didn't consider any of the industry

6    sampling carriers' linear foot rules when you did

7    your analysis here?

8    A.    That is correct.

9    Q.    You completely ignored it?

10   A.    That is correct.

11   Q.    Okay.  Going to number five, it says, A wide

12   array of carrier rating software, listed below, for

13   focusing on the topic of determining an average LTL

14   industry rate, period.

15         The rating software chosen for comparison

16   rate purposes represented carriers who were LTL

17   industry leaders during the timeframe of the invoices

18   of concern.

19         These carriers were also representative of

20   the same market area in which the majority of the

21   shipments occurred.  Rating software used included,

22   and then there is a list of all of the rating

23   softwares that you looked at?

24   A.    That is correct.

25   Q.    So those are the only ones that you looked at,

Page 107

1   A through G; right?

2   A.    That is correct.

3   Q.    Okay.  And so you believe that these carriers

4   are representative of the same market area in which

5   the majority of the shipments occurred.  What market

6   area is that that you're referring to?

7   A.    Specifically, to clarify, USF Reddaway and USF

8   Holland, and Oak Harbor are representative of a, the

9   close to the market area of Central Freight Lines,

10  while the other of these carriers are actually

11  nationwide carriers, so they do operate in that area

12  as well.

13  Q.    When you were looking at a representative

14  carriers, did you make any inquiry into the capacity

15  in the particular marketplace for alternative

16  shippers to Central Freight?

17            MR. BLOCK:  Carriers?

18  Q.    Carriers.  Did you understand the question or

19  no?

20  A.    I did not.  I'm sorry.

21            MR. BLOCK:  You said "alternative

22       shippers."

23            MR. KALLISH:  Okay.  Let me start the

24       question over.

25

Page 108

1    BY MR. KALLISH:

2    Q.    When you were choosing carriers to be the basis

3    of your industry average, did you make any

4    consideration for the capacity in the marketplace in

5    which Central Freight was operating at the time in

6    which all of this billing took place?

7    A.    So you're asking me did they basically have

8    available capacity to pick up these loads?

9    Q.    Yes.

10   A.    I did not.

11   Q.    Okay.  Would you agree that when capacity is

12   restricted, price goes up in a particular

13   marketplace?

14   A.    In generalities, it can if it is not already

15   subject to a contract that already has established

16   rates.

17   Q.    Okay.  If capacity was tight at the timeframe

18   in which Central Freight was taking these shipments,

19   would you expect the sample carriers that were

20   operating the same market space to have increased

21   their rates in order to account for restricted

22   capacity?

23   A.    I am not sure that I can answer that question

24   wholly.  Again, I mean several of these carriers as

25   well carry contracts with Amazon as I found them

Page 109

1    listed in one of the complaints.

2            So they already had an established

3    contract, so that would be what was applicable.  It

4    would not be subject to the market at that time.

5    It's an established contract.  As far as raising

6    rates, I don't understand in what capacity.

7    Q.    Do you think that a carrier that was already

8    operating for Amazon that's contained within your

9    industry average that had no capacity to take on

10   additional work in the market area should be excluded

11   from your analysis?

12   A.    This was not based on any capacity

13   availability.  This was based on the industry

14   leaders.  It wouldn't be necessarily factored by

15   capacity.

16   Q.    So you don't think, you don't think market

17   capacity is a factor for that should be considered in

18   any way in regards to the reasonableness of Central

19   Freight's pricing?

20   A.    Because they had an established contract, no.

21   Q.    And if Amazon wanted to get an alternative

22   carrier to replace Central Freight, do you know

23   whether there was capacity in the marketplace for

24   someone to take over that work?

25            MR. BLOCK:  Object to form.

Page 110

1   A.    I did not review LTL capacity.  I have reviewed

2   truckload capacity during that time, and the market

3   was favorable for shippers.

4   Q.    When you say you reviewed truckload capacity,

5   where did you review that information?

6   A.    From -- it was a process to find -- I went to

7   truck stop dot com to find their MDIA index, which is

8   market demand index, reviewed their website, and they

9   did not have a table that I could review directly.

10        So I went to the link where they were

11  getting their information, which was trans four cast,

12  the number four trans four cast, who was a

13  collaboration between truck stop dot com and FTR

14  transportation intelligence, and I contacted them

15  directly for those specific readings.

16  Q.    Okay.  And did you do that before you reviewed

17  Mr. Regin's report, or after you reviewed it?

18  A.    After.

19  Q.    Because Mr. Regin cited that information in his

20  report; right?

21  A.    That is correct.

22  Q.    You never considered any of that information

23  when you did your report; right?

24  A.    That's correct.

25  Q.    Okay.  What was your findings after you took

Page 111

1    Mr. Regin's information and investigated it?

2    A.    As far as?

3    Q.    What were the conclusions -- what conclusions

4    did you come to?

5                   MR. BLOCK:  Object to form.

6    A.    There were several.  I don't understand what

7    you're, what you're asking.  Do you want me to --

8    Q.    So what you're looking at is after you reviewed

9    Mr. Regin's report, you decided to do what he did,

10   which was to check capacity using various tools that

11   are available in the marketplace.  And so I'm

12   wondering whether your conclusions differ from

13   Mr. Regin's conclusions regarding capacity for

14   truckload?

15   A.    It did.

16   Q.    Okay.  In what way?

17   A.    Because his originally was based on 2014 to mid

18   2015.  The invoices of the subject of this complaint

19   were 2015 to mid 2016, and so I had to get a

20   different set of data date range.

21          I specifically asked for the MDI for this

22   specific van market.  Your options are reefer, van,

23   or flatbed.

24          Flatbed would not be applicable.  It

25   exposed them to elements.  Reefer, they didn't

Page 112

1    require refrigeration services, so van would be the

2    specified service type that they would need.

3            I also looked at the MDI index in general

4    for the truckload industry, and I found that for the

5    van index specifically the, the market was in the

6    shipper's favor for the majority of that.

7            I believe it was like 89. something percent

8    of the time.  Those ten-ish percent were not in the

9    carrier's favor but in between the two.

10   Q.    Okay.  Turning to your report page seven, I'm

11   at the start of where your opinions are; is that

12   right?

13   A.    Yes, sir.  That's -- well, this is not my

14   opinions starting -- oh sorry.  I'm sorry.  That is

15   correct.  I apologize.

16   Q.    So on page seven there is a section that says

17   Opinions Preface, and this is a description of how

18   you came up with the sample set of invoices to look

19   at.  So you whittled down the amount of invoices that

20   you actually looked at; is that right?

21   A.    That's correct.

22   Q.    Okay.  And, again, is it correct when I say you

23   looked at invoices, you didn't even look at invoices.

24   You looked at data points that were provided on a

25   spreadsheet from Mr. Block; is that right?

Nicole Bolton 5/22/2019                                Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 113

1    A.    Invoice data that was received from his office.

2    Q.    Okay.

3    A.    Correct.

4    Q.    And that was on the spreadsheet, so you didn't

5    actually look at the invoices?

6    A.    That's correct.

7    Q.    You didn't look at the EDI transmissions

8    between Central Freight and Amazon; right?

9    A.    No, sir.

10   Q.    And, again, we already talked about you didn't

11   look at the weight, inspection reports, or anything

12   like that?

13   A.    That's correct.

14   Q.    So all you had in order to perform your

15   analysis was information that was provided by

16   Mr. Block and the spreadsheet; is that right?

17   A.    Mr. Block's office, that's correct.

18                    (Brief interruption.)

19   BY MR. KALLISH:

20   Q.    Okay.  So, again, we were talking about your

21   opinion preface, and that's where you describe how

22   you whittled down the data points that were provided

23   by Mr. Block's office to create a subset in which you

24   then compared to the industry standard?

25   A.    That's correct.

Page 114

1    Q.    Or the industry standard average?

2    A.    That's correct.

3    Q.    Okay.  So I am just going to go through this

4    line by line real quick, so we all understand what

5    you did.

6          For the purposes of this review, a sample

7    of data representative of the original freight

8    billing data was used to reach the conclusions and

9    opinions contained herein, period.

10         Then it says, The sample was taken from the

11   original 6298 lines of individual shipment data from

12   the period in question that was provided for

13   examination.

14         So the 6298 lines of data, that was the

15   information that came from Mr. Block's office; right?

16   A.    Right.  One of them.

17   Q.    And you don't know how they compiled that;

18   right?

19   A.    I do not.

20   Q.    Okay.  And you said you tested it for accuracy?

21   A.    For the CzarLite 2011 rates, yes.

22   Q.    How many did you test?

23   A.    I wouldn't know a specific number.

24   Q.    Okay.

25   A.    If I were to give an estimate, at least a

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 115

1   hundred.

2   Q.    Okay.  And do you have the actual data for the

3   test that you performed on those 100 samples?

4   A.    I didn't make any entry on it.

5   Q.    Okay.  And then, so, were there also then,

6   there were 6,298 lines that represented the CzarLite

7   contract amount billed; is that right?

8   A.    I'm sorry?

9   Q.    Tell me, the 6,298 lines, tell me each column

10  that was on the spreadsheet that related to those

11  numbers.  I'm trying to understand what you looked

12  at.

13         So there was 6,298 entries that had a

14  CzarLite calculation that was provided by Mr. Block's

15  office using the contract discount; is that correct?

16  A.    That was one of the columns contained.

17  Q.    Okay.  And then there was a column, which was

18  represented to be by Mr. Block's office, the amount

19  that Central Freight billed under its spot quote; is

20  that right?

21               MR. BLOCK:  Object to form.

22  A.    That's correct.

23  Q.    And that amount that was contained on that

24  actual spreadsheet that represented the spot quote

25  billed amount, was that the gross amount or the net

Page 116

1   amount?

2   A.    There were two options, one that contained a

3   net amount, and there was not a gross amount.  It was

4   a net pre-fuel surcharge in excess accessorial, and

5   post that application of fuel, a net charge with the

6   addition of fuel and accessorial charges.

7   Q.    So there were two columns, one had the fuel,

8   the fuel surcharge, and any accessorials contained

9   within the dollar amount, and the other one had those

10  numbers backed out?

11  A.    That's correct.

12  Q.    Okay.

13  A.    Yes, sir.

14  Q.    All right.  It says, The first step taken to

15  narrow the original data set was to choose origin and

16  destination zip code combinations that had at least

17  eight or more individual shipments.  What do you mean

18  by that?

19  A.    So I ran a group by query that any shipments

20  that, from origin to destination, such as North

21  Little Rock to Little Rock, occurred eight or more

22  times during this billing timeframe.

23  Q.    Okay.  So it was an origin and destination that

24  had repeated a shipment that had taken place at least

25  eight times?

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 117

1    A.    That's correct.

2    Q.    Okay.  This has nothing to do with the size of

3    the shipment or the number of pallets?

4    A.    That's correct.

5    Q.    Okay.  Now, why did you do that?

6    A.    For comparative persons, not persons, for

7    comparative reasoning, we could see any -- it would

8    be easier to compare any discrepancies between

9    similar movements.

10   Q.    Okay.  Did you take into account the zip code

11   and origin and destination based upon whether it was

12   a lane, a regular lane of Central Freight, or an

13   outside network lane of Central Freight?

14   A.    An outside lane of central network, could you

15   please define?

16   Q.    Well, LTL carriers typically have lanes in

17   which they operate, where they have regular LTL

18   trucks that pick up from various customers on a

19   regular basis.  Are you familiar with that?

20   A.    Yes.

21   Q.    Okay.  They may have.  Sometimes they were

22   asked to pick up something outside of their regular

23   lanes, and they usually surcharge, or they charge

24   additional money because it's outside of their normal

25   lanes, and there are a lot more expenses that are

Page 118

1   involved.  Are you familiar with that?

2   A.    I don't know that there is a charge outside of,

3   which would be additional to, it would be built into

4   the rates that were produced by a rating software.

5   Q.    Well, like in the spot quote system, that would

6   increase the rate; right?

7   A.    Right, because it would increase the rates that

8   would be applicable.

9   Q.    Right.  So was that a consideration at all when

10  you were deciding what origin and destinations to

11  select?

12  A.    I was not privy to what would be considered

13  Central Freight's standard lanes of operation.

14  Q.    So you didn't consider that at all when you

15  made your sample set?

16  A.    No.

17  Q.    So it's possible that contained within your

18  sample sets are shipments that were outside Central

19  Freight's normal lanes; would you agree with that?

20  A.    It could also include the opposite.

21  Q.    Okay.  But you would agree that it's possible

22  that some of the shipments that you obtained were

23  ones that were outside of Central Freight's normal

24  lanes?

25  A.    It's possible that there were shipments outside

Page 119

1   and within their normal lanes.

2   Q.    And you would expect that if they were outside

3   of the normal lanes under the spot quote system that

4   there would be some increased charges for those

5   movements; right?

6   A.    Not additional charges but built into the

7   actual rates.

8   Q.    Right.  You would agree with that?

9   A.    Yes, sir.

10  Q.    Okay.  All right.  These combinations of groups

11  of shipments allowed comparison of multiple shipments

12  for each origin and destination zip code combinations

13  and would highlight inconsistencies if there were

14  any.

15         So that's like where you looked at multiple

16  shipments that were on the same day, same zip code,

17  same origin, destination, same weight, and you found

18  that there were inconsistencies in the price?

19  A.    It may not be an exact everything is the exact

20  same comparison.

21  Q.    But that was what you intended to do.  That's

22  why you wanted to have multiple groupings; right?

23  A.    It was my intention to compare similar

24  shipments with one another.

25  Q.    Okay.  So this process reduced the original

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 120

1    data set to 3,327 lines of individual shipment data.

2    So that process that you engaged in almost cut it in

3    half, the sample size?

4    A.    That's correct.

5    Q.    Is that right?

6    A.    That's correct.

7    Q.    Okay.  And in terms of sampling of data, is

8    there any reference that you have that suggested this

9    is a proper way to whittle down a data group into a

10   sample set?

11   A.    There is no standard that I used to determine

12   that.

13   Q.    Okay.  And you didn't consult a statistician or

14   anything like that in terms of what the proper way is

15   to sample this amount of data?

16   A.    No, sir.

17   Q.    And you didn't look at any statistics, books,

18   or guidelines, or anything like that?

19   A.    No, sir.

20   Q.    And there is no auditor's guide in order to

21   create sample sets that you're aware of?

22   A.    That's correct.

23   Q.    So this is just your own process that you made

24   up for this project; is that right?

25   A.    This is the process I used.  Yes, sir.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 121

1   Q.    Did you have the input of the CEO or the COO on

2   this, or this is all you?

3   A.    This was my methodology.

4   Q.    Okay.  Did Mr. Block help you with this

5   methodology?

6   A.    No, sir.

7   Q.    Okay.  It says, The next step and final step

8   was to remove any shipment data where the total

9   amount billed for charges representing the cost to

10  move the freight from origin to destination with no

11  fuel or accessorial cost added was less than $150.

12  Why did you remove those?

13  A.    As the time constraint and the normal processes

14  that we may use within my office, a lot of times this

15  becomes negligible, this area, and due to, again,

16  time constraints, you're talking about rating 1,700

17  shipments four to six times a piece.  This was a

18  fairly large sample, in my opinion.

19  Q.    Okay.  By the way, when you took the sample

20  from 6,298 lines down to 3,327 lines, had you used

21  that same process in other audits to reduce a sample

22  set?

23  A.    I have not had to do this prior to this

24  situation.

25  Q.    So this is the first time you ever did create a

Page 122

1  sample set in the manner that you described here in

2  this opinion preface?

3  A.    That is correct.

4  Q.    Okay.  And it was determined these low-dollar

5  shipments would produce results that ultimately would

6  be insignificant compared to shipments of greater

7  weights and billed charges.  This resulted in a

8  working sample of 1,739 shipments.

9          So after you got rid of the $150 shipments,

10  you wound up with 1,739 shipments; is that right?

11  A.    That's correct.

12  Q.    Shipments; is that right?  It is individual

13  shipments; right?

14  A.    Right.  It is lines of data, which represent a

15  shipment a piece.

16  Q.    Okay, gotcha.

17  A.    Thank you.

18  Q.    So then we go to where it says, A, and it says

19  in here, In order to render an opinion regarding Item

20  H 1, multiple aspects of the data and associated

21  considerations had to be made, period.

22          I have offered an overall opinion below,

23  but this is supported by additional information

24  offered in opinion support one through five.

25          So we're going to go down to H-1, and

Page 123

1    that's going to be your opinion, and then the support

2    for that is contained in opinion support numbers one

3    through five; is that right?

4    A.    H-1 is not my opinion.  It is in my synopsis.

5    This is what I was asked to review.

6    Q.    Okay.  So that is what Mr. Block asked you to

7    review?

8    A.    That's correct.

9    Q.    And in reference to Item H-1, review the

10   shipments that CFL, in quotations, volume rated, to

11   determine whether the rate is reasonable or not,

12   period.

13           If not, comma, what would be a reasonable

14   rate for that shipment?  That is what you were asked

15   to do by Mr. Block?

16   A.    That's correct.

17   Q.    Okay.  All right.  Under that in bold it says,

18   It was determined that, comma, of the sample

19   shipments, comma, 98 percent were billed above the

20   LTL contract rates contained in the Transportation

21   Agreement effective July 7th, 2011, and 63 percent

22   were billed above determined industry standard

23   average.

24           Do you see that?

25   A.    Yes, sir.

Nicole Bolton 5/22/2019                              Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 124

1    Q.    Okay.  So the first part of that opinion is

2    that if you compare what Central Freight, after you

3    did the whittle down and created the sample set, if

4    you compared the sample set of the Central Freight

5    volume rates to the contract rates under CzarLite

6    with the discount that you found that 98 percent of

7    the sample set were higher than the contract rates?

8    A.    Yes, sir, when comparing the net rates --

9    Q.    Okay.

10   A.    -- and fuel or accessorial.

11   Q.    And the net rates, again, that was the

12   information that was provided by Mr. Block.  You

13   didn't hand calculate the CzarLite plus the

14   contractual discount for all of the sample sets; is

15   that correct?

16   A.    I did not confirm all of them, that's correct.

17   Q.    Okay.

18   A.    I did, as we discussed earlier, checked around

19   a hundred of those.

20   Q.    Okay.  In order to calculate the CzarLite

21   contractual amount, you would take the base rate,

22   which is the origin, destination, weight and class,

23   put into CzarLite, and that creates the base rate.

24   Then you take the contractual discount, and then add

25   in fuel, the Amazon fuel surcharge plus accessorials.

Nicole Bolton 5/22/2019                                   Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 125

1   Is that right?

2   A.    I did not add in the fuel surcharge or the

3   accessorials.  There were two options prior to the

4   addition of and with the addition of fuel and

5   accessorials.

6   Q.    Okay.  It wasn't a big surprise that almost all

7   of these shipments when done on the Amazon spot quote

8   were going to be more than the contractual rate

9   because that was the intention of Amazon was to get

10  additional money for what they believe they deserved

11  for volume shipments; right?

12  A.    I believe Central Freight was what you were

13  meaning, instead of Amazon.

14  Q.    I'm sorry.

15  A.    I know.  I followed you.

16  Q.    Okay, good.

17            MR. BLOCK:  Rephrase the question,

18        please.

19            MR. KALLISH:  Okay.  I will rephrase

20        the question.

21  BY MR. KALLISH:

22  Q.    It was not a big surprise when you did the

23  first part of your analysis to learn that the spot

24  quote prices that Central Freight provided to Amazon

25  were higher than the contractual rate, because that

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 126

1    was the intention of Central Freight was to get

2    higher rates, because they felt that they should get

3    additional money for these larger shipments; right?

4    A.    So, again, I don't know the mindset of Central

5    Freight and why they did this necessarily.  I was not

6    privy to all of that; however, I -- it would be my

7    expectation regardless that the spot volume quotes

8    would be higher because that is applicable to all of

9    their customers.  Any customer could be applicable to

10   that.

11         Amazon as being one of the largest shippers

12   would negotiate -- it would be expected in the

13   industry that they would negotiate better rates.

14   Q.    Gotcha.  Okay.  Great.  And then the second

15   part of your opinion is that 63 percent were billed

16   above determined industry standard average rates.

17   What does that mean?

18   A.    So once we went through all of the calculations

19   and determined the average industry rate as compared

20   to the industry LTL carriers that 63 percent of the

21   volume spot quote rates were above the industry

22   average that was determined.

23   Q.    Okay.  So that would mean that 37 percent of

24   the Central Freight spot quotes were, in fact, lower

25   than the industry standard average rates; is that

Page 127

1   right?

2   A.    Of the industry.

3   Q.    Is that -- my statement is correct?

4   A.    That's correct.

5   Q.    Okay.  So would it be your opinion then for

6   those 37 percent that the spot quotes were reasonable

7   and that Amazon should pay Central Freight for those

8   37 percent of the sample set?

9              MR. BLOCK:  Object to form.

10  A.    I would not say that even in those cases

11  necessarily that they would pay the spot quote rate

12  regardless, because it was not what was applicable.

13  Q.    But it was less than --

14  A.    In my opinion.

15  Q.    -- your industry average, which you say is what

16  a reasonable rate is for this type of shipping;

17  right?

18  A.    Yes, sir, and I can understand that that seems

19  a little backwards, but my philosophy is, and of our

20  office, carriers should get paid according to what's

21  applicable and agreed upon for the services they

22  provide, and a shipper should only have to pay

23  subject to what services they received and what is

24  applicable.

25  Q.    Okay.  But on the reasonableness which you were

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 128

1    asked to determine whether Central Freight spot

2    quotes were reasonable compared to an industry

3    standard.

4              You would agree that 37 percent of Central

5    Freight's spot quotes were reasonable when compared

6    with an industry standard average; correct?

7              MR. BLOCK:  Object to form.

8    A.    I do agree to the industry standard, however,

9    the industry standard as established is greater than

10   the contract rates, so, therefore, I still, in my

11   opinion, state that the contract rates apply.

12   Q.    Okay.  But let's put the contract rates aside.

13   Based upon your industry standard average rates, you

14   would agree that 37 percent of the spot quotes were

15   lower than what you say was the industry standard

16   average rate for the shipments at issue; correct?

17   A.    That's correct.

18   Q.    Okay.  Do you believe that the industry

19   standard average rates that you calculated represent

20   a reasonable rate for these shipments?

21             MR. BLOCK:  Object to form.

22   A.    Not necessarily.

23   Q.    So the comparison that you're making to our

24   spot quotes is not a reasonable rate either?

25             MR. BLOCK:  Object to form.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 129

1   A.    That's not what I stated necessarily.  Not

2   necessarily, again, because I will go back to the

3   contract rates of CzarLite 2011 is applicable, and as

4   stated 98 percent of the time this spot volume quote

5   rate was greater than the contract rate.

6   Q.    But why go through this exercise of creating an

7   industry standard average and then comparing it to

8   the CFL spot quotes when you -- I guess what you're

9   saying is you don't even believe that the industry

10  standard average rate is a reasonable price to charge

11  for this work?

12              MR. BLOCK:  Object to form.

13  A.    That was what was asked for us to produce for

14  comparison analysis, and that's what we produced.

15  But, again, it's not saying that I'm not saying it's

16  not a reasonable rate expected within the industry,

17  but there's more to that than just the industry.

18  Q.    How much less -- the 37 percent of the CFL spot

19  quotes that were less than the industry average, how

20  much in percentage were they less than the industry

21  average?

22  A.    I did not produce that number in this report.

23  I would have to calculate that.

24  Q.    But you did produce, the flip side of that,

25  when you found that the industry standard average

Page 130

1   rates were less than the CFL volume rates, you then

2   calculate the percentage of how much more CFL rates

3   were than the, than the industry standard average

4   rate; right?

5   A.    That's correct.

6   Q.    Why wouldn't you do the flip side?

7              MR. BLOCK:  Object to form.

8   A.    I can produce that number, and I would be happy

9   to if asked.

10  Q.    Okay.  I don't want to spend too much more time

11  with this, but I'm kind of dumbfounded, I mean, to be

12  quite honest.

13              I don't understand that -- I just want to

14  make sure that your opinion is that even though

15  37 percent of all of the spot quotes of the sample

16  set that you selected that were billed by Central

17  Freight were lower than the industry standard

18  average, you still believe that those 37 percent of

19  the spot quotes were unreasonable, according to your

20  opinion, for Central Freight to have billed?

21              MR. BLOCK:  Object to the form.

22  A.    For Amazon specifically.

23  Q.    Okay.  If you assume for the purpose of this

24  question, that Central Freight had the right to use

25  its spot quote system to create a volume price, would

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 131

1   you agree that for at least 37 percent of the sample

2   set Amazon should pay Central Freight for those

3   movements?

4            MR. BLOCK:  Object to form.

5   Q.    Or those shipments?

6            MR. BLOCK:  Object to the form.

7   A.    If we're assuming that the spot volume quote

8   rate was applicable, is that what you're saying in

9   this scenario?

10  Q.    Yes.

11  A.    Would Amazon or should Amazon pay for the

12  37 percent that was below?

13  Q.    Yes.

14  A.    With the assumption that is not in my opinion

15  applicable that it is, that the quote is applicable,

16  I just want to clarify it is not an agreement with

17  me, but if we are assuming that, and it is

18  applicable, then that would be what is paid.

19  Q.    Okay.

20  A.    But, again, it is my opinion that it is not

21  applicable.

22  Q.    Okay.  And is it also your opinion that

23  anything that is above the industry, the industry

24  standard average rates that you developed is an

25  unreasonable amount for Central Freight to have

Page 132

1   submitted as a spot quote, assuming that they have

2   the right to spot quote?

3                    MR. BLOCK:  Object to form.

4   A.    Again, assuming that they had the right to spot

5   quote, and it was above industry average, if it is

6   agreed upon and applicable and binding that they use

7   that as their format, then that's what should be

8   paid.

9   Q.    Okay.  So it's not problematic to you that

10  67 percent of them were above the industry average?

11  If they had the right to spot quote, they had the

12  right to spot quote; it didn't matter?

13                    MR. BLOCK:  Object to form.

14  A.    It absolutely concerns me.

15  Q.    Yeah, but my question to you was simply because

16  a spot quote shipment fell into the range of being

17  above the industry standard average that you created,

18  does that in itself make the spot quote unreasonable,

19  if you assume that Central Freight had the right to

20  use its spot quote program to generate the volume

21  price, as they did in this matter?

22                    MR. BLOCK:  Object to form.

23  A.    I think it is unreasonable; however, because

24  there is no regulated rate tariff bureau, a carrier

25  is pretty much subject to itself in determining its

Page 133

1    rates.

2            So if that's what they set up to bill, then

3    that's their software, and that's their billing

4    practice, but, again, I do not agree with it.

5    Q.    Okay.  Let me just go back to the industry

6    standard average that you created.  Again, you took a

7    number of carriers that were in similar market space

8    as Central Freight and used their rating system to

9    create a comparison rate to the spot quote; correct?

10   A.    Yes.

11   Q.    Okay.  But you took all of the various industry

12   LTL carriers that were part of the industry average

13   group, you took their results.  You added them all

14   together, and then you divided them by the number of

15   carriers; is that how you got the average?

16   A.    Yes, sir.

17   Q.    So and then did you do that on the final

18   amount?  So, for instance, let's take, let's take,

19   what is it, Oak Haul -- what is that?

20   A.    Oak Harbor Freight Lines.

21   Q.    Oak Harbor Freight Lines.  So you fed all of

22   the information into the Oak Harbor rating system,

23   and for each of the one, each of the 3,327 lines of

24   shipments that you fed into Oak Haul's rating system,

25   you then had, ultimately had a rate for each one of

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 134

1  those line items; is that correct?

2  A.    My sample size was the 1,739, not the 3,000.

3  Q.    You're right.

4  A.    And there were a few specifically for Oak

5  Harbor that was outside of their -- they did not

6  service the origin or the destination.  There were a

7  couple of those.  So all rates that were returned, I

8  did.

9  Q.    Okay.  What I'm trying to figure out is when

10  you did the average.  So did you take -- of the 1,739

11  shipments, did you go on the list and, say, Go to

12  line number 12, okay.  And then you inputted all of

13  the information that you needed to input into the Oak

14  Haul; is that what it's called?

15  A.    Oak Harbor.

16  Q.    Oak Harbor rating system, and then you came up

17  with a rate for the Oak Harbor movement for line

18  number 12 on the, of the 1,739 sample site; right?

19  A.    Yes, sir.

20  Q.    Okay.  And then would you do that for each of

21  the other industry sample LTL carriers?  So there is

22  six of them, take all of their pricing, ultimate

23  pricing information, add them all together, and

24  divide it by six for each line, or did you do it in

25  bulk?  Do you understand what I'm asking you?

Nicole Bolton 5/22/2019                                   Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

                                                                          Page 135

1   A.    Could you rephrase?  I'm not sure that I'm

2   getting that question.

3   Q.    Okay.  So it's my understanding that you

4   created an industry standard average; right?

5   A.    That's correct.

6   Q.    Okay.  And to me what an average means is, you

7   take the amount that was generated by a shipment for

8   each of the industry carriers.  You take that amount.

9          You add all of those numbers together, and

10  then you divide by the number of carriers, and that

11  gives you an average.  Do you agree with that?

12  A.    Right.  It was -- that's correct.  It was the

13  rate, not the amount, but that is the correct

14  process --

15  Q.    Okay.

16  A.    -- of finding the average.

17  Q.    So my question is did you create an average for

18  each line number of the 1,739?  So for line number

19  12, you would have inputted all of the information

20  into six different carriers.

21          Each carrier came up with a rate, which is

22  a number.  Then you took all of those numbers from

23  Oak Harbor, FedEx Freight, all of the various

24  industry LTL carriers, and then divided that by six.

25  And then you did that process for each line over and

Page 136

1  over and over again, 1,739 times?

2  A.    Right.  It was, it was directly for that

3  specific line or shipment that it represents.

4  Q.    Right.

5  A.    It was done, each line was done separately.

6  Q.    As opposed to -- the other thing would be,

7  would be to take all of the data for all of the 1,739

8  shipments and the aggregate, add it all together, and

9  divide it by six.  Do you understand the difference?

10 A.    Can you ask that again --

11 Q.    Okay.

12 A.    -- or rephrase.

13 Q.    So, so one way we just talked about was you

14 take line by line the rate after you put it through

15 the calculator, and then add all of the various

16 sample LTL carriers' rates for that one line number,

17 number 12, add them all together and divide them by

18 six.  That's one way to do this; right?

19 A.    Uh-huh.

20 Q.    The other way would be to take -- to do all of

21 the movements six times across all of the different

22 carriers, then add it all up in the aggregate and

23 divide it by six.  Does it make a difference?

24 A.    I guess I'm still not understanding the second

25 process that you're trying to describe.  I'm having

Page 137

1    trouble envisioning.

2    Q.    Okay.

3    A.    I'm sorry.  I'm not trying to be complicated.

4    Q.    So you have a spreadsheet for Oak Harbor, and

5    at the end there's a rate, say $200; right?

6    A.    I did not input a rate for, like a money rate

7    for the carriers.  I entered a carat weight rate.

8    Q.    Right, and that created the average?

9    A.    Correct.

10   Q.    And you did that line by line?

11   A.    That's correct.

12   Q.    We'll move on.

13   A.    Okay, I'm sorry.

14            MR. BLOCK:  Marc, when you get to a

15         good stopping point, can we take a short

16         break?

17            MR. KALLISH:  Why don't we stop at

18         3:00?

19            MR. BLOCK:  Twenty minutes?

20            MR. KALLISH:  Well, okay, if we need

21         to stop now.

22               (Three-minute break.)

23   BY MR. KALLISH:

24   Q.    Okay.  Looking at page nine of your report?

25   A.    Yes, sir.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 138

1   Q.    So look at the top, it says, On average, the
2   volume rate, slash, spot quote was billed above the
3   contract LTL, period.  Transportation Agreement --
4   there is no period there, I'm sorry.  Let me start
5   all over.  I'm sorry.
6            On average, comma, the volume rate, slash,
7   spot quote was billed above the contract LTL
8   Transportation Agreement effective July 7th, 2011
9   contract rate amount was by 50 percent more.
10           So in this line are you saying that if you
11  compare the spot quote rates to the CzarLite contract
12  rates that the spot quote rates were 50 percent
13  higher than what the Amazon contract would have
14  provided?
15  A.    In the instances where the spot quote was
16  higher than the contract rates, it was by 50 percent
17  on average.
18  Q.    So the 50 percent excludes the 37 percent where
19  they were, where they could have been lower?
20  A.    That's correct.
21  Q.    Okay.  Going to Opinion Support number two, and
22  it says, again, in reference to Item H-1, so then,
23  again, this is the same, this is support for the
24  consent of review the shipments at CFL in quotations,
25  volume rated to determine whether the rate is

Page 139

1   reasonable or not, period.

2          If not, comma, what would be a reasonable

3   rate for that shipment?  So this is the same analysis

4   that we have been talking about?

5   A.    That's correct.

6   Q.    Now, it says, it was -- your opinion says, It

7   was also determined using this sample data, that when

8   compared to an industry average net billed amount,

9   and then it says in parenthesis, the amount that

10  would be the result of gross charges less a discount

11  and that represent the totals as provided for in data

12  columns, and it says inv_charge_amt and

13  mfst_charg_amt, in parenthesis, that 56 percent of

14  the sample shipments were billed above industry

15  standard average rate.

16         That number, 56 percent, is different from

17  the number that you set forth on page 67, on page

18  seven of your report that says 63 percent were billed

19  above the determined industry standard average rate.

20  Why are those two numbers different?

21  A.    Because when we initially started this process

22  we realized we used the wrong weight column, and so

23  we had to adjust for that, and we put in the correct

24  figures, but it appears that I did not go back and

25  correct my number in that opinion, but it would be --

Page 140

1    Q.    So the number should be the same.  The opinion

2    that's set forth in page nine and the opinion that's

3    set forth on page seven, those should be the same

4    numbers; is that right?

5    A.    That's correct.

6    Q.    So it's just a typo?

7    A.    That's correct.

8    Q.    Okay.  So which is the correct number?  Is it

9    56 percent of the sample shipments were billed above

10   industry standard average rate, or was it 63 percent

11   were billed --

12   A.    It was --

13   Q.    Let me just finish the question.

14   A.    I'm sorry.

15   Q.    Was billed above the determined industry

16   standard average rate?

17   A.    I apologize.  It's the 56 percent.

18   Q.    Okay.  So in reality what you're saying,

19   then -- well, strike that.  I'm not going to say in

20   reality.

21         So what you're saying then is 44 percent of

22   the Central Freight volume spot quotes were less than

23   the industry standard average rate on the sample set

24   that you reviewed?

25   A.    That's correct.

Page 141

1    Q.    And so, again, if you assume that Central

2    Freight had the right to volume bill Amazon, you

3    agree that 44 percent of those spot quotes were

4    reasonable?

5                   MR. BLOCK:  Object to form.

6    Q.    Correct?

7    A.    These are a lot of assumptions that, again, in

8    my opinion, I do not agree with as compared to what

9    we determined to be an industry standard not

10   necessarily applicable to Amazon, yes, that would be

11   correct.

12   Q.    Okay.  And just to say it another way, you have

13   come to the determination that 44 percent of the

14   Central Freight spot quotes were less than the

15   charges that would have been incurred if your

16   industry standard average was used for these

17   shipments?

18   A.    That is correct.

19   Q.    Okay.  Would you agree that if Central Freight

20   had the right to use its spot quote systems to

21   generate volume rates for these shipments that Amazon

22   at a minimum should pay for 44 percent of those

23   shipments because the spot quotes were reasonable?

24                   MR. BLOCK:  Object to form.

25   A.    I don't agree with that.

Page 142

1   Q.    You agreed to it before, this, again, has the

2   assumption that Central Freight had the right to spot

3   quote?

4             MR. BLOCK:  Object to the form.

5   A.    If is under the assumption, again, that does

6   not agree -- I do not agree within my opinion, but if

7   we are assuming, and it has to be accepted that way,

8   then if it is applicable then, yes, but if it is,

9   again, in my opinion, not applicable so, no, it would

10  not, I would not expect them to pay that.

11  Q.    But if it was applicable, you think Amazon

12  should pay Central Freight?

13            MR. BLOCK:  Object to form.

14  A.    If it's applicable, in my opinion.

15  Q.    Yes?

16  A.    Yes.

17  Q.    Okay.  If you look at page 11 of your report.

18  It says, Processes/Calculations used for opinion

19  supports one and two; okay?

20            This is an outline of the process that you

21  used in order to create a sample set, to develop the

22  industry standard average, and then to analyze or

23  compare the industry standard average to the Central

24  Freight spot quote.  Is that correct?

25  A.    That's correct.

Nicole Bolton 5/22/2019                                          Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 143

1   Q.    This is, this is step-by-step analysis of what

2   you did?

3   A.    That's correct.

4   Q.    Okay.  If you look at where it says, Steps

5   taken to determine comparative industry rates.  And

6   it says, A, it says, Received file named TIPS DATA

7   2153, Based on F_ID, end paren, in parenthesis, 6298

8   shipments, end parenthesis.  Do you see that?

9   A.    Yes, sir.

10  Q.    That's the data that you received from

11  Mr. Block's office; is that right?

12  A.    That's correct.

13  Q.    Okay.  You don't know what the TIPS systems is;

14  right?

15  A.    That is correct.

16  Q.    Were you aware whether, whether Amazon had an

17  internal system for estimating rates for shipments

18  invoiced by carriers?

19  A.    I cannot remember if it was during this process

20  or after I had rendered this original opinion that I

21  did hear that there was an internal system.

22         I think I may have read it in the Amended

23  Complaint, I believe is where I read about it, that

24  they did either have a system or an internal auditor

25  mechanism of some sort.

Page 144

1   Q.    Are you familiar with those type of systems?

2   A.    They are commonly referred to as rate engines,

3   or TMS, transportation management systems.  I know

4   that some shippers do employ these, but it is not

5   something that I have used.

6   Q.    Okay.  So you're not familiar with it?

7   Correct?

8   A.    That's correct.  Sorry.

9   Q.    Okay.  What -- when you look at G, it says, The

10  table had additional fields added, with column names,

11  and it says FXF_CWT, and then little number, little

12  i, and ii, it says FXF_percentCWT_Increase.  What is

13  that?

14  A.    So the Roman numeral one with just the _CWT,

15  that is the carat weight rate that was produced by

16  the software when we entered the shipment

17  characteristics.

18          And then the FXF_percentCWT_Increase would

19  be the percent increase of that rater's carat weight

20  rate over the CzarLite 2011 carat weight rate.

21  Q.    So you pumped up the carrier's carat weight in

22  response to the CzarLite carat rate.  Is that

23  accurate, you increased it?

24  A.    I'm not quite sure of that question.

25  Q.    What did you do from step i to ii, what

Page 145

1   happened during those two steps?

2   A.    So once determining the FedEx Freight carat

3   weight that was entered into the data, then it was

4   the formula I used here to determine the percent

5   difference, which would be the increase here.

6           So the difference between 2011, CzarLite

7   2011 carat weight rate and the FedEx Freight carat

8   weight for that particular shipment.

9   Q.    Okay.  What does that mean, "increased"?  What

10  are you increasing?

11  A.    It's determining the difference, the percent

12  difference between the Czar 2011 carat weight rate

13  and the FedEx Freight carat weight rate.

14  Q.    And what is the significance of that

15  difference?

16  A.    Because it will have to be applied into the

17  next formula that was used, because there is not a

18  standard industry discount, and because we have to

19  net neutralize what we are working with to make net

20  versus net, versus net, the apples-to-apples

21  comparison, we, as a result of this increase,

22  therefore increased the net charges of the Czar 2011

23  based rate charges so that it was an even increase in

24  comparison.

25  Q.    Okay.  And then when you get down to iv there,

Page 146

1 | that's the same process just being done with UPS
2 | then; is that right?
3 | A.    That's correct.
4 | Q.    Okay.  So, and then that's repeated for each
5 | of, all of the various sample carriers or standard
6 | carriers; is that right?
7 | A.    Yes, sir, that's correct.
8 | Q.    Okay.  So just bear with me, because I don't
9 | understand this, and so that's probably my fault, but
10 | I need you to really explain in the most explicit
11 | details that you can provide exactly what you did for
12 | step i, step ii, and step iii.
13 |                 MR. BLOCK:  Roman numeral one?
14 |                 MR. KALLISH:  It's not really a roman
15 |         numeral, those little i's.
16 |                 MR. BLOCK:  That's still roman
17 |         numerals, though.
18 |                 MR. KALLISH:  Okay.
19 | BY MR. KALLISH:
20 | Q.    You know what I'm talking about; right?
21 | A.    Yes, sir.
22 | Q.    Okay.  I always call it little i's and double
23 | little i's, triple little i.  Can you go through
24 | roman numeral one, roman numeral two, and roman
25 | numeral three in explicit detail and describe exactly

Nicole Bolton 5/22/2019                              Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 147

1    what you're doing, because I don't understand it?

2    A.    Okay.  I will try my best to translate.  So for

3    i, this was the rate that was produced using,

4    specifically in this example it's FedEx.

5              So we will say FedEx, but represented again

6    for each carrier examples we use, we entered the

7    shipment characteristics into the software and

8    determined the carat weight rate applicable to that

9    shipment.  So that was what that column is.

10             Then column two is where we inputted this,

11   inputted this equation, sorry, and determined I have

12   my CzarLite 2011 carat weight rate, and now I have a

13   comparative FedEx Freight carat weight rate.

14             I need to determine how much of an increase

15   or difference, I mean, it became an increase, but the

16   difference between those two rates would be.

17   Q.    Okay.

18   A.    Okay.  And then to then arrive at a net value,

19   which we are now talking in money and not necessarily

20   rates.

21             Again, because we were provided with this

22   spot volume quote net value, we have a Czar 2011 base

23   contract value now for an industry net value, this

24   one specifically for FedEx.

25             We increased the Czar 2011 net value by the

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 148

1    percent difference, therefore, arriving at the

2    difference that would amount for the carrier.

3    Q.    Okay.  If we looked at the carat weight rate

4    for one of the 1,739 shipments at phase roman numeral

5    one, and compare that to the rate, or the net value

6    or the rate at roman numeral three, would the, would

7    the amount go up or down?  Would the rate go up or

8    down?

9    A.    I'm not sure I understand the question.

10   Q.    Okay.  Roman numeral one is take the rating

11   software, plug in the shipment criteria.  That gives

12   you carat weight rate; correct?

13   A.    Yes, sir.

14   Q.    Okay.  Does that tell you how much Amazon would

15   have paid for that shipment at that point without any

16   other adjustments?

17                  MR. BLOCK:  Object to form.

18   A.    I'm not sure on this question.

19   Q.    What do I do with -- what is a carat weight

20   rate; what is that?

21   A.    It is the rate that is produced dependent on

22   the lane, origin, destination given the factors of

23   the weight break from the weight entered and the

24   class that's entered, and then it produces this rate

25   which is then multiplied by the weight to determine

Page 149

1    gross charges.

2    Q.    Okay.  So you take that carat weight rate and

3    then multiply it by the weight of the shipment and

4    that gives you the gross amount that will be billed

5    to Amazon?

6                   MR. BLOCK:  Object to form.

7    A.    It would not be billed.  The gross amount is

8    not what is billed.

9    Q.    Okay.  Then what happens?  So how do you get

10   from that amount, the gross amount to what is

11   actually billed to Amazon?

12   A.    So, again, that's why we had to determine the

13   carat weight difference percentage.

14   Q.    No, I want to just do this based on plugging in

15   the information into the rating system and then

16   getting the carat weight rate.  I want to convert

17   that into a price.  How do I do that?

18   A.    You have converted it into a price of gross

19   charges.

20   Q.    Okay.  That's the gross charges?

21   A.    Yes, that's correct.

22   Q.    Okay.  When you apply roman numeral two, does

23   that gross amount go up or down?

24   A.    So I'm not using the gross amount.  This is

25   still in the format of a carat weight rate and then

Page 150

1    the percent difference between the two.

2          So it's not an amount, but it is an

3    increase.  These numbers produced by the carrier

4    software would be an increase compared to the Czar

5    2011 base rates.

6    Q.    Okay.  So when you apply roman numeral two to

7    the carat weight base rate, does the carat weight

8    base rate go up or down?

9    A.    So ultimately it would raise the carat weight

10   rate.

11   Q.    And what does that do to the ultimate price?

12   A.    It would raise the price.

13   Q.    Making it more expensive?

14   A.    That's correct.

15   Q.    So when you applied roman numeral two, the

16   industry standard prices go up?

17   A.    Correct, because it's the percent difference

18   between the CzarLite 2011 base rate and the industry

19   base rate.  And it was greater, so I would

20   increase -- well, it's -- I mean, sorry.  I'm having

21   difficulty explaining it, because we are moving from

22   carat rates to percentages to money.  Maybe that's

23   some of the confusion here.

24   Q.    Well, explain what the proper way is to do it

25   then.  I just don't understand.  I have no idea what

Page 151

1    you're doing here.  I don't understand, so I need you

2    to explain it to me.

3    A.    Okay.  So, again, we find the carat weight rate

4    of the carrier that we're using.

5    Q.    Okay.  Let me interrupt you.  What is the carat

6    weight rate in layman's terms?

7    A.    It's a hundred weight rate, so if it were -- if

8    the rate came out as 12.34, really you would multiply

9    the weight times .1234.  It's a hundredth weight

10   rate.

11   Q.    And how does that -- how does that relate to

12   the ultimate price that's charged?

13   A.    Because the carat weight rate is what's

14   multiplied by the rate to determine the gross

15   charges.

16   Q.    Okay.

17   A.    It's basically the base.

18   Q.    And the gross charges are for the, the fuel

19   surcharges added and the accessorials?

20   A.    And discount.

21   Q.    And discount?

22   A.    That's correct.

23   Q.    Okay.  All right.  So then the second roman

24   numeral is when you add the discount?

25   A.    That's not correct.

Nicole Bolton 5/22/2019                                   Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 152

1   Q.    Okay.  Tell me what happened in the second

2   roman numeral.

3   A.    So on the second one you determine -- you, you

4   didn't do this.  I'm sorry.  It's where it's

5   determined that the percent difference between the

6   Czar 2011 base carat weight rate versus the industry,

7   one that we, for this carrier, that it came out.  So

8   it's the percent difference between the two.

9   Q.    Okay.  And then what happened at the third

10  roman numeral?

11  A.    So taking the increased percentage, we

12  increased the Czar 2011 base net amount by that

13  percent difference, the difference between the two

14  raters to produce a net charge.

15  Q.    Okay.  And then that is compared with the spot

16  quote charge?

17  A.    That's correct.

18  Q.    Okay.  All right.  And you did that for each of

19  the, each of the industry standard samples, and then

20  divide them all by six, add them all up, and then

21  divide them by six; is that right?

22  A.    The rates were divided by six, yes, sir.

23  Q.    Okay.  All right.  What is H, I, J, K, L, what

24  is that?  Is that additional processes that were done

25  when you're rating these shipments?

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

                                                                        Page 153

1   A.    So these, these above roman numerals, you know,

2   the one -- excuse me, you know, that was not nice,

3   that above matches with the three roman numerals for

4   each individual carrier; correct?  Is that making

5   sense?

6   Q.    No.

7   A.    So, like, for roman numeral 1, 2, and 3 here

8   for FedEx specifically, this is talking about the

9   column creation.

10           This is just the actual steps.  So in my

11  explanation that we just went through about what

12  actually happened in these steps, this is physically

13  entering the data.  These are just the column headers

14  and describing what it represents and if there was a

15  formula used.

16  Q.    When you say "these," are you talking about the

17  roman numerals and then the letters H, I, J, K, and

18  L, that is just data, the actually inputting of the

19  data?

20  A.    That's correct.

21  Q.    Okay.  All right.  Let's move on to page 14

22  then, and here it says, In reference to Item H-1,

23  period, review the shipment that CFL volume rated to

24  determine whether the rate is reasonable or not,

25  period.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 154

1          If not, comma, what would be a reasonable

2     rate for the shipment?  So that's the same task that

3     you have been given repeated again; right?

4     A.    That's correct.

5     Q.    Okay.  Then it says, In my expert opinion that

6     the application for the flat charge of $400, used in

7     certain instances as the lowest charge that could be

8     billed by CFL, comma, was not a reasonable charge,

9     period.

10          This charge is well above the contract

11     Transportation Agreement effective July 7th, 2011,

12     minimum charges, period.  100 percent of the

13     occurrences for this sample were billed, on average,

14     82 percent more than the contract minimum charges.

15          What are you saying here?

16     A.    So using the data, there were a large grouping

17     of $400 shipments that in my auditor intuition was

18     curious about.  So pulling out these 400 shipments,

19     $400 shipments indicated by an "M" in the class

20     column, which is pretty standard for a carrier to

21     indicate an "M" as a minimum charge being applied,

22     and this flat charge occurring consistently is a good

23     indicator as well.

24          In all of the cases of this grouping of

25     this continuously used $400, it was billed on

Page 155

1   shipments that would most likely be subject to the

2   minimum charge or something very close to it, and

3   this $400 was well above the minimum charge listed in

4   the contract.

5   Q.    What was the minimum charge that was listed in

6   the contract?

7   A.    They were varying depends on lanes.  I don't

8   have the contract in front of me.  I believe 85 was

9   the highest.

10  Q.    $85 dollars?

11  A.    Yes, sir, that's correct.

12  Q.    Okay.  And so you believe that Central Freight

13  was charging a minimum charge for what they

14  determined were volume shipments of $400?

15  A.    In certain instances, I do believe.

16  Q.    Okay.  Doesn't that seem inconsistent, because

17  in the analysis that you do in your report on page

18  20, 21, 22, 23, 24, 25, 26, 27, 28, there are

19  multiple shipments that are described there that are

20  under $400, so how could there be a minimum charge?

21  A.    That's why when I was responding about this I

22  said in certain instances.  It's not every lane that

23  this was applicable.

24  Q.    So there was a minimum charge only in certain

25  lanes?

Page 156

1    A.    For this grouping.

2    Q.    How many specific minimum charges did you find

3    that were $400?

4    A.    If it's not listed in here, I don't have the

5    number for that at this time.

6    Q.    What was the total dollar value of minimum

7    charges charged to Amazon that you think are

8    inappropriate?

9    A.    I would have to look at the data specifically

10   to review all minimum charges.

11   Q.    Okay.  So are we talking about a hundred

12   minimum charges, a thousand minimum charges?  How

13   many did you decide?

14   A.    I can't speculate.  I do not recall.  That is

15   something that I would have to go back and filter the

16   data for.

17   Q.    Do you know if the minimum charges were in

18   specific lanes?  So could you look at the data and

19   determine that all of these minimum charges of $400

20   were in specific lanes?

21   A.    I could provide the origin and destination

22   imposed as related to these $400 shipments.

23   Q.    But you didn't do that; you didn't look at that

24   already?

25   A.    I did not provide that, no.

Page 157

1  Q.    Do you know whether there are any anomalies

2  with those shipments?  For instance, could it be

3  unpalletized shipments, could those be subject to a

4  minimum charge?

5              MR. BLOCK:  Object to form.

6  A.    What factors in for palletized and unpalletized

7  shipment could affect the NMSC classification that's

8  used.  But as far as having a choice of palletized or

9  unpalletized in any other aspects, I have not ever

10  witnessed that.

11  Q.    Are you familiar with any other carriers'

12  minimum charges?

13  A.    Like their standard in their, their general use

14  tariffs or --

15  Q.    Yes.

16  A.    They're all different, but they are listed and

17  can publicly be found.

18  Q.    Are you familiar with Estes Freight?  Are you

19  familiar with that company?

20  A.    Estes Express?

21  Q.    Yes, Estes, Estates Freight?

22  A.    Estate?

23  Q.    E-s-t-e-s, Estes.

24  A.    Estes Express?

25  Q.    Yeah.

Page 158

1   A.      Uh-huh.

2   Q.      Are you familiar with them?

3   A.      Yes.

4   Q.      Do you know what their minimum charge is?

5   A.      I would have to review.  That's not something I

6   have memorized.

7   Q.      So you didn't look at that when you gave the

8   opinion that $400 is an exorbitant amount for Central

9   Freight to charge?

10  A.      Again, I didn't find it necessary as it's my

11  opinion that the contract would apply.

12  Q.      Okay.  But if there were other carriers that

13  also had a $400 minimum charge, would you agree that

14  $400 is not exorbitant?

15              MR. BLOCK:  Object to form.

16  A.      Again, it's in comparison to what I believe is

17  the applicable rates, which is in the contract, so

18  that would not be in consideration.

19  Q.      Well, but for a large part of your analysis,

20  you're comparing what Central Freight did to industry

21  standards, so why wouldn't industry standards

22  regarding minimum charges be relevant?

23  A.      I was asked to make that comparison, but that

24  does not reflect my opinion of what's applicable.

25  Q.      Okay.  So if I represented to you that Estes

Page 159

1    also had a $400 minimum charge, would you say that

2    Estes minimum charge is exorbitant, if it's in their

3    tariff?

4              MR. BLOCK:  Object to form.

5    A.    Again, because of deregulation, a carrier does

6    not have to answer to anybody about their rates or

7    their minimum charges.  They are just trying to be

8    competitive in the industry.  So they may bill as

9    they want.

10             Again, that's assuming -- again, that that

11   number even exists, which I find to be highly

12   unlikely, and that their tariff would even apply.

13   Q.    Okay.  But you have no idea how many times

14   Central Freight billed the minimum charge; right?

15   A.    That's correct.

16   Q.    So you don't know if it was significant in

17   terms of the overall billing that was done here;

18   right?  It could have been five times over 6,000

19   shipments; is that right?

20   A.    I could get you that number if it's of concern.

21   Q.    But you didn't do that for your report, yet you

22   put this big graphic here showing that the average

23   percentage billed above contract rate when sampling

24   was a flat charge is 82 percent, but you didn't

25   really quantify that, how many times they did that?

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 160

1    A.    Oh, I'm sorry.  I apologize.  This number right

2    here, 167 is the number of invoices.

3    Q.    Okay.

4    A.    I do apologize.

5    Q.    Okay.  So it was 167 invoices that were billed

6    at $400 minimum charge across the whole 6,000, or

7    only in the sample set?

8    A.    I did not specify, so I would have to re-run

9    that.

10   Q.    Okay.  You have to check on that; huh?

11   A.    I am -- I will reserve that.  I'm sorry.

12   Q.    Well, it's not -- so, your report is inaccurate

13   there; right?

14            MR. BLOCK:  Object to form.

15   Q.    Because it doesn't specify whether it's over

16   the sample set or over the entire 6,000 shipments?

17   A.    I don't know how that makes it inaccurate.  It

18   just needs to be clarified.

19   Q.    If you look at page 16.  What is this?  Is

20   this, again, just a description of the process in

21   which you have created the industry standard average

22   and compare it to the spot quote?

23   A.    It's the sets that were necessary in order to

24   produce these results to support opinion three.

25   Q.    Does any difference than what we have already

Page 161

1    talked about?

2                    MR. BLOCK:  Object to form.

3    A.    It's basically the same process.

4    Q.    Why did you put it in support number three?

5    Why do you have to have another opinion support for

6    it?

7    A.    Oh, I would like to clarify right here in the

8    notation, it's 167 shipments out of the 1,739.  So it

9    was about ten percent in my sample.

10   Q.    Okay.  So does page 16, does this relate to

11   your analysis and process for determining the minimum

12   charge was excessive, or is this relating back to the

13   overall industry standard comparison?

14   A.    This was specific to the steps that I had to

15   perform to render this opinion about the minimum

16   charge.

17   Q.    All right.  Then let's go through this.  Let's

18   go to number one.  It says, Using the shipment data

19   provided and internally generated figures the

20   following comparisons were made.

21                    One, between what was billed per the volume

22   spot quote software, what would be considered the

23   industry average standard rate and what would have

24   been the amount billed using the contract rates.

25   What does that mean?

Page 162

1   A.    This, again, is just highlighting the approach

2   to our data.

3   Q.    The what?

4   A.    The approach to the data or process.

5   Q.    Which data, which process?

6   A.    The data that we received and the processes of

7   our calculations, what we were doing with the data.

8   Q.    Okay.  And then A, it says, Used filter of

9   equals 400 in the inv_charge_amount.  Then in

10  parenthesis 167 shipments out of the 1,739.

11        What does that mean?

12  A.    So anywhere that the amount charged in the

13  invoice charge amount which is representative of this

14  spot volume quote amount charged on the invoices when

15  it was $400, and, again, this would be the net value

16  prior to fuel surcharge or accessorial applications,

17  it was the filtering that we did, and that was the

18  number of shipments that were the result of that

19  filter.

20  Q.    Okay.  Then if you look at roman numeral one,

21  it says, Group By query was built to determine number

22  of shipments which the billed amount, and then it

23  says, inv_charge-amt, was greater than the applicable

24  contract amount, in parenthesis mfst_chrg_amt, end

25  parenthesis.  What does that mean?

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 163

1   A.    So it was a comparison of the $400 charge, as

2   compared to the application of what would have been

3   billed according to the contract rates.

4   Q.    Okay.  Did you do that same comparison compared

5   to the industry standard?

6   A.    I did not run it against the industry standard.

7   Q.    Why not?

8   A.    Because, again, it's in my opinion that the

9   contract is what applied.

10  Q.    Okay.  It's possible that the 400 minimum

11  charge could have been less than the industry average

12  standard?

13  A.    I find that highly unlikely, given my

14  experience in the industry.

15  Q.    But you didn't run the numbers; right?

16  A.    I did not look up all of those charges.  No, I

17  did not.

18  Q.    When you say "all of those charges," it was

19  only 167 shipments; right?

20  A.    You are asking did I look up the minimum

21  charges.  I would have to go and look at every

22  carrier that we used in this sample.

23        I would have to find their minimum charges,

24  as per their rules tariff, because it would be

25  different for every carrier.

Page 164

1          And then there could be complexity in the

2    fact that it would be dependent on some other factors

3    that could --

4    Q.    What about just comparing the minimum charge

5    versus the industry standard rate that you compiled

6    for those, on those shipments?

7    A.    I did not run these specifically.  They were

8    included in the grouping of the 1,739 shipment

9    comparison, but as far as comparing to the industry,

10   I did not do that step specifically on this grouping.

11   Q.    But you could have; right?

12   A.    Sure.

13   Q.    And then it says, Then the average percentage

14   above contract rate was determined.  What is that?

15   A.    I'm sorry.  Where are you referencing?

16   Q.    It's the bullet after roman numeral one.

17   A.    So the amount that would be -- sorry.  I'm

18   trying to separate these steps.  So the percent of

19   invoices above the billed volume spot quote rate as

20   compared to above the, the contract rates.

21   Q.    Okay.  And then the next open bullet says,

22   Column PctDiff between charges was created.  And then

23   there is a square bullet, and it says, This is a

24   percentage change between using the contract

25   specifications for rating shipments, in parenthesis,

Page 165

1    off manifest, underscore, amount, end parenthesis,

2    and a volume spot quote rate amount that was billed.

3    And then in parenthesis there is this inv_charge_amt,

4    end parenthesis, was determined for comparative

5    purposes.

6              What is that?

7    A.    So if you reference back to page 16, this

8    82 percent, the average percent billed above contract

9    rate when sample invoice is flat charged $400.  So

10   that's the percent amount above the minimum charge.

11   Q.    Okay.  Is all of the rest of the stuff on page

12   16, does it relate to this minimum charge?

13   A.    That is correct.

14   Q.    Okay.  Let's move on.  Moving on to page 17.

15   So this says, in your opinion, it says, Using a

16   sample of 1,739 shipments of the original 6,298

17   shipments, it was determined that 98 were billed

18   above contract rate?

19              MR. BLOCK:  98 percent.

20   Q.    Ninety-eight percent were billed above contract

21   rate, period.  This is of significance because,

22   comma, in my expert opinion, comma, the LTL contract

23   rating should be applicable, period.

24              The sample shipments reviewed would have

25   qualified for LTL shipping rates given the following

Page 166

1   reasons.

2            So it's your opinion that all of the

3   shipments that were in the sample set should have

4   qualified as LTL shipments, meaning there should have

5   been no additional charges based upon the size of the

6   shipment or the volume of the shipment; is that

7   correct?  Is that your opinion?

8   A.    In accordance with the contract.

9   Q.    What does that mean, "in accordance with the

10  contract"?

11  A.    It is LTL rates.  There's no exceptions to it.

12  Q.    Okay.  So your opinion is based upon the fact

13  that the contract makes no exceptions for volume

14  rates?

15  A.    That is correct.

16  Q.    Okay.  Then you go to number one.  It says, In

17  the motor carriers industry many transportation

18  providers consider shipments to be LTL when they

19  weigh less than 20,000 pounds and are rated using

20  rates from weight breaks that are below the 20,000

21  pound weight break.

22            What does that mean?

23  A.    So the first part of this is most carriers

24  define LTL's as less than 20,000 pounds, and it's not

25  necessarily based on pallet spaces.

Page 167

1        And it's also rated using the weight breaks

2   that are below 20,000 pounds, because when you use a

3   rating application, there is, there is an opportunity

4   where if they were to -- for instance, you have a

5   4,500 pound shipment.

6        At 4,500 pounds it would be subject to the

7   2,000 pound line weight break rates, because, again,

8   our rates are by class and by weight breaks.

9        However, if the rater can determine that if

10  you were to pay for 5,000 pounds, and the 5,000 pound

11  weight break at 5,000 pounds would be cheaper, then

12  it bumps the weight, and you get that rate.

13       So there could be shipments that are

14  between 10,000 pounds and 20,000 pounds, where

15  there's a 10,000 pound weight break and the 20,000

16  pound weight break where the rater may in its

17  calculations that it's told to perform would think

18  that bumping it to the 20,000 pound rate and paying

19  for 20,000 pounds would be cheaper.

20       But so long as this shipment is under

21  20,000 pounds and is multiplied by nothing higher

22  than the 10 M carat weight rate, the weight break for

23  that rate, then it's considered LTL.

24  Q.   Is it your opinion that the only criteria to

25  determine whether a shipment is an LTL shipment or

Page 168

1   not is weight?

2   A.    Not the only criteria.

3   Q.    What other criteria determined whether an LTL

4   shipment is -- strike that.  What other criteria are

5   involved in determining whether a shipment is LTL?

6                   MR. BLOCK:  Object to form.

7   A.    LTL is when you do not use the full capacity of

8   a trailer.

9   Q.    Okay.  So are there some circumstances where a

10  shipment would not be 20,000 pounds, but would,

11  nonetheless, be constitute, nonetheless would

12  constitute an LTL shipment?

13  A.    I'm sorry.  Can you re-ask that question?

14  Q.    Is there circumstances where a shipment does

15  not weigh 20,000 pounds, but, nonetheless, should not

16  be considered an LTL shipment?

17                  MR. BLOCK:  Object to form.

18  A.    If it, you know, would require a 40-foot

19  trailer, it couldn't be LTL.

20  Q.    Well, what about a shipment of feathers that

21  takes up 80 percent of the capacity of a trailer,

22  should that still be considered an LTL shipment, in

23  your opinion?

24                  MR. BLOCK:  Object to form.

25  A.    Yes.

Page 169

1    Q.    Why?

2    A.    It doesn't fill the full capacity of the

3    trailer.  And even at that, if you're using an LTL

4    carrier, again, there are rules in their rules

5    tariff, if applicable, that account for these

6    shipments called capacity loads, and it is, you know,

7    it's dealing with larger volume shipments, including

8    the full capacity of an LTL trailer.

9              But there's a difference between an LTL pup

10   trailer, a 28 feet, and a truckload trailer that on

11   average begins at 40 feet.

12             There can be LTL shipments that actually go

13   beyond a 28-foot trailer, therefore, again, applying

14   capacity load and then overflow charges, which would

15   be LTL charges, for those beyond a 28-foot trailer.

16   Q.    When determining whether there is an LTL

17   shipment or not, should you consider whether pallets

18   are stackable?  Is that important?

19   A.    It is not necessarily about stackable pallets,

20   especially given where the industry is now with

21   loading bars or decking bars, which allows freight

22   that can't be directly stacked upon, but if there is

23   room above it, you can place pallets on these bars

24   and, therefore, occupy the space above it.

25   Q.    What about a shipment that's high, like a 98

Page 170

1    inch shipment?

2    A.    So it would be to the ceiling?

3    Q.    Yeah, does that get different treatment?

4                 MR. BLOCK:  Object to form.

5    A.    Not necessarily.

6    Q.    So you think that a pallet count is irrelevant

7    to whether a shipment should be considered LTL or

8    not?

9    A.    Yes, sir.

10   Q.    So a 25 pallet shipment, that should be LTL if

11   it's under 20,000 pounds?

12                MR. BLOCK:  Object to form.

13   A.    Sure.

14   Q.    Yes?

15   A.    Yes.

16   Q.    A shipment of pillows that takes up 90 percent

17   of the trailer, is that LTL?

18   A.    Yes.

19   Q.    No matter how many pallets it's on?

20   A.    That's correct.

21   Q.    In your analysis you didn't consider pallets

22   whatsoever; right?

23   A.    That's correct.

24   Q.    In your opinion, pallets are irrelevant?

25   A.    That's correct.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 171

1   Q.    The only thing that matters is weight?

2              MR. BLOCK:  Object to form.

3   A.    In this scenario, yes.

4   Q.    And why is it in this scenario?

5   A.    Because, again, it is in my opinion that the

6   contract applies and that, therefore, the LTL rating

7   application applies for these movements.

8   Q.    So you believe that Central Freight was stuck

9   with whatever Amazon gave them, because there wasn't

10  a linear foot rule in the contract?

11  A.    I would not call it "stuck."  I -- in my

12  opinion and in my experience in the industry, I have

13  witnessed contracts where this rule is waived for

14  other shippers.

15             I have experienced where a reduced rate is

16  offered.  I have also experienced contract instances

17  where the footing that would enact such a rule as

18  lineal foot or capacity was moved beyond to a greater

19  length.  So I don't find it that they're stuck with

20  this, in my opinion.

21  Q.    If you assume for the purpose of this question

22  that Amazon did enter into an, did enter into a

23  modification of the Transportation Agreement which

24  allowed Central Freight to spot quote eight pallet

25  plus shipments, then do all of your opinions on page

Nicole Bolton 5/22/2019                                        Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 172

1    17, are they out the window?

2                  MR. BLOCK:  Object to form.

3    Q.    Are they inapplicable to this situation?

4    A.    Can you ask the question again?  I'm sorry.

5    Q.    If you assume for the purpose of this question

6    that Amazon and Central Freight did modify the

7    Transportation Agreement to allow Central Freight to

8    volume bill eight pallet plus shipments, would you

9    agree that all of the opinions that are set forth on

10   page 17 and 18 of your report are irrelevant?

11                 MR. BLOCK:  Object to form.

12   A.    I do not agree.

13   Q.    Why?

14   A.    Because in the review of some of these

15   shipments, even though we didn't factor in pallets,

16   we did review weight and shipments that were only a

17   few hundred pounds to even a hundred pounds would not

18   constitute eight pallets, yet they were included in

19   the 6,298 shipments.

20   Q.    So part of your report is that you believe that

21   Central Freight misrepresented that there were eight

22   pallets in a shipment when there were not eight

23   pallets; is that right?  Is that one of your

24   opinions?

25   A.    I cannot say that, because I am not looking at

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 173

1    that data.

2    Q.    Is one of your opinions that Central Freight

3    billed Amazon for eight pallet plus shipments in

4    circumstances when you determined based upon your

5    review of the data that those pallets, that there

6    could not be eight pallets in that truck, based upon

7    weight?

8    A.    I did not specifically seek that opinion out;

9    however, as I stated, shipments under a hundred

10   pounds, if you're talking about pallets themselves,

11   the common industry pallet weighs between 40 and 60

12   pounds, so how could you have eight pallets if your

13   shipment was less than a hundred pounds?  There is

14   not enough weight to constitute even just pallets

15   being on the truck.

16   Q.    Did you look at that individual data line that

17   had that information and pull the weight and

18   inspection report to determine whether the

19   information that was on your data points were

20   accurate?

21   A.    I did not pull inspections, no.

22   Q.    Do you think the inspection report -- strike

23   that.  Do you know whether an inspection report would

24   provide the answer to your question as to whether

25   there were eight pallets in the circumstances of

Page 174

1   which data, the data that you discussed suggests that

2   it was impossible that there were eight pallets?

3   A.    There were two weight columns as provided in

4   the data.  One was what was originally submitted, and

5   then one as to what was actually used in billing,

6   which would be the result of any inspection, and,

7   therefore, there were changes between the two.

8   Q.    Is it possible that that information was

9   misentered, manually misentered?

10  A.    Humans make mistakes.

11  Q.    So that's possible; right?

12  A.    That's possible.

13  Q.    So wouldn't the prudent thing to do would be to

14  pull the inspection report before you gave this

15  opinion to verify that your statement was right

16  before you accuse Central Freight of misrepresenting

17  a pallet count?

18            MR. BLOCK:  Object to form.

19  A.    I did not accuse them of that.  That is not my

20  statement.  I'm just drawing a conclusion of what was

21  provided to me.

22  Q.    What is your conclusion?  Can you tell me what

23  that conclusion is?

24  A.    That, again, in some instances, given the data

25  that I was reviewing, there are questionable

Page 175

1    instances of if there could actually have been eight

2    or more pallets.

3    Q.    But you did nothing to verify that that data

4    was correct, even though you had potential access to

5    the weight, the weight and the inspection reports;

6    right?

7    A.    Can you ask the question again?  I'm sorry. .

8              MR. KALLISH:  Can you repeat it?

9              THE WITNESS:  I'm sorry.

10    (Court reporter read back pending question.)

11   A.    I did not verify it with weight certificates,

12   but it would be my opinion that what was billed by

13   Central Freight would be the correct weight so that

14   they would get accurate payment.  That's what they

15   put on their freight bill.

16   Q.    How many times did you find shipments in the

17   over 6,000 set of data points where you believe there

18   was a misrepresentation or it was impossible that

19   there were actually eight pallets when Central

20   Freight said there were, there was eight pallets, how

21   many times?

22   A.    I can't give you that number.  I didn't

23   specifically zero in on that.

24   Q.    More than one time?

25   A.    I believe so.  I would have to look at it.

Page 176

1   Q.    More than five times?

2   A.    I would have to look at the data.

3   Q.    More than ten times?

4   A.    I would have to look at the data.

5   Q.    So you can't tell me if it was more than ten

6   times, or if it was a hundred times, or if it was a

7   thousand times?  You can't give me that information?

8   A.    Not at this time.

9   Q.    Yet you make the, the statement generally in

10  your report that there were instances in which

11  Central Freight billed for eight pallet shipments

12  when it was impossible that those were eight pallet

13  shipments?

14  A.    I did not say that in my opinion report.

15  Q.    Okay.  Let's look at what you are saying here

16  then; okay?  If you look here at, on page 17, one, it

17  says, In the motor carrier industry, many

18  transportation providers consider shipments to be LTL

19  when they weigh less than 20,000 pounds and are rated

20  using rates from weight breaks that are below the

21  20,000 pound weight breaks.

22          Do you see that?

23  A.    Yes, sir.

24  Q.    Okay.  Isn't it true that, that many carriers

25  in the transportation industry also have linear foot

Page 177

1    rules that would be contrary to using a 20,000 pound

2    threshold for LTL?

3    A.    It doesn't make it not an LTL shipment.

4    Q.    But it provides more revenue for the LTL

5    shipment; correct?

6    A.    It does.

7    Q.    Than simply using 20,000 pounds as a threshold?

8    A.    That's correct.

9    Q.    What percentage of the carriers that you use as

10   industry leader samples had tariffs that included

11   linear foot rules?

12   A.    Again, I didn't specifically research that.

13   Q.    Based upon your knowledge of the industry and

14   your experience in the industry, would you say

15   90 percent of them have followed linear foot tariffs?

16   A.    It's pretty standard to have lineal foot or a

17   comparative capacity load application.

18   Q.    Okay.  So using 20,000 pounds as a threshold

19   for whether something was LTL or not LTL, it was

20   really inapplicable, considering that most carriers

21   have linear foot rules that give them more revenue

22   for volume shipments anyways; right?

23   A.    Well, you have to take into consideration the

24   rules and their stipulations.  As some say, it could

25   be over the amount of feet that enact the lineal foot

Page 178

1    rule; however, if it's computed to a specific

2    weight, then the lineal foot charge wouldn't apply.

3              Some don't have a lineal foot charge.  They

4    use capacity loads, and that usually is dependent on

5    a combination of lineal foot and weight as well.

6    Q.    What is capacity load?

7    A.    It is when you use the majority of a trailer.

8    It sometimes is kind of used in lieu of a lineal foot

9    rule.

10   Q.    And most carriers charge more for that, right,

11   when that occurs?

12   A.    They have a different rating mechanism, yes.

13   Q.    So if you look at roman numeral one, the bullet

14   says, 1732 out of the 1739 sample shipments and 6273

15   of the 6298 shipments would be considered LTL, as

16   these were all less than 20,000 pounds.

17             Is that your opinion, that all of these

18   should have been rated as straight LTL shipments,

19   because they're under 20,000 pounds?

20   A.    I make this note in reference to what is, what

21   is mainly used in the industry about less than 20,000

22   pounds, but, again, my opinion based on how it's

23   rated is due to the contract.

24   Q.    Why is it now that you've switched back to

25   using the full sample, the two full set of 6273 --

Page 179

1   I'm sorry -- of 6298, why all of the sudden are you

2   going back to that, after you've spent all of this

3   time to filter out to have a sample set?

4   A.    I offered both what it would be of a sample set

5   and of the full set, because this information was

6   already provided and didn't require the rewriting of

7   these invoices.

8   Q.    I mean, but there were thousands of shipments

9   that were under 150 to 50 dollars, so, of course,

10  that's not going to be a $20,000 shipment; right?

11  A.    Dollar a pound.  I'm sorry.

12  Q.    A lot of these shipments were -- over a

13  thousand of the shipments when you filter them out of

14  your sample set were $150 charges or less, so,

15  obviously, they're not going to be 2,000 -- they're

16  not going to be 20,000 pound shipments; right?

17  A.    That's correct.

18  Q.    So I don't understand.  It seems disingenuous

19  now to have a sample set that you say filters out

20  certain types of shipments that are not applicable to

21  the analysis, and then when it serves your purposes

22  you go back to the full sample set.  That seems

23  awfully dishonest; don't you agree?

24            MR. BLOCK:  Object to form.

25  A.    I'm not being dishonest, and if you don't like

Page 180

1    to use the full sample, I mean the full set, I also

2    provided the other specifics of the sample size of

3    1732 or 1739.

4    Q.    It just seems to me that you used whatever

5    sample set is most convenient for your opinions, as

6    opposed to being consistent; isn't that right?

7    A.    There is consistency.  I gave you the number

8    for the sample set I used.

9    Q.    But why when you did all of the other analysis

10   did you use the full number?  Why did you use a

11   sample size?

12   A.    Given the time constraints and all the work

13   that would have to be rendered, a sample size was

14   more --

15   Q.    So when it's convenient to you, you use the

16   full amounts, and when it's convenient, you use a

17   sample size; is that right?

18   A.    That's not --

19               MR. BLOCK:  Object to the form.  It's

20          getting argumentative, Marc.

21   Q.    You can answer the question.

22   A.    I'm sorry.  Can you ask --

23               MR. KALLISH:  Read it back.

24       (The court reporter read back the question.)

25               THE WITNESS:  It's not necessarily

Nicole Bolton 5/22/2019                                  Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 181

1              about convenience.  In my opinion this was

2              already provided, and I provided those

3              numbers.  Again, I provided both, both

4              options.

5    BY MR. KALLISH:

6    Q.    Looking at number two it says, When reviewing

7    all 6,298 shipments, the average weight for each is

8    3,381.9 pounds, indicating they were more than likely

9    LTL shipments requiring less than eight pallet floor

10   spaces.  What do you mean by that?

11   A.    So an average weight of 3,381.9 pounds would,

12   again, most likely not require eight pallets, because

13   the standard industry pallet can hold almost by

14   itself all of this weight.

15              And given the factors of the classes that

16   are applied, which are indicative of the density,

17   these were not -- I mean, these were very dense

18   shipments.

19              They weren't feathers, where I probably

20   could get eight pallets of feathers weighing 3,398,

21   given the combination of the -- it further explains

22   here in this, if this helps, that the common freight

23   class, the average freight class would be 85, and

24   classes in the NMFC correspond with a density

25   grouping that they represent.

Page 182

1          In this case 85 corresponds to a density of

2     at least 12 pounds per cubic foot, but less than 15

3     pounds per cubic foot.

4          So to be in favor of the carrier, I would

5     use the 12 pounds per cubic foot, because it would

6     render the highest amount of cubic feet.

7          Given the average class using the

8     corresponding density most in favor of the carrier,

9     and using the average weight, I can determine on

10    average it would be 281.825 cubic feet required for

11    these shipments.

12    Q.    Who palletizes products in the Amazon system?

13    A.    I'm uncertain of that.

14    Q.    Do you think that Central Freight palletizes

15    these shipments?

16    A.    I don't believe.  Usually it is the shipper

17    that palletizes, unless they have dock workers from a

18    carrier that are dedicated to working on their docks

19    and palletizing their shipments.

20    Q.    So if Central Freight shows up at a dock, and

21    there's eight pallets, do you think that they should

22    unpalletize them and repack them more tightly so that

23    there's less pallets; is that your opinion?

24    A.    I have not in any way insinuated that opinion.

25    Q.    I mean, I just don't understand your opinion,

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 183

1   because you're saying that Central Freight based upon

2   weight shouldn't have considered these eight pallets,

3   but they are physically eight pallets when they pick

4   them up.

5          There's an inspection report that indicates

6   the number of pallets, the size of the pallet, and

7   the capacity that it takes up in the truck; right?

8   A.    I was not given these inspections, so I cannot

9   confirm.

10  Q.    So, again, I'm just trying to understand what

11  you're trying to say.  You're trying to say based

12  upon your analysis of the weight of the shipments and

13  the class of shipments that these were not palletized

14  in the manner in which Central Freight says they

15  were, that they were on less pallets; is that your

16  opinion?  I'm just trying to understand the opinion.

17  A.    My opinion is given known factors in the

18  industry as corresponding with the class and the

19  weights, these -- I mean, it -- the class represents

20  a specific pounds per cubic, so, therefore, the

21  density, the capacity that it would require.

22          And if that is what it is, then you can

23  determine with the factors with the cubic footage

24  would be.  So at most it would require 281, round it

25  to 282 cubic feet.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 184

1   Q.    So you're saying you can do that calculation,

2   and that if there's an inspection report that shows

3   eight pallets that the inspection report is false?

4   A.    I did not say that.

5   Q.    Well, I don't understand what you're saying.

6   You make the statement that there are not, that

7   Central Freight stated that they were eight pallet

8   shipments, and you don't believe they were eight

9   pallet shipments.  Isn't that your opinion?

10  A.    I did not state that Central Freight says that

11  these were eight pallet shipments.  These were

12  shipments that were rated per the volume quote

13  software.

14  Q.    I'm going to show you a group exhibit.  I don't

15  have additional copies of these.  I'll represent to

16  you that these are a number of bills of lading and

17  weight and research inspection certificates that were

18  part of the shipments that were spot quoted.

19        I'm going to ask you to look at them.  They

20  are bates numbered CFL 031993 through CFL 031502.  We

21  will mark that as a group exhibit.

22              (Exhibit No. 3 was marked.)

23  BY MR. KALLISH:

24  Q.    I'm showing you what I have marked as group

25  Exhibit 3.  Can you take a look at those documents?

Page 185

1  A.    Yes, sir.  (Witness reviews documents.)

2  Q.    So I showed you what has been marked as group

3  Exhibit Number 3.  Those are all weight and

4  inspection reports and bills of lading.

5        Would it have been helpful for you to look

6  at those similar documents for the shipments that you

7  analyzed in this case.

8                MR. BLOCK:  Object to form.

9  A.    No.  Because, again, I believe that the, the

10  contract rates would apply, and I would ask for an

11  industry comparison of LTL rates.

12  Q.    Would that have helped you in terms of your

13  statement that Central Freight submitted invoices for

14  eight pallet shipments that were not eight pallet

15  shipments?  Would that information have been helpful

16  to your analysis of that issue?

17  A.    Again, as I don't believe that this rule is

18  applicable, but I can, if you would like to discuss

19  some examples in here, I do have comments about them.

20  Q.    That relate to the fact that you think that

21  they are not eight pallet shipments?

22  A.    Physically are they eight pallets, sure.

23  Q.    Okay.  So I'm trying to understand.  So you are

24  criticism is not that they weren't packed in eight

25  pallet shipments.  Your criticism is that they could

Page 186

1   have been packed in a more efficient way so they

2   wouldn't have taken up eight pallet spaces; is that

3   right?

4   A.    Because I did not review all of these

5   documents, I do not know the number of pallets that

6   they were on.  I did not focus in on that.

7   Q.    Okay.  Does your opinion assume that Central

8   Freight has some control over the number of pallets

9   that are used or how the things are packed?

10  A.    No.

11  Q.    So, I mean, if Central Freight goes to an

12  Amazon vendor, and they packed a shipment on eight

13  pallets, and the weight per pallet is not what you

14  think is the industry standard, what should Central

15  Freight have done in that situation?

16  A.    Okay.  This question is slightly confusing, in

17  the fact that we are specifically talking about eight

18  pallets.  It's eight pallet space.  So I could have

19  up to 16 pallets stackable.

20        Also in the -- I know in the Amended

21  Complaint that it was stated that eight pallets is

22  representative of 16 feet, which I can show you some

23  examples in these examples that you brought me where

24  I could still load eight pallets, and it would not

25  constitute 16 feet.

Page 187

1          So there's some flaw in this pallet

2     argument.  I am not aware of any carrier that uses

3     the number of pallet spaces used to enact a lineal

4     foot rule, as by feet.

5     Q.    You would agree that some pallets you can't

6     stack things on top of them; right?  Wine glasses you

7     can't stack on top of them; would you agree?

8     A.    I'm not an expert in packing, but I do also

9     know, like we discussed earlier, decking bars that

10    allow for shipments that can't be directly stacked to

11    be actually two pallets tall on top of decking bars.

12    Q.    Do you know if any of Central Freight's trucks

13    have decking bars?

14    A.    I do not personally, no.

15    Q.    Do you know if they had them during the

16    relevant time period that we're talking about?

17    A.    I cannot confirm that.

18    Q.    All right.  Let's look at your report again.

19    So looking at page 18, number four it says, It is not

20    a common practice, seen in any of my ten years of

21    experience of freight cost auditing, that shipments

22    are bumped to a volume shipment depending on the

23    number of pallets, period.

24          There are usually two factors that would

25    constitute a bump, weights over 19,999 pounds, or

Nicole Bolton 5/22/2019                                        Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 188

1    meeting a certain lineal footage.

2            Do you see that?

3    A.    Yes, sir.

4    Q.    Okay.  So the two areas that would put an LTL

5    shipment into a volume shipment range is pounds or

6    linear footage; right?

7    A.    Or a combination of both.

8    Q.    Okay.  And linear footage, what would be the

9    threshold number of a linear footage that would put

10   it into a surcharge type of situation?

11   A.    It's dependent on the carrier's rules.

12   Q.    Okay.  And you say, It appears in the Complaint

13   that eight pallet floor spaces constitute 16 feet,

14   period.  However, the most common type of pallet used

15   in the industry is actually a 40 by, 48 by 40 pallet,

16   period.

17           These could be loaded 48 wide and 40 long,

18   and therefore, two pallet wide and four pallet long

19   on each side would only be 13.33, period.  This is

20   why there is usually a minimum number you of linear

21   foot that must be reached rather than a number of

22   pallets.

23           Do you believe that pallets of that size,

24   48 by 40, are, are typically shipped side by side or

25   are they pinwheeled?

Nicole Bolton 5/22/2019                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 189

1  A.    I don't even know what "pinwheeled" means, but

2  as a standard practice in loading a trailer, as seen

3  in many inspection photos and inspections, they are

4  able to stack pallets 48 by 48 side by side in a

5  28-foot pup trailer.

6  Q.    And that doesn't risk damaging the freight,

7  because there's no room in between the pallets?

8  A.    I am not in damage claims, but, again, that is

9  how it is used in my experience over ten years.

10  Q.    Based upon looking at photos of shipments and

11  inspection reports, that's your opinion?

12  A.    Photos, research, inspection reports from

13  carriers.

14  Q.    Okay.

15           (Exhibit No. 2 was marked.)

16  BY MR. KALLISH:

17  Q.    Let me show you what we've marked as Deposition

18  Exhibit 2.  What I have marked as Deposition Exhibit

19  2, that is the file that you provided us; is that

20  correct?

21  A.    I believe so.

22  Q.    The file that you provided consists of a copy

23  of the Complaint that was filed; is that right?  A

24  number of tariffs, carrier tariffs of Central Freight

25  and other carriers; is that right.

Page 190

1   A.    Yes, sir.

2   Q.    A copy of the Transportation Agreement?

3   A.    Yes, sir.

4   Q.    A document entitled "JOC.com"?

5   A.    Oh, I'm sorry.  Yes, sir.

6   Q.    That was all that you tendered in response to

7   our request for your complete file; is that right?

8   A.    Yes, sir.

9   Q.    And, again, this, what you tendered to us for

10  this deposition does not include any email

11  correspondence that you received from Mr. Block's

12  office; is that right?

13  A.    That's correct.

14  Q.    It doesn't include the data spreadsheet that

15  was provided by Mr. Block's office that formed the

16  basis of all of your opinions; is that right?

17  A.    That's correct.

18  Q.    It doesn't include your rating of the

19  individual sample set industry leaders to form the

20  average; correct?

21  A.    That's correct.

22  Q.    What else doesn't it include that you have at

23  your office regarding this matter, or that you

24  reviewed electronically or otherwise?

25  A.    Any calculation spreadsheets that I may have

Page 191

1    used.

2    Q.    It doesn't include your draft reports --

3    A.    Yes, sir.

4    Q.    -- that were edited by the CEO and COO of your

5    company?

6    A.    That's correct.

7    Q.    What else?  Draft calculations you have?  What

8    else do you have, handwritten notes?

9    A.    Again, I sincerely apologize on my

10   misunderstanding of this.  I thought it was anything

11   that I had paperwise, which included any handwritten

12   notes that I had, or any paper that I had available,

13   and not electronic.

14   Q.    And, you know, I'm not looking for an apology.

15   I'm just trying to find out what you have, so we can

16   get it, because it's helpful.

17   A.    Yes, sir.

18   Q.    So if you just tell me what else you have,

19   other than what I've talked about so far?

20   A.    I believe that is conclusive of what we have.

21   Q.    Okay.  In going back to your report, I'm

22   looking at page 19 of your report; okay?  It says,

23   During the time of this investigation, all required

24   elements, data tables, program codes, stored

25   procedures, et cetera, of CFL's volume/spot quote

Page 192

1   rating software were not provided in order that it

2   would be fully functional.

3            This is -- you were unable to do an

4   analysis of the spot quote before you received the

5   additional software update from Central Freight.

6   That's what this section is talking about on page 19?

7   A.    That is the beginning, yes, sir.

8   Q.    Okay.  Are there any opinions on page 19?

9   A.    Not -- well, this whole paragraph.

10  Q.    Okay.  So the first part of this paragraph says

11  that you couldn't do a full analysis because you

12  didn't have the right software to run the spot quote

13  program, but eventually that was provided by Central

14  Freight, and that forms the basis of your supplement

15  opinion; right?

16  A.    That's correct.

17  Q.    Okay.  But you did do some analysis, or attempt

18  to do some analysis, to determine whether there's

19  accuracy in the spot quotes and if the spot quotes

20  were actually used; is that correct?

21  A.    I made some comparisons.

22  Q.    Okay.  So you state here, Without the exact

23  software used to generate the billing rates, I can

24  only make informed inferences using my industry

25  knowledge and by examining the raw data provided in

Nicole Bolton 5/22/2019                                      Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 193

1   regards to shipments that move between the same

2   origins and destination, destinations, dash,

3   specifically reviewing the date shipped, comma,

4   weight, comma, classes and billed amount, period.

5           From these inferences, comma, it is my

6   expert opinion, comma, shipment data indicates that

7   there were inconsistencies in volume, slash, spot

8   quote billing and that shipments were not billed in

9   alignment with what would be expected of an LTL

10  shipment rating, period.

11          The following -- then it goes on.  The

12  following examples show comparison between shipments

13  that have the same origin zip code and the same

14  destination zip code.  For these same shipments, the

15  ship date, class and weight were all compared.

16          To the best -- to best understand the

17  comparison examples, comma, there is certain industry

18  knowledge that should be understood.  Please find the

19  below notes to help in the review of these shipments.

20          Okay.  And then you have got one through

21  six.

22  A.    I have one through seven.

23  Q.    What is one through seven?

24  A.    So, basically, understanding the varying

25  factors that are used to rate an LTL shipment, again,

Page 194

1    as outlined origin, destination, class, weight.  And

2    then, basically, as these are applied, again, just

3    noting the significance, like, for class, the lower

4    the class is, the cheaper the rate is going to be, as

5    far as the carat weight provided.  Less weight

6    shipments should cost less than higher weight

7    shipments.

8    Q.    Okay.  You provided a bunch of examples where a

9    shipment was -- where two shipments were shipped on

10   the same day from the same origin, same destination

11   with same class rates and same weights, yet the

12   invoice charge amounts were different on those two

13   shipments; is that correct.

14   A.    Not all of my shipments were exactly the same

15   in all of that information, and that's why they are

16   broken down in different examples.

17   Q.    Okay.  So let's look at your first example.  So

18   your first example is a pickup date.  It says,

19   1/11/2016 at 4:25:51 PM, and it has a zip of 90242 as

20   an origin zip and a destination zip of 92551, and a

21   package weight of 5202, and a freight class of M(70),

22   and an invoice charge amount of 255.65.

23            And then you look at the other example that

24   you have put next to that is 1/11/2016, 4/28/09 PM.

25   90242 is the origin.  92551 is the destination zip.

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 195

1    The weight is 5202.  The class is M(70), and the

2    invoice charge amount is 239.28.

3              What are you trying to show by putting

4    those two shipments together?

5    A.    That given these identical shipments, other

6    than the two and half minute time difference, they

7    are billed differently.

8    Q.    And so the invoice charge amount is different;

9    is that what you're saying?

10   A.    That is correct.

11   Q.    So what are you suggesting that means?

12   A.    If I have all of the same factors logically my

13   invoice charge would be the same.

14   Q.    Okay.  Does your analysis that you have set

15   forth in example one there, does that contemplate the

16   number of pallets?

17   A.    No.

18   Q.    If one of those shipments had eight pallets,

19   and the other shipment had nine pallets, would you

20   expect there to be an increased charge based upon the

21   spot quote pricing that Central Freight was using and

22   an eight pallet addendum?

23   A.    As that's not applicable, that did not take

24   that into consideration.

25   Q.    You say it's not applicable, and you make the

Nicole Bolton 5/22/2019                                          Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 196

1   assumption that the rates are random and inaccurate.

2   But, obviously, Central Freight was operating under

3   the impression that they were allowed to spot quote

4   and that pallet count mattered.  Wouldn't you agree?

5               MR. BLOCK:  Object to form.

6   A.    I don't know the pallet situation of this, so

7   I'm not comfortable discussing that.

8   Q.    So you didn't consider any -- I mean, see, it

9   just seems unbelievable to me that you make the

10  assumption here that Central Freight was using random

11  spot quote numbers or numbers that were made up or

12  false when you didn't even take the time to discover

13  whether or not there was a difference between pallet

14  number, pallet numbers, which would have changed the

15  price.

16              Is that correct?  Is that what you did?

17              MR. BLOCK:  Object to form;

18              argumentative.  You can answer that if you

19              understand it.

20  A.    Okay.  I will try to address that.  That was a

21  really long question.  I'm sorry.  Can I please have

22  that re-read back to me?

23      (The court reporter read back the question.)

24  BY MR. KALLISH:

25  Q.    Okay.

Nicole Bolton 5/22/2019                              Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 197

1   A.    So, again, I am making a comparison here.  As I

2   explained to the difference of these, or what it

3   means in the LTL industry, I did not -- I am not

4   accusing.  I am not saying these numbers are false.

5          I am just making a comparison of these,

6   that if there are identical shipments with all of

7   this information, then it would be expected in the

8   LTL industry that these ratings would be the same.

9   Q.    You know, when you say that you're not making

10  an accusation or making an assumption, if you'll look

11  at page 19 of your report, the last page says, From

12  these inferences, it is my expert opinion shipment

13  data indicates that that were inconsistencies in

14  volume, slash, spot quote billing, and that shipments

15  were not billed in alignment of what would be

16  expected of an LTL shipment rating.

17         What does that mean?

18  A.    So when rating as an LTL shipment, again, with

19  all of these factors being the same, the expectation

20  would be that the invoice charge amount would be the

21  same.

22  Q.    Doesn't that require that you look at all

23  factors, not just factors that you specifically

24  chose, and don't consider other factors that the

25  carrier considers material to the price?

Page 198

1   A.     I'm speaking as to LTL shipment rating, which

2   includes the origin, destination, zip, the weight,

3   and the class, in order to produce a rate.

4                    MR. KALLISH:  Let me show you what

5           we'll mark as deposition Exhibit 4.

6              (Exhibit No. 4 was marked.)

7   BY MR. KALLISH:

8   Q.     First of all, the data that you provided in

9   your example one, you didn't provide the pro number,

10  or the invoice number, or any information that would

11  have allowed Central Freight to cross reference the

12  specific shipments that you were talking about; is

13  that right?

14  A.     Not on purpose.

15  Q.     Well, it certainly makes it more difficult for

16  Central Freight to review the information that you

17  put in your report if you don't at all designate the

18  pro number, or any identified line number, or

19  anything like that?

20                   MR. BLOCK:  Is that a question?

21                   MR. KALLISH:  Yeah, that is a

22          question.  I mean, I don't understand why

23          someone would create a report like this and

24          not put in information so that their work

25          could be checked unless they're trying to

Page 199

1          hide something.

2                  THE WITNESS:  These are very specific

3          characteristics, and you could, most

4          likely, in every instance use these

5          characteristics provided to pull out this

6          shipment data.

7                  The purpose in this is that I am

8          specifically addressing these

9          characteristics in my comparison, and

10         that's why those were listed.

11     BY MR. KALLISH:

12     Q.    Okay.  Well, if you're looking at deposition

13     Exhibit 4, you'll see where the data that you

14     extracted is provided at the top of the first page of

15     this exhibit, and Central Freight attempted to locate

16     those same shipments using the date, the time, the

17     zip, the weight, the class, and the dollar amount,

18     and they couldn't find it in any of their data.

19             So, number one, that's just that either the

20     data was wrong, was misentered, or was somehow

21     purposefully being kept from our being able to

22     analyze it.

23             Do you have any -- do you know why they

24     couldn't find these numbers in, in their database?

25                  MR. BLOCK:  Object to the form;

Page 200

1        argumentative?

2    A.    I'm not certain.

3    Q.    Okay.  But since we couldn't find these exact

4    shipments, we did search for the same criteria that

5    you had.  And I'll call your attention to, in the

6    first box under the data points that you put forth in

7    your example, if you look, there's a shipment on

8    12/30/2015.

9             Again, we provide the pro number, which is

10   how you can track all of these shipments, and then we

11   have the destination zip of 90242 -- I'm sorry -- the

12   origination zip of 90242, the destination zip of

13   92551.  Those are the same origin and destination

14   zips of the examples that you provided; right?

15   A.    That is correct.

16   Q.    Okay.  And then you'll see in ours the weight

17   is 5202.  That's the same weight that you have in

18   your two examples, right, 5202.  Do you see that?

19   A.    That's correct.

20   Q.    Okay.  And you'll see that in our example the

21   price was 239.28, which matches the second data point

22   that you have there; right?

23   A.    That's correct.

24   But it doesn't match the other data point, which is

25   255.65.  Do you see that?

Page 201

1   A.    That is correct.

2   Q.    Okay.  But if you look at ours, the 239.28, the

3   $239.28 shipment on 12-30-215 that has a weight of

4   52.02 was nine pallets.  Do you see that?

5   A.    I do see that.

6   Q.    Okay.  If you look at a similar shipment with a

7   similar weight, class, origin, and destination that

8   has an invoice amount of $255.65, which would be

9   12-30-215, the one, two, three, four, fourth line.

10                  MR. BLOCK:  Did you say 12-32?

11                  MR. KALLISH:  12-30-215.

12                  MR. BLOCK:  Oh, 12-30 of 2015?

13                  MR. KALLISH:  Right.  If you look at

14             that on our data that's provided underneath

15             there.

16                  MR. BLOCK:  I understand.

17   BY MR. KALLISH:

18   Q.    You go across, and you see the base rate is

19   255.65, and, again it's, the same weight, same

20   origin, same destination, but interestingly, if you

21   look at the pallets, that was ten pallets, and so the

22   more expensive invoice rate contained ten pallets,

23   where the less expensive invoice rate only contained

24   nine pallets.

25                  So doesn't it appear that the reason for

Page 202

1   the discrepancy for these two shipments in price

2   seems to be directly related to pallet count, which

3   you never looked at and didn't consider when you made

4   your assumption that these billing rates were random?

5               MR. BLOCK:  Object to form.

6   A.    Again, the consideration of these shipments in

7   my report is based on the expectations of the LTL

8   industry, and, again, it is not defined by pallets.

9               You know, I question the number of pallets

10  over here.  Is it nine pallets non-stackable?  Is it

11  nine pallets total that could have been stackable in

12  my trailer?

13              And, again, I did not include pallets in

14  the consideration here because my LTL rates that are

15  run through the rating systems are not, not affected

16  by pallets but by weight and class, and the class

17  which is representative of density.

18  Q.    But wouldn't it make perfect sense after you

19  reviewed this data that's provided by us underneath

20  the data points that you provide that if you look at

21  when it's nine pallets, it's 239.28.

22              When it's 10 pallets, it's 255.65.  Doesn't

23  that totally rebut your suggestion that the numbers

24  are random and inconsistent, rather showing that by

25  pallet they are completely consistent?

Page 203

1          We have got one, two, three movements that

2     all have the same origin, destination, and weight,

3     and nine pallets, and they were all billed at the

4     same amount, versus a shipment that has the same

5     origin, destination, and weight but has ten pallets,

6     and that one is built at a slightly increased price,

7     doesn't that clearly rebut the argument that you

8     based off of your example number one?

9               MR. BLOCK:  Object to form.

10    A.    I don't agree.  This is slightly an

11    apples-to-oranges comparison, as, again, you're

12    talking about the results of your spot quote

13    application -- excuse me -- CFL spot quote rate

14    application, which is dependent on pallets.

15          Again, this is a comparison given LTL

16    industry knowledge and what rates are.  I'm making a

17    comparison that if these are rated as LTL shipments,

18    then there shouldn't be a difference here, because

19    pallets don't have an effect on these LTL shipment

20    rates.

21          It does in your spot quote.  So what we are

22    both saying here can be correct.  It doesn't

23    necessarily make this opinion incorrect.

24    Q.    If you look on page 20 under Example 1-A and

25    then numeral one, it says, If shipments are

Page 204

1   identical, then their bill charges should be

2   identical.

3          They were not.  That's false.  That's a

4   false statement because they have different pallet

5   sizes.  And under the Central Freight spot quoting

6   system, there's going to be a different price based

7   upon the number of pallets; wouldn't you agree?

8                  MR. BLOCK:  Object to form;

9          argumentative.

10  A.   It would need clarification that the

11  characteristics necessary to determine LTL rates are

12  identical.

13  Q.   Let's look at your other example under Example

14  1.  Here you've got a shipment 4-28-2016 at

15  6:32:55 p.m., with an origin of 91789, and a

16  destination zip of 92551.

17          You've got a weight of 50, 1502, you have

18  got a class of M(50), and you have got an invoice

19  charge of 312.

20          And then you have got another shipment at

21  4-28-2016 at 6:44, same origin, same zip code.  The

22  weight is 1,500, so two pounds lighter.  It has the

23  same freight code, freight class, and it has an

24  invoice charge amount of 383.81.

25          Isn't the reason why you included that

Page 205

1   example because you are showing basically identical

2   shipments at the same time, same weight, same origin,

3   destination, and yet they have different prices?

4              Isn't that the point you're trying to make,

5   that that suggests that the spot quotes are

6   inconsistent?

7   A.   It suggests that the spot quote results here

8   are not in alignment with what the rates would be for

9   an LTL shipment.

10  Q.   If you then look at the data that we provided

11  on Exhibit 4 underneath your example, if you look at

12  there was another shipment at 4:28 at 2-16, on 2-16,

13  that, again, has the same origin, same destination

14  and was billed $312, and it's weight was 6,400, and

15  it was for eight pallets; do you see that?  So that's

16  consistent with what you put down as an example.

17  A.   I'm sorry.  I don't -- where are you

18  referencing?

19  Q.   I'm looking at the second page of Exhibit 4.  I

20  can give you the pro number.  I can give you the

21  date, 4-28-2016.  It's about a quarter of the way

22  down.

23  A.   Uh-huh.

24              MR. BLOCK:  Twenty minutes or so,

25         Marc.

Page 206

1          MR. KALLISH:  Yeah.

2   BY MR. KALLISH:

3   Q.    Do you see that?  It says 4-28-2016, and again,

4   same origin, destination as your example, the same

5   price, and it's eight pallets.

6          And then if you look at the other shipments

7   that were 383.81, $383.81 that are similar to the

8   other example that you put in your second example,

9   where the weight is 1,500, that, those are $383.81

10  because they have nine pallets.

11          So, again, the difference between the two

12  shipments that you're highlighting is because of the

13  pallet count.  When there is eight pallets, the

14  amount is less than when there is nine pallets.  Do

15  you see that?

16          MR. BLOCK:  Object to form.

17  A.    I do understand the explanation of how the

18  application of the spot volume quote takes into

19  consideration the number of pallets.

20  Q.    And if you look at our second page, okay, so

21  you're going to see that starting at the top, going

22  all of the way down to almost just shy of half the

23  page, you'll find one, two, three, four, five, six,

24  seven, eight, nine, ten, eleven, twelve, thirteen,

25  fourteen, fifteen, sixteen, seventeen, eighteen,

Nicole Bolton 5/22/2019                              Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 207

1    nineteen, twenty, twenty shipments that are all

2    billed at $312, that all have eight pallets, that all

3    have similar weights, same origin and destination,

4    similar timing of shipments, and they are all

5    completely consistent.

6              And then if you move down, and you go down

7    to nine pallets, you will see that the price jumps.

8    Doesn't that completely rebut your theory that there

9    were inconsistencies based upon same day, same

10   shipments, same weight, same origin, destination;

11   isn't that totally throughout your entire opinion,

12   that Central Freight was using random or false

13   shipments?

14             MR. BLOCK:  Object to form.

15   A.   I did not give my opinion that it was random or

16   false.  What I am, again, comparing here is given the

17   factors of an LTL shipment, these would not be

18   consistent as an LTL shipment should be rated.

19   Q.   Wouldn't you agree that if you factor in pallet

20   count, that Central Freight's spot quotes are very

21   specific based upon the data in front of you in

22   Exhibit 4 --

23             MR. BLOCK:  Object to form.

24   Q.   -- where similar shipments are all billed at

25   the same rate if they have the same pallet count?

Page 208

```
 1            MR. BLOCK:  Object to form.
 2  A.     Because their spot quote rating application is
 3  dependent on the number of pallets, it appears in
 4  some of this example that I'm reviewing at the moment
 5  that there is consistency.
 6  Q.     So your opinion is wrong in your report?
 7  A.     It is not a direct comparison between the two.
 8  Q.     Would you agree that your opinion should have
 9  considered pallet count when you were looking at this
10  when you made the allegation that Central Freight's
11  spot quotes were random and unreasonable?
12            MR. BLOCK:  Object to form.
13  A.     I did not state that they were random or
14  unreasonable in this comparison, as it is compared to
15  what would be expected for an LTL shipment rating.
16  Q.     Well, your opinion was, From these inferences,
17  it is my expert opinion shipment data indicates that
18  there were inconsistencies in volumes spot quote
19  billing and that shipments were not billed in
20  alignment with what would be expected in LTL shipment
21  rating.
22  A.     Using LTL shipment rating is the key.
23  Q.     Okay.  But when you say if the shipments are
24  identical and their billed charges should be
25  identical, isn't that incorrect if you consider
```

Page 209

1   pallet count, based upon the way that Central Freight

2   was using its spot quote system?

3                    MR. BLOCK:  Object to form.

4   A.    It doesn't make it inaccurate because, again,

5   I'm basing this on the LTL shipment rating, which

6   does not involve pallets.

7   Q.    Okay.  In your example two you say, These

8   shipments had same origin, zip code, destination, zip

9   code, same ship date, same class but a large

10  difference in weight.  The lower the weight, the less

11  costly a shipment should be.  In these examples, they

12  were not.

13            So in these examples that are on page 21 of

14  your report, you are critical of the manner in which

15  Central Freight provided spot quotes for these

16  because you're saying that if there was lower weight,

17  there should be lower prices; right?

18  A.    As it is in the LTL industry rating.

19  Q.    But if you do it based upon the way that

20  Central Freight was working its spot quotes, you

21  would agree that if the pallet count is higher, even

22  though the weight is lower, it would be proper and

23  consistent for Central Freight to bill these

24  shipments at a higher rate because there are more

25  pallets in one shipment than the other?

Page 210

1          MR. BLOCK:  Object to form.

2    Q.    Do you understand the question?

3    A.    The logical answer, given that the mechanism

4    increases its charges by more pallets that it is

5    entered, the more pallets that are shipped, the

6    greater the cost will be.

7    Q.    So, then, your statement in, on page 21 of your

8    opinion says, The lower the weight, the less costly a

9    shipment should be, if you take into account the

10   manner in which Central Freight's spot quote system

11   worked, that statement is incorrect?

12          MR. BLOCK:  Object to form.

13   A.    Again, this is according to, in comparison to

14   LTL ratings.

15   Q.    That doesn't say that there.  It doesn't say

16   it's in comparison to LTL ratings.

17   A.    It's in the beginning.  It's in my opinion,

18   and, therefore, these examples below are examples of

19   my opinion.

20   Q.    You agree that if you take in the pallet

21   counts, all of your opinions that are associated with

22   Part B of your report are all wrong?

23          MR. BLOCK:  Object to form.

24   A.    Ask the question again.  I'm sorry.

25          MR. KALLISH:  Can you read it back?

Page 211

1      (Court reporter read back pending question.)

2              MR. KALLISH:  I'll ask it again.

3   BY MR. KALLISH:

4   Q.    Would you agree that all of the opinions that

5   are contained in your report from page 19 to 28, that

6   if you take pallet count into account are simply

7   wrong?

8              MR. BLOCK:  Object to form.

9   A.    Pallet count is not applicable in LTL ratings,

10  so it does not make my opinion inaccurate.

11  Q.    But doesn't Exhibit 4 rebut your statement that

12  there were inconsistencies in the manner in which

13  Central Freight billed for its same day, same origin,

14  same destination shipments?

15             MR. BLOCK:  Object to form.

16  A.    I'm sorry?

17             MR. KALLISH:  Can you read that one

18         back?

19      (The court reporter read back the question.)

20  BY MR. KALLISH:

21  Q.    So after reviewing Exhibit 4, would you agree

22  that your statement that Central Freight same day,

23  same origin, same destination, same weight shipments

24  were inconsistently billed because there was a price

25  variance between those shipments was wrong?

Page 212

1              MR. BLOCK:  Object to form.

2    A.    It was inconsistently billed within LTL rating

3    standards.

4    Q.    Okay.  But when you review the data on Exhibit

5    4, wouldn't you agree that Central Freight was

6    consistently billing the same rate for same

7    destination, same origin, same weight shipments that

8    had same pallet weights, pallet counts?

9              MR. BLOCK:  Object to form.

10   A.    In the examples on pages one and two that I

11   have quickly reviewed, it appears so, but I have not

12   reviewed all of that data.

13   Q.    Do you want to change your opinion that Central

14   Freight spot quote billing was inconsistent regarding

15   same day, same origin, same destination shipments?

16   A.    In regards to as compared to LTL shipment

17   rating, that's the key piece.

18   Q.    I don't understand.  What do you mean that's

19   the key piece?

20   A.    I'm stating in the LTL industry, given these

21   factors, which does not include pallet count, because

22   that is not, that does not affect the price in the

23   LTL rating, that the expectation would be given these

24   factors, the pricing should be similar or the same.

25   Q.    But knowing that Central Freight considered

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 213

1   pallet count when they did these calculations,

2   doesn't that change your opinion?

3                 MR. BLOCK:  Object to form.  You're

4             getting argumentative.  You've asked the

5             same thing ten times, Marc.

6                 MR. KALLISH:  Well, she is not

7             answering truthful.

8                 THE WITNESS:  I'm sorry.  I don't

9             appreciate that.  I'm trying my best.  I'm

10            afraid I'm not quite understanding your

11            question.

12  BY MR. KALLISH:

13  Q.   I mean, it's a simple question.  You said in

14  your report time after time, example after example,

15  that Central Freight provided random spot quotes

16  because for same destination, same origin, same

17  weight, same class shipments, they used different

18  prices, and you're saying that that was random and

19  inconsistent.

20            And Exhibit 4 shows you that it wasn't

21  random and inconsistent, because Central Freight uses

22  pallet count as a factor to determine pricing.

23            And based upon Exhibit 4, Exhibit 4 shows

24  that if you factor in pallet count that it was

25  extremely consistent.  Would you agree with that?

Page 214

1           MR. BLOCK:  Object to form.  This is

2           well into being argumentative, Marc, and

3           she -- I can't instruct her not to answer

4           but at some point I would not have a

5           problem if she said, "I have answered this

6           for the last time."

7                I would recommend that she answer this

8           and move on.  You've got about eight

9           minutes left here.

10    A.    I'm sorry.  I will attempt to answer this.

11    From the inferences, it is my expert opinion shipment

12    data indicates that these were, that there were

13    inconsistency in volume spot quote billing, and the

14    shipments were not billed in alignment with what

15    would be expected of LTL shipment ratings, so within

16    alignment of LTL shipment ratings, the

17    characteristics.

18    Q.    So the question is if you consider the way that

19    Central Freight spot quote system worked, would you

20    agree that these are consistent?

21           MR. BLOCK:  Object to form.  This is

22           outside the scope of her opinion.  She has

23           answered this question a dozen times.  She

24           hasn't fully analyzed what you're premising

25           your question on.

Page 215

1   Q.   Can you answer the question?

2   A.   I would choose not to answer the question at

3   this time.

4   Q.   So you are going to refuse to answer that

5   question?  So you have no opinion regarding that?

6   You won't give an opinion in the future on that?

7              MR. BLOCK:  Object to form.

8   A.   I didn't say that I can't.

9              MR. BLOCK:  She has answered your

10             question so many times, I don't blame her

11             for that.

12             MR. KALLISH:  I don't think she has.

13             MR. BLOCK:  She has.

14             MR. KALLISH:  I will ask it one more

15             time.

16   BY MR. KALLISH:

17   Q.   If you consider the manner in which Central

18   Freight billed spot quotes and took into account

19   pallet count, would you agree, based upon your review

20   of Exhibit 4, that they were consistent in the manner

21   in which they billed Amazon?

22             MR. BLOCK:  Given the repetitious and

23             argumentative nature of this question, I

24             would recommend that Ms. Bolton decline to

25             answer that question again.  I cannot

Page 216

1          instruct her not to, but I will state my

2          feelings.

3   A.    Considering the advice of Mr. Block, I ask that

4   we move past this question.

5   Q.    Okay.  So you are going to refuse to answer

6   that question?

7   A.    At this time I cannot offer an opinion beyond

8   what I have already stated.

9   Q.    All right.  If you don't have an opinion, you

10  don't have an opinion.

11          Moving on to the supplement that you

12  created.  What is the purpose of the supplement,

13  supplemental report?

14  A.    We were able to get the spot quote, volume spot

15  quote rating software functional for review.

16  Q.    And do you have criticisms of the manner in

17  which the spot quote system created pricing for

18  Amazon?

19  A.    That's a -- I'm sorry.  I'm not sure that I

20  understand the question.

21  Q.    Okay.  So what is the purpose of the

22  supplement?  What is your opinion in the supplement

23  regarding the spot quote systems of Central Freight?

24  A.    Would you like me to read the summary?

25  Q.    No, I can read the summary.  I'm asking for

Page 217

1   your understanding of what the opinions are, if you

2   have an understanding.

3   A.   So, one, there's a concern about hand entry

4   fields.  Again, as we've pointed out earlier, there

5   can be human error, and with hand entry there can be

6   mistyping.

7        There is manual data entry fields that

8   represent money that do not accept dollar signs or

9   commas, which can cause mistypings there.

10       Again, a major concern is that the actual

11  price for the shipment is in a hand entry field, and

12  the only parameters are that it cannot be less than

13  the minimum floor that it determines or greater than

14  a hundred thousand dollars.

15  Q.   Did you --

16       MR. BLOCK:  Five minutes, Marc.

17  BY MR. KALLISH:

18  Q.   Did you find any specific entries that you

19  believed were improperly entered?

20  A.   CFL did not provide the historical data table

21  for that to be analyzed.

22  Q.   Okay.  So your answer is you didn't find any

23  specifically?

24  A.   I cannot confirm either way, because I did not

25  have the data to review.

Page 218

1   Q.    Okay.  In your analysis and the work that you

2   did in this case, you hand entered all of the data

3   that you used; didn't you?

4   A.    That is correct.

5   Q.    So it's possible that all of your data is

6   inaccurate as well, just like you're accusing Central

7   Freight of being inaccurate?

8                     MR. BLOCK:  Object to form.

9   Q.    Is that right?

10  A.    There is a possibility.

11  Q.    Okay.  Let's move on to your second opinion.

12  What's your second opinion?

13  A.    There are per mile rates that are common for

14  linear foot charges or capacity load shipments,

15  which, again, can sometimes be interchanged in

16  carrier rules tariffs, but this is based on the miles

17  being traveled, again, origin to destination, those

18  type of lane things.

19          And so this system produces a static per

20  mile dependent only on a head haul or back haul lane.

21  You know, and given that they can go from California

22  to Florida, or California to California, that is not

23  consistent with what you would see in the industry.

24  Q.    How many other spot quote systems have you

25  analyzed in the manner in which you provided your

Page 219

1   opinions on our spot quote system, on the Central

2   Freight spot quote system?

3   A.    That is proprietary information to carriers

4   that they're not subject to provide to me, so I have

5   not analyzed any.

6   Q.    So this is the first time you have ever

7   analyzed the spot quote system?

8   A.    That's correct.

9   Q.    Have you ever built a spot quote system for the

10  purposes of rating freight?

11  A.    No, sir.

12  Q.    Do you have any -- have you ever taken any

13  courses or have any experience on the development of

14  spot quote systems?

15  A.    No, sir.

16  Q.    What's the basis of your understanding of the

17  Central Freight spot quote system?  Why do you think

18  you're an expert in spot quote systems?

19           MR. BLOCK:  Object to form.

20  A.    It's not necessarily about this system building

21  itself.  It's about the production of rates and the

22  application of charges that are produced, as I'm a

23  freight cost auditor.

24  Q.    Can you describe what your methodology is that

25  you used in order to analyze the Central Freight spot

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 220

1   quote systems?

2   A.    I used some sample data to start putting in the

3   key pieces to make the application work, and then as

4   this worked, code was pulled to determine what,

5   basically, the system is telling to produce in that

6   rate column.

7   Q.    And is there some audit manual or some document

8   or information that tells you that that's the proper

9   way to analyze the spot quote system to determine the

10  reasonableness of rates that are being put out?

11  A.    There is no such manual that exists to my

12  knowledge.

13  Q.    Okay.  So this is just something that you came

14  up with, in terms of how you were going to analyze

15  the spot quote system?

16  A.    Correct.

17  Q.    You never did it before?

18  A.    That's correct.

19  Q.    You never did it in the course of your job or

20  occupation with your current employer, or any other

21  employer; correct?

22  A.    I analyzed the rates that were produced, which

23  is what I do in my job description.

24  Q.    Okay.  But you never analyzed the spot quote

25  systems?

Page 221

1    A.    That's correct.

2    Q.    You mentioned --

3              MR. BLOCK:  It's --

4              MR. KALLISH:  This will be my last

5         question.

6              MR. BLOCK:   Okay.

7    BY MR. KALLISH:

8    Q.    You mentioned that there was certain

9    information that was missing from the spot quote

10   systems.  That was historical lane usage, et cetera;

11   is that right?

12   A.    There was a historical table where you could --

13   there was a tab that allowed you to look at

14   historically entered spot quotes.

15   Q.    Okay.  So what you were looking at is Central

16   Freight's current spot quote system; correct?

17   A.    Yes, sir.  They stated they could not provide a

18   previous version.

19   Q.    Would you agree -- this is my last question.

20   Would you agree that after Amazon terminated Central

21   Freight, that Central Freight's lane capacity, line

22   haul, back haul would have changed dramatically,

23   considering the volume of business that Central

24   Freight was doing for Amazon?

25             MR. BLOCK:  Object to form.

Page 222

1   A.    I cannot answer that.

2   Q.    You don't know one way or another whether the

3   termination of Central Freight by Amazon affected

4   significantly it's lane, back haul, head haul, and

5   all of that that would be considered in the spot

6   quote system?

7   A.    I'm not privy to that information.

8   Q.    And you don't know one way or another whether,

9   how different the spot quote system is today, the one

10  that you looked at versus the one that was used to

11  calculate the pricing here?

12  A.    Again, Central Freight said that they couldn't

13  provide a historical version, and, therefore, I

14  couldn't analyze it.

15              MR. KALLISH:  Okay.  That's all the

16        questions I have.

17              MR. BLOCK:  We will reserve signature.

18        (The deposition was concluded at 4:45 p.m.)

19

20

21

22

23

24

25

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 223

1                         WITNESS' SIGNATURE

2

3              I, NICOLE BOLTON, hereby certify that I

4    have thoroughly read the transcript of my deposition

5    taken on the 22nd day of May, 2019, and that said

6    transcript and corrections, if any, that appear on

7    the attached errata sheet, are a true and accurate

8    accounting of my testimony given on that day.

9    _____

10   WITNESS

11   _____

12   DATE

13

14   *******************************************************

15

     STATE OF        )
16                    )ss.
     COUNTY OF        )
17              SUBSCRIBED AND SWORN TO before me, a Notary

18   Public in and for the aforesaid county and state on

19   this, the ____ day of _____, 2019.

20

21                         _____

22                         Notary Public

23                         My Commission Expires:

24                         _____

25

Nicole Bolton 5/22/2019                                        Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 224

```
 1                          ERRATA SHEET

 2               If there are any corrections to your

 3     deposition, indicate them on this sheet of paper,

 4     giving the change, page number, line number, and

 5     reason for the change.

 6     The reasons for making changes are:

 7                    (1) To clarify the record;

 8                    (2) To conform to the facts; or

 9                    (3) To correct major transcription errors.

10     Page number ____Line Number____Reason for change_____

11     Change_____to_____

12     Page number ____Line Number____Reason for change_____

13     Change_____to_____

14     Page number ____Line Number____Reason for change_____

15     Change_____to_____

16     Page number ____Line Number____Reason for change_____

17     Change_____to_____

18     Page number ____Line Number____Reason for change_____

19     Change_____to_____

20     Page number ____Line Number____Reason for change_____

21     Change_____to_____

22     Page number ____Line Number____Reason for change_____

23     Change_____to_____

24                          _____

25                          SIGNATURE OF DEPONENT
```

Nicole Bolton 5/22/2019                                    Central Freight Lines, Inc. v. Amazon Fulfillment Services, et al

Page 225

1                    COURT REPORTER'S CERTIFICATE

2    STATE OF ARKANSAS)
                      )ss.
3    COUNTY OF SALINE )

4              I, JANESS FERGUSON SMITH, CCR, RPR, a

5    Notary Public in and for Saline County, Arkansas do

6    hereby certify that the facts stated by me in the

7    caption of the foregoing matter are true; and that

8    the foregoing matter was transcribed by me, to the

9    best of my ability and understanding, from my machine

10   shorthand notes taken at the time and place set out

11   in the caption hereto.

12             In accordance with Rule 30(e) of the Rules

13   of Civil Procedure, review of the transcript was

14   requested by the deponent or a party thereto.

15             I FURTHER CERTIFY that I am neither counsel

16   for, related to, nor employed by any of the parties

17   to the action in which this proceeding was taken;

18   and, further that I am not a relative or employee of

19   any attorney or counsel employed by the parties

20   hereto, not financially interested or otherwise, in

21   the outcome of this action.

22             GIVEN UNDER MY HAND AND SEAL OF OFFICE on
     this, the 22nd day of May, 2019.
23

24   _____
     JANESS FERGUSON SMITH, CCR, RPR
     Notary Public for Saline County
25         and Court Reporter.

Bushman Court Reporting              Janess Ferguson Smith                        501-372-5115

# EXHIBIT C

# FILED UNDER SEAL

# Exhibit D

HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CENTRAL FREIGHT LINES, INC., a Texas )
Corporation )
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　Plaintiff, )　NO. 2:17-CV-00814-JLR
　　　　　　　　　　　　　　　　　　　　)
　　v. 　　　　　　　　　　　　　　　　)　**DECLARATION OF DOUG**
　　　　　　　　　　　　　　　　　　　　)　**CULBERTSON**
AMAZON FULFILLMENT SERVICES, )
a Delaware corporation, and DOES 1 through )
25, inclusive, )
　　　　　　　　　　　　　Defendants. )
_____ )

I, Doug Culbertson, declare as follows:

　　1.　　I am over the age of eighteen, have personal knowledge of the matters attested to herein and am capable of testifying to them.

　　2.　　I am the Vice President of Pricing at Central Freight Lines, Inc. In my role, I have access to and am often called upon to review and interpret Central Freight's pricing and shipment data, both historical and current.

　　3.　　I reviewed the Expert Report of Ms. Nicole Bolton dated April 29, 2019.

　　4.　　In Part B of her Report, on pages 19-28, Ms. Bolton presents a number of Examples comparing "shipments that have the same origin zip code and the same destination zip

DECLARATION OF DOUG CULBERTSON
NO. 2:18-cv-00814-JLR

ROETZEL & ANDRESS LPA
30 N. LASALLE STREET SUITE 2800
CHICAGO, IL 60602
312.580.1200

1  code." (Report at p. 19.) I reviewed Ms. Bolton's Examples and the shipments that she identifies

2  in them.

3       5.     I then performed an analysis of shipments Central Freight transported from the

4  same origin zip codes to the same destination zip codes that Ms. Bolton identified. I included in

5  this analysis the number of pallet spaces each shipment occupied, which Ms. Bolton had omitted.

6  The results of my analysis, inserted into Ms. Bolton's analysis, are contained in Exhibit A hereto.

7       6.     When the number of pallets is included in the analysis, it is clear that Central

8  Freight charged consistently across shipments going from the same origin to the same destination

9  that had occupied the same amount of pallet spaces on a trailer.

10       7.     In her Example 1, Ms. Bolton asserts that shipments going from the zip code

11  90242 to the zip code 92551 that weigh the same should be priced the same. (Report at p. 20.)

12       8.     When I analyzed the same zip codes Ms. Bolton identified in Example 1, 90242 to

13  92551, but reviewed the pallet count of the shipments instead of the weight of the shipments, I

14  determined that all shipments going from 90242 to 92551 that are 9 pallets are priced at the same

15  rate (approximately $230). Moreover, all shipments to and from those zip codes that occupy 12

16  pallet spaces are priced at the same rate as each other (approximately $320) and at a higher rate

17  than those shipments that occupy only 9 pallet spaces.

18       9.     The consistency in price across shipments containing the same number of pallets

19  remains true for each of the examples Ms. Bolton offers.

20       10.     My analysis illustrates that Central Freight's spot quote program was not

21  inconsistent in rating shipments, but instead resulted in essentially identical billing for similar

22  shipments based on the number of pallet spaces the shipments occupied.

23       //

24       //

25       //

26

DECLARATION OF DOUG CULBERTSON
NO. 2:18-cv-00814-JLR-2

ROETZEL & ANDRESS LPA
30 N. LASALLE STREET SUITE 2800
CHICAGO, IL 60602
312.580.1200

1        I declare under penalty of perjury of the laws of the United States that the foregoing is

2    true and correct to the best of my knowledge, information and belief.

3        Executed on June ___25___ 2019

4

5    _____

6    Doug Culbertson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF DOUG CULBERTSON
NO. 2:18-cv-00814-JLR-3

ROETZEL & ANDRESS LPA
30 N. LASALLE STREET SUITE 2800
CHICAGO, IL 60602
312.580.1200

# Exhibit E



ROETZEL & ANDRESS, A LEGAL PROFESSIONAL ASSOCIATION

30 N. LaSalle St.
Suite 2800
Chicago, IL 60602
DIRECT DIAL 312.582.1604
PHONE 312.580.1200 FAX 312.637.3104
mkallish@ralaw.com

WWW.RALAW.COM

May 23, 2019

**VIA EMAIL**

Mr. Steven Block
Foster Pepper PLLC
1111 Third Avenue, Suite 3000
Seattle, WA 98101
Steve.block@foster.com

      Re:     Central Freight Lines, Inc. v. Amazon Fulfillment Services,
               Case No. 17-cv-0814 (W.D. Wash.)

Dear Steve,

      In response to our request for the complete file of Amazon's disclosed expert Nicole Bolton, Amazon produced only a limited number of hard copy documents. During yesterday's deposition of Ms. Bolton, it became readily apparent that Ms. Bolton considered a large volume of materials in forming her opinions, which were not produced, including electronic documents, emails and spreadsheets.

      We therefore request that Amazon supplement its production within seven days to include all the materials in Ms. Bolton's complete file. This includes, but is not limited to, the following materials identified by Ms. Bolton at yesterday's deposition:

- emails and spreadsheet(s) prepared by Amazon's counsel and provided to Ms. Bolton, which formed the base data from which Ms. Bolton conducted various analyses;

- various working spreadsheets which were the basis for analyses conducted by Ms. Bolton relating to purported industry average shipments;

- working papers and spreadsheets that provided support for certain of Ms. Bolton's analyses;

- multiple copies of her draft report containing edits made by her employer's CEO and COO;

- emails produced in this lawsuit that were provided to Ms. Bolton and which she reviewed;

- research materials and work papers relating to CFL's expert Michael Regan's Truckstop.com calculations; and

Steve.block@foster.com
Page 2

- emails sent to Ms. Bolton by Amazon's counsel containing information considered by Ms. Bolton in forming her opinions.

The above list is not exhaustive, and we expect that Amazon will supplement its production to include, as it is required to under the Federal Rules, all materials considered by Ms. Bolton in forming her opinions. Please confirm that these materials will be produced within the next seven days. Thank you.

Very truly yours,

ROETZEL & ANDRESS, LPA

Marc H. Kallish

cc: Christopher Rogers, Esq.

FOSTER PEPPER PLLC

| | |
|---|---|
| Direct Phone | (206) 447-7273 |
| Direct Facsimile | (206) 749-2109 |
| steve.block@foster.com | |

June 3, 2019

*Via E-Mail and U.S. Mail*

Marc H. Kallish
Julia L. Mohan
Roetzel & Andress, LPA
20 South Clark St. Ste., 300
Chicago, IL 60603

Re:     *Central Freight Lines, Inc. v. Amazon Fulfillment Services*
         W.D. Wash. Case No. 17-cv-0814

Dear Marc and Julia:

This letter responds to yours dated May 23, 2019 requesting certain materials from the files of Amazon's FRE 702 expert Niki Bolton. Most of what you request either is not discoverable under FRCP 26(2)(B) or does not exist. That rule enables you to obtain only the following expert witness file materials:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

You have received Ms. Bolton's complete opinions and bases for them per (i). Most of the facts and data required by (ii) are stated in her two reports. Virtually all exhibits per Ms. Bolton might refer to in her trial testimony (iii) has been produced in discovery and is apparent from her reports and deposition. Ms. Bolton's report and deposition revealed her qualifications and compensation per (iv) and (vi), but attached are a few documents that further demonstrate her qualifications. Lastly, Ms. Bolton explained to you she has never before testified as an expert witness per (v).

Marc H. Kallish
Julia L. Mohan
June 3, 2019
Page 2

During her deposition, you expressed particular interest in the spreadsheet of shipment and pricing data Ms. Bolton relied on. These were produced to you earlier at Bate Stamp page nos. AFS_CFL_00106512 through 00106512.

Ms. Bolton did communicate with third-party sources to obtain data addressing the LTL pricing market at times material. Copies of her communications also are attached.

We believe all other facts and data Ms. Bolton relied on were produced to you in discovery. Because her files are extensive, she will require several days to review them to be certain. If she finds any other emails or other materials that contain data or facts she relied on, we will produce them to you promptly.

Very truly yours,

Steven W. Block

Attachments



**ROETZEL**
ROETZEL & ANDRESS, A LEGAL PROFESSIONAL ASSOCIATION

30 N. LaSalle St.
Suite 2800
Chicago, IL 60602
DIRECT DIAL: 312.582.1604
PHONE 312.580.1200 FAX 312.637.3104
mkallish@ralaw.com

WWW.RALAW.COM

June 12, 2019

**VIA EMAIL**

Mr. Steven Block
Foster Pepper PLLC
1111 Third Avenue, Suite 3000
Seattle, WA 98101
Steve.block@foster.com

> Re:   Central Freight Lines, Inc. v. Amazon Fulfillment Services
>         Case No. 17-cv-0814 (W.D. Wash.)

Dear Steve,

I am writing regarding your letter dated June 3, 2019, in which you responded to my May 23, 2019 letter by producing certain supplemental materials from the files of Amazon's FRE 702 expert Niki Bolton. Thank you for the supplemental production, but it is still incomplete.

As Ms. Bolton testified at her deposition, her opinion regarding the reasonableness of CFL's Volume Rate is based on calculations she performed on a sample size of 1739 shipments. (Bolton Dep., 134:2-19.) For each of these 1739 line items, Ms. Bolton went through a series of calculations, including comparing the CzarLite 2011 cwt rate to a number of individual carriers' cwt rate and applying a percent increase to the carriers' cwt rate. (*Id.*, 142:17145:24; *see also* Bolton Report, pp. 11-13.) The spreadsheets detailing these calculations should have been produced as part of Ms. Bolton's mandatory disclosures, but to date have not been produced.

Federal Rule of Civil Procedure 26(a)(2)(B)(ii) requires the production of "the facts or data considered by the [expert] witness in forming" her opinions. Courts have read the term "considered" to include information that an expert "reviews **or generates**." *Apple Inc. v. Amazon.com, Inc.*, No. 11-1327, 2013 WL 1320760, at *1 (N.D. Cal. Apr. 1, 2013) (emphasis added). It is unquestionable that Ms. Bolton "considered" these calculations in forming her opinions – in fact, they formed the basis for opinions one and two of her report.

We therefore request that you produce the spreadsheets detailing this data within five (5) business days. Should you refuse to do so, we will assume that Ms. Bolton will not be relying on the information on the spreadsheets and therefore her opinions in sections one and two of her report will be considered moot. We will also seek to bar Ms. Bolton's opinions, to the extent they are based on this data, pursuant to Fed. R. Civ. P. 37(c). In relevant part, Fed. R. Civ. P.

Practical Advice. Real Solutions.
That's the Roetzel way.

**ralaw.com**

13919405 _1

Steven Block
Page 2

37(c)(1) states that if a party fails to provide information required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *See also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed."). Here, there is no justification for Ms. Bolton's failure to produce these materials. Ms. Bolton's report contains only her conclusions, but not the underlying data or calculations that she admittedly has in his possession. Without this information, neither my client nor the Court will be able to assess the basis and reasons for her opinions.

      Please confirm that this data will be produced within the next five days. Thank you.

Very truly yours,

ROETZEL & ANDRESS, LPA

*Marc H. Kallish*

Marc H. Kallish

MHK

Marc H. Kallish

cc: Christopher Rodgers (christopher.rogers@foster.com)

13919405 _1

## Wills, Garry

| | |
|---|---|
| **From:** | Wills, Garry |
| **Sent:** | Thursday, June 20, 2019 3:37 PM |
| **To:** | steve.block@foster.com; christopher.rogers@foster.com |
| **Cc:** | MKallish@ralaw.com; JMohan@ralaw.com |
| **Subject:** | CFL v. Amazon |

Large File Send
Sent Files

Powered by mimecast

You shared files with
steve.block@foster.com  christopher.rogers@foster.com  MKallish@ralaw.com  JMohan@ralaw.com

File(s):

PRODUCTION PDFS.zip

Steve,

Attached is a link to CFL's supplemental production of financial statements and tax returns, all of which are designated as highly confidential – attorneys' eyes only. Please let us know when you will be producing the spreadsheet(s) showing Ms. Bolton's underlying calculations. Thank you.

Garry

Garry L. Wills, Counsel
ROETZEL
30 N. LaSalle St.
Suite 2800
Chicago, IL  60602
Direct Phone No.:  312.582.1687
Telephone:  312.580.1200
Facsimile:  312.580.1201
Email:  GWills@ralaw.com
www.ralaw.com

*Both Garry L. Wills and Roetzel & Andress intend that this message be used exclusively by the addressee(s).  This message may contain information that is privileged, confidential and exempt from disclosure under applicable law.  Unauthorized disclosure or use of this information is strictly prohibited.  If you have received this communication in error, please permanently dispose of the original message and notify Garry L. Wills  immediately at (312) 582-1687.  Thank you.*